1  KARIN G. PAGNANELLI (SBN 174763)
   kgp@msk.com
2  MARC E. MAYER (SBN 190969)
   mem@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
4  Los Angeles, California 90064-1683
   Telephone:   (310) 312-2000
5  Facsimile:   (310) 312-3100

6  GREGORY O. OLANIRAN (*pro hac vice*)
   LUCY HOLMES PLOVNICK (*pro hac vice*)
7  STINSON MORRISON HECKER LLP
   1150 18th Street NW, Suite 800
8  Washington, D.C. 20036-3816
   Telephone:  (202) 785-9100
9  Facsimile:   (202) 785-9163

10 Attorneys for Defendant
   MOTION PICTURE ASSOCIATION OF
11 AMERICA, INC.

12                  UNITED STATES DISTRICT COURT

13                 CENTRAL DISTRICT OF CALIFORNIA

14

15 WORLDWIDE SUBSIDY GROUP,            CASE NO.  CV08-3701 FMC (MANx)
   LLC, a Texas Limited Liability
16 Company, dba INDEPENDENT            The Honorable Florence-Marie Cooper
   PRODUCERS GROUP; WORLDWIDE
17 SUBSIDY GROUP, LLC, a California
   Limited Liability Company, formerly  **REQUEST FOR JUDICIAL NOTICE**
18 named ARTIST COLLECTIONS           **IN SUPPORT OF DEFENDANT**
   GROUP, LLC,                         **MOTION PICTURE ASSOCIATION**
                                       **OF AMERICA, INC.'S (1) MOTION**
19              Plaintiffs,            **TO DISMISS, AND (2) MOTION TO**
                                       **TRANSFER**
20        v.

21 MOTION PICTURE ASSOCIATION
   OF AMERICA, INC., a New York        DATE:     July 14, 2008
22 Corporation doing business in       TIME:     10:00 A.M.
   California; and DOES 1 through 10,   CTRM.:   750 Roybal Federal Building
23 inclusive,

24              Defendants.

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

1867886.1

1    Pursuant to Federal Rule of Evidence, Rule 201, Defendant Motion Picture

2  Association of America, Inc. ("MPAA"), requests that this Court take judicial

3  notice of the following documents:

4    1.    Attached hereto as Exhibit A is a true and correct copy of the

5  Recommendation and Order issued by the United States Librarian of Congress

6  ("Librarian") in <u>In the Matter of Distribution of the 1993, 1994, 1995, 1996, and</u>

7  <u>1997 Cable Royalty Funds</u>, Docket No. 2000-2 CARP CD 93-97 (April 2, 2004).

8    2.    Attached hereto as Exhibit B is a true and correct copy of the Order

9  issued by the United States Court of Appeals for the District of Columbia Circuit

10  ("D.C. Circuit") in Case Nos. 02-1033 and 02-1040 (Consolidated) (April 21,

11  2004).

12    3.    Attached hereto as Exhibit C is a true and correct copy of the

13  Distribution Order issued by the United States Register of Copyrights ("Register")

14  in <u>In the Matter of Distribution of the 1993, 1994, 1995, 1996, and 1997 Cable</u>

15  <u>Royalty Funds</u>, Docket No. 2000-2 CARP CD 93-97 (June 28, 2004).

16    4.    Attached hereto as Exhibit D is a true and correct copy of the Order

17  issued by the Register in <u>In the Matter of Distribution of the 1996-1998 Satellite</u>

18  <u>Royalty Fund</u>, Docket No. 2000-7 CARP SD 96-98 (August 8, 2005).

19    5.    Attached hereto as Exhibit E is a true and correct copy of the

20  Distribution Order issued by the Register in <u>In the Matter of Distribution of the</u>

21  <u>1996-1998 Satellite Royalty Fund</u>, Docket No. 2000-7 CARP SD 96-98 (January

22  12, 2006).

23    6.    Attached hereto as Exhibit F is a true and correct copy of the Order

24  issued by the Register in <u>In the Matter of the Distribution of the 1998-2002 Cable</u>

25  <u>Royalty Funds and Distribution of the 1999-2000 Satellite Royalty Funds</u>, Docket

26  Nos. 2001-8 CARP CD 98-99, <u>et al.</u> (February 8, 2006).

27    7.    Attached hereto as Exhibit G is a true and correct copy of the Order

28  issued by the Register in <u>In the Matter of the Distribution of the 1998-2002 Cable</u>

Mitchell
Silberberg &
Knupp LLP

1867886.1

1

<u>Royalty Funds and Distribution of the 1999-2000 Satellite Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99, <u>et al.</u> (June 26, 2006).

8.    Attached hereto as Exhibit H is a true and correct copy of the Order issued by the Register in <u>In the Matter of the Distribution of the 1998-2002 Cable Royalty Funds and Distribution of the 1996-2000 Satellite Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99, <u>et al.</u> (April 3, 2007).

9.    Attached hereto as Exhibit I is a true and correct copy of the Order issued by the Register in <u>In the Matter of the Distribution of the 1998-2002 Cable Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99, <u>et al.</u> (April 3, 2007).

10.    Attached hereto as Exhibit J is a true and correct copy of the Clarification Order issued by the Register in <u>In the Matter of the Distribution of the 1998-2002 Cable Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99, <u>et al.</u> (April 6, 2007).

11.    Attached hereto as Exhibit K is a true and correct copy of the Order issued by the Register in <u>In the Matter of the Distribution of the 1998-2002 Cable Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99, <u>et al.</u> (April 10, 2007).

12.    Attached hereto as Exhibit L is a true and correct copy of the Order issued by the Register in <u>In the Matter of the Distribution of the 1998-1999 Cable Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99 (May 24, 2007).

13.    Attached hereto as Exhibit M is a true and correct copy of the Acknowledgement of Reallocation of 1998 Cable Royalty Funds issued by the Register in <u>In the Matter of the Distribution of the 1998-1999 Cable Royalty Funds</u>, Docket Nos. 2001-8 CARP CD 98-99 (July 11, 2007).

14.    Attached hereto as Exhibit N is a true and correct copy of the Plea Agreement in <u>United States v. Raul C. Galaz</u>, D.D.C. Criminal Docket No. 02-230 (dated May 29, 2002).

Mitchell
Silberberg &
Knupp LLP

1867886.1

2

1        15.   Attached hereto as Exhibit O is a true and correct copy of the

2   Information in <u>United States v. Raul C. Galaz,</u> D.D.C. Criminal Docket No. 02-230

3   (dated May 29, 2002).

4        16.   Attached hereto as Exhibit P is a true and correct copy of the

5   Judgment in <u>United States v. Raul C. Galaz,</u> D.D.C. Criminal Docket No. 02-230

6   (dated December 23, 2002).

7        17.   Attached hereto as Exhibit Q is a true and correct copy of the

8   Complaint filed in <u>Galaz, et al. v. Bogert,</u> Los Angeles Superior Court Case No.

9   SC091734 (dated November 9, 2006).

10       18.   Attached hereto as Exhibit R is a true and correct copy of the Demand

11  for Damages filed in <u>Galaz, et al. v. Bogert,</u> Los Angeles Superior Court Case No.

12  SC091734 (dated February 6, 2007).

13       19.   Attached hereto as Exhibit S is a true and correct copy of the Civil

14  Case Summary in <u>Galaz, et al. v. Bogert,</u> Los Angeles Superior Court Case No.

15  SC091734 (downloaded June 9, 2008), https://www.lasuperiorcourt.org/civilcase

16  summary/Casesummary.asp?referer=index.

17

18       Good cause exists for the Court to grant this Request for Judicial Notice.

19  Fed. R. Evid. 201(b)(2) provides that "a judicially noticed fact must be one not

20  subject to reasonable dispute in that it is…capable of accurate and ready

21  determination by resort to sources whose accuracy cannot reasonably be

22  questioned."  Courts routinely and uniformly take judicial notice of legal briefs and

23  memoranda publicly filed in other cases.  <u>See</u> <u>Holder v. Holder</u>, 305 F.3d 854, 866

24  (9th Cir. 2002) (judicial notice of state court of appeal opinion and briefs); <u>MGIC</u>

25  <u>Indem. Corp. v. Weisman</u>, 803 F.2d 500, 504 (9th Cir. 1986) (judicial notice of

26  motion to dismiss filed in another case; "we may take judicial notice of matters of

27  public record outside the pleadings"); <u>Egan v. Teets</u>, 251 F.2d 571, 578-79 (9th

28  Cir. 1957) (judicial notice of "record in the prior district court proceedings").

Mitchell
Silberberg &
Knupp LLP
1867886.1

1    Also, courts routinely take judicial notice of information made available on a

2    government website.  See Benhabib v. Hughes Electronics Corp., No. CV 04-0095

3    CAS, 2007 WL 4144940, at *3, n.2 (C.D. Cal. 2007) (judicial notice of SEC-10K

4    forms "available to the Court through the official SEC website"); Deirmenjian v.

5    Deutsche Bank, A.G., No. CV 06-00774 MMM, 2006 WL 4749756, at *16, n.101

6    (C.D.Cal. 2006) (judicial notice of federal court management statistics, "found on

7    the U.S. Courts website").  Moreover, courts have repeatedly found documents on

8    file with the United States Copyright Office to be the proper subjects for judicial

9    notice.  See Warren v. Fox Family Worldwide, Inc., 171 F. Supp. 2d 1057, 1062

10   (C.D.Cal. 2001) (judicial notice of copyright registration certificate); Island

11   Software and Computer Service, Inc. v. Microsoft Corp., 413 F.3d 257, 261 (2d

12   Cir. 2005) (judicial notice of copyright registrations).

13        Exhibits A-M (collectively, "Orders") are Orders issued by the Office and

14   the D.C. Circuit.   Exhibits N-R (collectively, "Pleadings") are public court filings

15   in the District of Columbia District Court and the Los Angeles Superior Court.

16   Exhibit S is a Civil Case Summary obtained from the Los Angeles Superior

17   Court's website. These are documents whose contents are "capable of ready

18   determination by resort to sources whose accuracy cannot reasonably be

19   questioned," Fed. R. Evid. 201(b)(2), and properly are the subject of judicial

20   notice.

21        MPAA, thus, respectfully requests that this Court take judicial notice of the

22   Orders, Pleadings, and the Civil Case Summary, attached hereto as Exhibits A–S.

23

24

25

26

27

28

1    DATED: June 13, 2008                  GREGORY O. OLANIRAN
                                           LUCY HOLMES PLOVNICK
2                                          STINSON MORRISON HECKER LLP

3                                          KARIN G. PAGNANELLI
4                                          MARC E. MAYER
                                           MITCHELL SILBERBERG & KNUPP LLP
5

6                                          By: _____/S/ Marc E. Mayer_____
7                                              MARC E. MAYER
                                               Attorneys for Defendant
8                                              MOTION PICTURE ASSOCIATION
                                               OF AMERICA, INC.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Mitchell
Silberberg &   28
Knupp LLP

1867886.1

5

# EXHIBIT A

Exhibit    A

Page    4



**Copyright Arbitration Royalty Panels · United States Copyright Office**
Library of Congress · P.O. Box 70977, Southwest Station · Washington, D.C. 20024
TEL (202) 707-8380 · FAX (202) 252-3423 · www.copyright.gov

4-2-04

In the Matter of           }

Distribution of the 1993, 1994, 1995,   }    Docket No. 2000-2 CARP CD 93-97
1996 and 1997 Cable Royalty Funds   }

## RECOMMENDATION AND ORDER

On December 26, 2001, the Library published an Order announcing the Librarian of Congress's decision to reject the initial and revised reports of the Copyright Arbitration Royalty Panel ("CARP") in this Phase II proceeding in the syndicated programming category for distribution of the 1997 cable royalty funds. The Order identified a number of flaws in the cases presented by both IPG and MPAA and in the determination made by the Copyright Arbitration Royalty Panel ("CARP"), and concluded that a distribution of royalties could not be made based on the current record. Accordingly, the Librarian remanded the matter for a new proceeding before a new CARP. Order, 66 FR 66433 (Dec. 26, 2001).

Both parties, Independent Producers Group ("IPG") and The Motion Picture Association of America, Inc. ("MPAA") petitioned the United States Court of Appeals for the District of Columbia Circuit to review the Librarian's determination. Motion Picture Association of America v. Librarian of Congress, No. 02-1033; Independent Producers Group v. Librarian of Congress, 02-1040.

The parties have now settled this dispute, making a remand for new proceedings unnecessary and making it possible to distribute the remaining funds that were in dispute. As part of the settlement, it has been agreed that the December 26, 2001 Order shall be vacated.

Because the parties have settled their dispute, and therefore there is no reason to remand the matter for further proceedings before a new CARP, the Register recommends that the December 26, 2001 Order be vacated as moot. Further, in light of the flaws in the determination made by the CARP as identified in the December 26, 2001 Order, the CARP's initial and final determinations should also be vacated, to make clear that those determinations have no precedential value. The recommendation that the December 26, 2001 Order be vacated is made in order to facilitate the settlement and because the matter is now moot; this recommendation should not be construed as a repudiation of the reasoning in the December 26, 2001 Recommendation and Order.

**Order of the Librarian**

Having duly considered the recommendation of the Register of Copyrights the Librarian accepts the recommendation in its entirety and orders that the December 26, 2001 Order, the April 16, 2001 initial Report of the CARP, and the June 20, 2001 revised Report of the CARP are hereby VACATED as moot.

Dated: April 2, 2004

Marybeth Peters,
Register of Copyrights.

Approved by:

James H. Billington,
Librarian of Congress.

# EXHIBIT B

Exhibit B

Page 8

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

**No. 02-1033**                                   **September Term, 2003**

                                        **Filed On: April 21, 2004** [817492]

Motion Picture Association of America, Inc.,
Represented Program Suppliers,
              Petitioner

              v.

Register of Copyrights and Librarian of Congress,
              Respondents

———————————————————————

Independent Producers Group, et al.,
              Intervenors

———————————————————————

Consolidated with 02-1040

### O R D E R

      Upon consideration of the joint motion to dismiss petitions for review, it is

      **ORDERED** that the motion be granted, and these cases are hereby dismissed.

      The Clerk is directed to transmit forthwith to the Register of Copyrights and the
Librarian of Congress a certified copy of this order in lieu of formal mandate.

                                        **FOR THE COURT:**
                                        Mark J. Langer, Clerk

              BY:
                                        Nancy G. Dunn
                                        Deputy Clerk

# EXHIBIT C

Exhibit C

Page 10

**Copyright Arbitration Royalty Panels · United States Copyright Office**
Library of Congress · P.O. Box 70977, Southwest Station · Washington, D.C. 20024
TEL (202) 707-8380 · FAX (202) 252-3423 · www.copyright.gov

*6-28-04*

| | |
|---|---|
| In the Matter of | } |
| | } |
| **Distribution of 1993, 1994, 1995, 1996** | } |
| **and 1997 Cable Royalty Funds** | } |
| | } |

**Docket No. 2000-2 CARP CD 93-97**

## DISTRIBUTION ORDER

On May 13, 2004, the Motion Picture Association of America, Inc. ("MPAA") filed a motion for full distribution of the remainder of the cable royalty funds in the above-captioned proceeding.[1]  The sole remaining controversy in this proceeding had been in the Program Suppliers category and was between MPAA and Independent Producers Group ("IPG"). The matter was fully considered by a Copyright Arbitration Royalty Panel ("CARP"); and on December 26, 2001, the Librarian of Congress issued a final determination in this matter, rejecting the CARP's resolution of the outstanding controversies.  66 FR 66433 (December 26, 2001).  Shortly thereafter, MPAA and IPG appealed the Librarian's decision to the United States Court of Appeals for the District of Columbia Circuit.

During the pendency of the appeal, MPAA and IPG reached a settlement regarding the distribution of the contested 1997 cable royalty fees.  As a result of this settlement, on April 21, 2003, the United States Court of Appeals for the District of Columbia Circuit dismissed both appeals; one week later, IPG filed a notice with the Copyright Office withdrawing its Notice of Intent to Participate in this proceeding; and the Librarian of Congress vacated his Order of December 26, 2001.  See 69 FR 23821 (April 30, 2004).  In light of these actions resolving the final controversy, the Register determines that it is appropriate to make a final distribution of the funds remaining in the 1997 cable royalty fund which have been withheld to settle the MPAA/IPG claim.

Wherefore, **IT IS ORDERED** that MPAA's motion for a full distribution of Program Suppliers' remaining share of the 1997 cable royalty fees **IS GRANTED**.  These funds shall be distributed on or after July 8, 2004, provided that MPAA supplies all pertinent information to effect the transfer of the funds to the Licensing Division of the Copyright Office no later than July 2, 2004.

**SO ORDERED.**

*Marybeth Peters*
Marybeth Peters,
Register of Copyrights.

**DATED:** June 28, 2004

---

[1]  The Copyright Office has made three previous partial distributions of the 1997 cable royalty fees.  See Order, Docket No. 99-5 CARP CD 97 (October 18, 1999) (authorizing distribution of all but 25% of these fees to a common agent for the Copyright Owners); Order, Docket No. 2000-2 CARP CD 93-97 (May 8, 2000) (authorizing a further distribution of $35 million from the 1997 cable royalty fund to a common agent for the Copyright Owners); and Order, Docket No. 2000-2 CARP CD 93-97 (May 29, 2001) (authorizing a third distribution in light of a settlement among the Music Claimants).

Exhibit C
Page 11

# EXHIBIT D

Exhibit D

Page 12



**Copyright Arbitration Royalty Panels · United States Copyright Office**
Library of Congress · P.O. Box 70977, Southwest Station · Washington, D.C. 20024
TEL (202) 707-8380 · FAX (202) 252-3423 · www.copyright.gov

8-8-05

In the Matter of                                    }
                                                    }
                                                    }
Distribution of the 1996-1998                       }    Docket No. 2000-7 CARP SD 96-98
Satellite Royalty Fund                              }
                                                    }
                                                    }

## ORDER

Currently, the Copyright Office is in the midst of reviewing its open distribution proceedings to determine which, if any, can be settled fully and distributions of remaining monies made. To that end, the Office is requesting an update on the status of any of the outstanding controversies set forth below.

**Background**

On December 15, 2000, representatives of the claimant categories in this proceeding–the Broadcaster Claimants Group, the Music Claimants, the Public Television Claimants, the Devotional Claimants, Joint Sports Claimants and Program Suppliers–filed with the Copyright Office a Stipulation of Partial Settlement of Phase I Claims and Joint Motion for Partial Distribution of Satellite Carrier Compulsory License Royalty Fees advising the Office that they had reached complete settlement of all Phase I controversies with regard to the 1996 and 1997 satellite royalty fees and a partial settlement of Phase I controversies with regard to the 1998 satellite royalties. Specifically, the Broadcaster Claimants Group, the Music Claimants, the Public Television Claimants, and the Devotional Claimants (the "Small Claimants Group") collectively would receive 15.5% of the 1996, 1997, and 1998 royalties while the Joint Sport Claimants and Program Suppliers would receive the remaining 84.5% of the 1996, 1997, and 1998 royalties. On February 21, 2001, the Office granted the motion but withheld funds from each year to cover outstanding Phase I and Phase II controversies.[1] See Amended Distribution Order in Docket No. 2000-7 CARP SD 96-98 (February 21, 2001).

Since that time, the Small Claimants Group have settled all of their Phase II controversies, and the Office has made a full distribution of their 15.5% share to the 1996, 1997, and 1998 satellite royalty fees. See Orders in Docket No. 2000-7 CARP SD 96-98 (January 28, 2002, and July 10, 2002).

On October 17, 2002, the Joint Sports Claimants and Program Suppliers filed with the Office a stipulation of settlement of their Phase I controversy and joint motion for a further distribution of their jointly held 84.5% share of the 1998 satellite royalty fees less an amount to satisfy the outstanding controversies in the Program Suppliers category. On July 29, 2003, the Office directed all parties with outstanding Phase II controversies in the Program Suppliers category to provide information regarding the continued existence and extent of such controversies. See Order in Docket No. 2000-7 CARP SD 96-98 (July 29, 2003). The parties informed the Office of two outstanding controversies: one between Program Suppliers and

---

[1] Previously, the Office granted the parties' joint motion for a partial distribution of 75% of each of the 1996, 1997, and 1998 satellite royalty funds. See Order in Docket No. 2000-7 CARP SD 96-98 (October 12, 2000).

Exhibit D
Page 13

Hearst-Argyle Television Production, Inc. ("Hearst") and the other between Program Suppliers and Independent Producers Group ("IPG"). Hearst estimated the value of its claim at less than $250,000; IPG estimated the value of its claim as between $4-6 million. Based on this information, the Office distributed all but $9,000,000 of Program Suppliers' and Joint Sports Claimants' jointly held 84.5% share of the 1998 satellite royalties. See Order in Docket No. 2000-7 CARP SD 96-98 (September 11, 2003).

Subsequently, the Librarian of Congress convened a Copyright Arbitration Royalty Panel ("CARP") proceeding to resolve a Phase II controversy between Program Suppliers and IPG regarding the 1997 cable royalty funds. Each side appealed the decision of the Librarian of Congress in this proceeding to the United States Court of Appeals for the District of Columbia Circuit. *Motion Picture Association of America v. Librarian of Congress*, No. 02-1033; *Independent Producers Group v. Librarian of Congress*, No. 02-1040. However, the parties settled their dispute, and the appeals were dismissed by the Court of Appeals on April 21, 2004. Subsequently, on May 10, 2004, apparently as a result of the settlement agreement, IPG withdrew its Notice of Intent to Participate in this proceeding.

**Remaining Phase II Controversies**

The Office's records indicate that the following Phase II controversies still remain in the Program Suppliers category for all three years: For each of the fund years 1996 and 1997, a Phase II controversy exists between Program Suppliers and certain broadcast station claimants. For fund year 1998, a Phase II controversy between Program Suppliers and Hearst.

**Status of Phase II Controversies**

In an effort to ascertain whether any or all of the remaining funds to the 1996, 1997, and 1998 satellite royalty fees can be distributed, the Office seeks information from the parties on the current number and extent of the remaining Phase II controversies within the Program Suppliers category.

Wherefore, **IT IS ORDERED** that all parties with outstanding Phase II controversies in the Program Suppliers category for the years 1996, 1997, and 1998 notify the Copyright Office of the continued existence and the extent of such controversies no later than September 6, 2005.

SO ORDERED.

Marybeth Peters,
Register of Copyrights.

BY:    *Tanya M. Sandros*
Tanya M. Sandros,
Associate General Counsel.

**DATED:** August 8, 2005

Exhibit D
Page 14

# EXHIBIT E

Exhibit E

Page 15

Copyright Arbitr    a Royalty Panels · United States Copyright Office
Library of Congress · P.O. Box 70977, Southwest Station · Washington, D.C. 20024
TEL (202) 707-8380 · FAX (202) 252-3423 · www.copyright.gov

*1-12-06*

In the Matter of                                          }
                                                         }
**Distribution of the 1996-1998**                        }
**Satellite Royalty Fund**                               }    Docket No. 2000-7 CARP SD 96-98
                                                         }
                                                         }

## DISTRIBUTION ORDER

On August 8, 2005, the Copyright Office issued an order requesting an update on the status of outstanding Phase II controversies in the Program Suppliers category regarding satellite royalty fees for the years 1996, 1997, and 1998 in an effort to ascertain whether any or all of these remaining funds could be distributed. According to the Office's records, a Phase II controversy existed between Program Suppliers and certain broadcast station claimants for each of the fund years 1996 and 1997; and a Phase II controversy existed between Program Suppliers and Hearst-Argyle Television Production, Inc. ("Hearst-Argyle") for fund year 1998. In response to this Order, Program Suppliers and the Broadcaster Claimants filed separate comments stating that while no controversies remained as to the 1996 and 1997 satellite royalty funds a single controversy still existed between Program Suppliers and Hearst-Argyle with respect to the 1998 funds. However, the parties did not provide any new information on the extent of the remaining controversy regarding the 1998 funds nor did they file a formal notice of settlement or a motion requesting distribution of the 1996 and 1997 funds.

Consequently, on September 20, 2005, the Office issued an Order setting a negotiation period to resolve the outstanding Phase II controversy with respect to the 1998 satellite royalty funds. In addition, the Office set a deadline for the parties to file comments on the remaining controversy regarding the 1998 funds and/or to file any notices of settlement and motions seeking a distribution of the 1996, 1997, and/or 1998 satellite royalty funds.

In response to its September 20 Order, the Office received from Program Suppliers a motion for final distribution of the 1996 and 1997 satellite royalties as well as a joint notice from Program Suppliers and Hearst-Argyle that they reached a settlement of all outstanding Phase II controversies.[1] In light of their settlement, they moved for a final distribution of the 1998 satellite royalties, requesting that distribution be made to the Motion Picture Association of America, Inc. ("MPAA") as a common agent for both the MPAA-represented Program Suppliers and Hearst-Argyle.

Both motions are unopposed.

---

[1] The Office also received separate comments from the Devotional Claimants and HSN, LP, Home Shopping En Espangol GP and AST LLC, jointly, confirming that they had resolved all controversies with respect to all three years.

## Discussion

Section 119(b)(4)(C) of the Copyright Act, title 17 of the United States Code, as it was in effect prior to May 31, 2005,[2] authorizes the Librarian of Congress to distribute royalty fees to the copyright owners entitled to receive them, after deducting reasonable administrative costs, upon making a determination that no controversy exists in regard to the distribution of the funds. Because all known controversies for the years 1996, 1997, and 1998 concerning the funds allocated to the Program Suppliers' category have now been settled and no party has opposed either motion for distribution of these funds, the Register determines that it is appropriate to make a final distribution of the 1996, 1997, and 1998 satellite royalty fees.

## Determination

Wherefore, **IT IS ORDERED** that the motions for a final distribution of the 1996, 1997, and 1998 satellite royalty fees are hereby **GRANTED**. The 1996, 1997, and 1998 satellite royalty fees are to be distributed to the MPAA as a common agent. A full and final distribution of these funds shall be distributed on or after January 26, 2006, provided that the Copyright Office receives all pertinent information to effect the transfer of funds no later than 7 days before the day of distribution.

**SO ORDERED.**

Marybeth Peters,
Register of Copyrights.

**DATED:** January 12, 2006

---

[2] The Copyright Royalty and Distribution Reform Act of 2004 ("CRDRA"), which became effective on May 31, 2005, replaces the Copyright Arbitration Royalty Panels ("CARPs") with a new system for making distribution of satellite royalty fees. However, section 6(b)(1) of the CRDRA allows proceedings initiated prior to the date of the CRDRA's enactment, November 30, 2004, to continue under the jurisdiction of the Library of Congress until such time as they are terminated by the Librarian. Since this proceeding commenced prior to November 30, 2004, and has not been terminated by the Librarian, the Library retains jurisdiction over this proceeding.

Exhibit E
Page 17

# EXHIBIT F

Exhibit F

Page 18



Copyright Arbitration Royalty Panels · United States Copyright Office
Library of Congress · P.O. Box 70977, Southwest Station · Washington, D.C. 20024
TEL (202) 707-8380 · FAX (202) 252-3423 · www.copyright.gov

2·8·06

| | | |
|---|---|---|
| In the Matter of | } | |
| | } | |
| Distribution of the 1998-2002 Cable | } Docket Nos. | 2001-8 CARP CD 98-99 |
| Royalty Funds | } | 2002-8 CARP CD 2000 |
| | } | 2003-2 CARP CD 2001 |
| and | } | 2004-5 CARP CD 2002 |
| | } | |
| Distribution of the 1999-2000 Satellite | } Docket Nos. | 2001-5 CARP SD 1999 |
| Royalty Funds | } | 2001-7 CARP SD 2000 |
| | } | |
| | } | |

### ORDER

In September 2005, the Office issued Orders in each of the above-captioned distribution proceedings establishing a negotiation period and requesting from the parties an update on the status of any remaining Phase I and Phase II controversies in an effort to distribute whatever monies it could before the Office terminated these proceedings and jurisdiction of these proceedings is assumed by the Copyright Royalty Board. The parties were required to notify the Office of the continued existence and the extent of Phase I and Phase II controversies and/or file any notices of settlement and motions seeking a full or further partial distribution of the royalty funds no later than December 1, 2005. The Office subsequently extended the deadline to December 6, 2005. In response to the Orders, the Office received such notification and, where appropriate, notices of settlement and motions seeking distribution.

The Joint Sports Claimants ("JSC") filed comments in each of the above-captioned proceedings noting that they were unaware of any Phase II controversies in the sports programming category until they received a letter from the Independent Producers Group ("IPG") informing JSC that it represents claimants with "rights . . . compensable in the Sports Programming category." Comments of the Joint Sports Claimants on Phase II Controversies (in the above-captioned proceedings), filed December 6, 2005, at 2, citing letter from IPG. Prior to receipt of IPG's December 1, 2005, letter, JSC states that they had not had any communication with IPG. Id. Joint Sports continued that they have tried to ascertain the identity of IPG's claimants, but IPG has not responded to their inquiry. Therefore, Joint Sports request that the Office "direct IPG to identify . . . (1) the claimants, if any, that have authorized IPG to pursue a claim for Sports Royalties in the above referenced proceedings and (2) the professional or collegiate teams whose telecasts" are included in IPG's claims. Comments of Joint Sports Claimants at 2-3. Joint Sports state that without this information they cannot determine whether or not a controversy exists in the sports category and, if so, whether the extent of the controversy requires the withholding of royalties allocated to the sports category. Id. at 3. IPG has not filed any opposition to Joint Sports' request.



Exhibit F
Page 19

04/06/06   16:26 FAX 202 707 6366          COPYRIGHT OFFICE                            003/004

However, IPG did submit[1] comments in the proceedings to determine the distribution of the 2002 cable funds and the 2000 satellite funds asserting, in pertinent part, Phase II controversies in the sports, program supplier, and devotional categories. IPG did not submit comments regarding the 1998 and 1999 cable funds or the 1999 satellite funds because it had not received the September Orders requesting these comments for the reasons discussed below.

In any event, unlike in the program supplier and devotional categories, there is no agreement between JSC and IPG as to whether a controversy even exists in the sports programming category, let alone the extent of any such controversy. Moreover, this question cannot be resolved until IPG identifies which of its claimants have a claim to the sports programming royalties.

Therefore, the Office is granting JSC's request in part and directing IPG to provide to JSC the names of its claimants identified in each of IPG's notices of intent to participate filed previously in each of the above-captioned proceedings who are asserting a claim to the sports programming royalties. A claimant who does not appear on the respective lists of claimants identified at the time IPG filed its various notices of intent to participate cannot assert a claim at this time.

Conversely, JSC's request that IPG identify the teams whose telecasts are included in IPG's claims goes beyond ascertaining whether a controversy exists with respect to certain claimants and seeks prematurely factual information concerning the nature of those claims. Since it is not the Office's role to consider factual information and evaluate the merits of any asserted controversy, we find JSC's request for the team information to be beyond the scope of our initial request for information concerning the existence and extent of any outstanding controversies. Consequently, the Office denies this request.

**IPG's Withdrawal of Notice of Intent to Participate**

IPG filed a notice of intent to participate in each of the proceedings to determine the distribution of the 1998 and 1999 cable funds as well as the 1999 satellite funds. In each proceeding, IPG asserted Phase II claims against the program supplier, sports, and devotional categories. On May 10, 2004, IPG filed a Withdrawal of Notice of Intent to Participate in each of these proceedings but only as to the Program Supplier category; the previously filed notices of intent to participate remained in effect as to the sports and devotional categories. Due to an inadvertent clerical error, IPG was removed from the service list in each of these proceedings.

---

[1] IPG failed to include a proof of service with its comments as required by 37 C.F.R. § 251.44(f). Because these documents were not properly filed with the Office, they have not been considered. In fact, many parties failed to serve their comments to the September orders properly, prompting the Office to issue on December 8, 2005, an order in the above-captioned proceedings directing parties who failed to comply with 37 C.F.R. § 251.44(f)("In all filings, a copy shall be served upon counsel of all other parties identified in the service list . . .") to effect service by December 13, 2005. IPG did not respond to this Order.

Nevertheless, the interests of IPG's claimants will be taken into account, as parties have acknowledged controversies with IPG in the above-mentioned categories.


Exhibit F
Page 20

Consequently, IPG was not served with copies of the Office's September Orders pertaining to these proceedings. IPG was, however, served copies of the comments filed by the parties in response to these Orders.

The Office has corrected its error and returned IPG to these service lists and is providing to IPG, under separate cover, copies of the September Orders so that IPG has the opportunity to provide any additional or supplemental information to that already provided by the other parties. IPG need only respond to the September Orders if it has information that was not already provided by other parties. The Office notes that copies of any response to the September Orders must be served on all other parties on the service list of each proceeding and include proof of service in accordance with 37 C.F.R. § 251.44(f). Otherwise, such filings will not be considered by the Office.

Wherefore, **IT IS ORDERED** that IPG shall provide to Joint Sports the identity of claimants previously identified in IPG's notices of intent to participate that have authorized IPG to pursue a claim in the sports programming category in each of the above-captioned proceedings by no later than **Wednesday, February 15, 2006.** JSC shall then notify the Office of the existence and extent of any controversy to the sports programming royalties by no later than **Wednesday, February 22, 2006.** IPG and JSC need not make a separate filing for each of the above-captioned proceedings; a single filing referencing each proceeding will suffice.[2] IPG and JSC must serve on the other parties in each of the above-captioned proceedings a copy of their filing and provide proof of service in accordance with 37 C.F.R. § 251.44(f).

**IT IS FURTHER ORDERED** that IPG shall file with the Copyright Office its response, if any, to the September Orders identifying any controversies not already addressed in the comments filed by the other parties by no later than **Monday, February 13, 2006.** IPG shall serve on all parties to those proceedings a copy of any such response and provide proof of service in accordance with 37 C.F.R. § 251.44(f).

**SO ORDERED.**

Marybeth Peters,
Register of Copyrights.

BY:    *Tanya M. Sandros*
Tanya M. Sandros,
Associate General Counsel.

DATED: February 8, 2006

---

[2] Filings sent through the U.S. Postal Service must be addressed as follows: Copyright Arbitration Royalty Panel (CARP), P.O. Box 70977, Southwest Station, Washington, D.C. 20024. 37 C.F.R. § 251.1(c).

-3-

Exhibit F
Page 21

# EXHIBIT G

Exhibit G
Page 22



**Copyright Arbitration Royalty Panels · United States Copyright Office**
Library of Congress · P.O. Box 70977, Southwest Station · Washington, D.C. 20024
TEL (202) 707-8380 · FAX (202) 252-3423 · www.copyright.gov

6-26-06

| In the Matter of | } | | |
|---|---|---|---|
| | } | | |
| Distribution of the 1998-2002 Cable | } | Docket Nos. | 2001-8 CARP CD 98-99 |
| Royalty Funds | } | | 2002-8 CARP CD 2000 |
| | } | | 2003-2 CARP CD 2001 |
| and | } | | 2004-5 CARP CD 2002 |
| | } | | |
| Distribution of the 1999-2000 Satellite | } | Docket Nos. | 2001-5 CARP SD 1999 |
| Royalty Funds | } | | 2001-7 CARP SD 2000 |
| | } | | |
| | } | | |

## ORDER

On February 8, 2006, the Office issued an Order in the above-captioned proceedings directing the Independent Producers Group ("IPG") to provide to the Joint Sports Claimants ("JSC") the identity of claimants previously identified in IPG's notices of intent to participate in each of the above-captioned proceedings by no later than February 15, 2006. The Order also provided IPG with an opportunity to respond to the Office's September Orders regarding the current status of its remaining Phase I and Phase II controversies in two of the aforementioned proceedings. Such response, if any, was due by no later than February 13, 2006. Neither document was filed timely with the Office.

On February 16, 2006, IPG filed with the Office its Motion for Acceptance of Late-Filed Response to the September Orders and Notification of Sports Claimants. No party opposed the acceptance of IPG's Notification of Sports Claimants; therefore, the Office grants that part of IPG's motion without discussion. However, the representatives of Phase I claimant categories–namely, Program Suppliers, JSC, Public Television Claimants, National Association of Broadcasters and Broadcaster Claimants Group, American Society of Composers, Authors and Publishers, Broadcast Music, Inc., SESAC, Inc., Canadian Claimants, Devotional Claimants, and National Public Radio ("Phase I Parties")–did oppose the acceptance of IPG's response to the September Orders ("Response"),[1] and IPG filed a reply in support of its motion. For the reasons stated herein, IPG's Motion for Acceptance of Late-Filed Response to the September Orders is denied.

**IPG's Motion**

*Parties' Positions*

IPG argues that its Response should be accepted because "IPG complied to the best of its ability" to complete a "leviathan task" in an unreasonable time frame, as evidenced by the fact that IPG e-mailed the Office a courtesy copy of the Response. IPG motion at 3. In addition, "IPG understood that the filing need only have been served by February 13, 2006," and not physically received by the Office by that date. IPG motion at 2. Moreover, IPG argues that "[n]o

---

[1] JSC has filed a motion to strike the reply brief IPG filed in support of its notification of claimants to JSC. This motion will be addressed in a separate Order.

Exhibit G
Page 23

prejudice will inure to any party, or the Copyright Office," because the filing was "less than three business hours late," as it was delivered to the Office's post office box at "11:09 a.m. on February 14, 2006." Id.

In their opposition, the Phase I Parties counter that IPG has been afforded sufficient time to respond to the September Orders since the February 8 Order provided IPG with a second opportunity to submit a response. Opposition at 4-5. Phase I Parties point out that the first opportunity was provided by the Office's December 8, 2005, Order, which required all parties to effect proper service of the comments filed in response to the September Orders. IPG admits to receiving this Order as well as the other parties' comments. The Office's December 8 Order also directed all parties, including IPG, to file any objections or oppositions to said comments by December 22, 2005. Id. at 5. No such filing was made. Id.

The Phase I Parties also contend IPG's Response was three days, not less than three business hours, late. Id. at 4. Moreover, the Phase I Parties fail to see how IPG could reasonably believe that the date of mailing constituted the filing date, especially in light of the fact that the Office previously explained what constituted a timely filing in the 1997 cable distribution proceeding in which IPG was a party. Id. at 6-7. They go on to argue that they have been prejudiced by IPG's actions, which have delayed the Office's decision on their request for a further distribution of the 2000-2002 cable royalties. Id. at 8-9. IPG refutes these arguments in its reply.

**Discussion**

*Scope of the February 8 Order*

Before addressing IPG's motion, the Office must clarify the scope of its February 8 Order. As the Office discussed in that Order, IPG had not received copies of the September Orders pertaining to the proceedings to determine the distribution of the 1998 and 1999 cable funds, Docket No. CARP CD 98-99, or the 1999 satellite funds,[2] Docket No. CARP SD 1999, due to a clerical error; however, IPG had been served copies of the comments filed by the parties in response to those Orders. Nonetheless, so as not to penalize IPG for the Office's error, the Office provided IPG the opportunity, for the very limited purpose, to add to or supplement information already provided by the other parties in their responses to the September Orders issued in those two proceedings. Therefore, given the narrow scope of the Order, IPG's Response should have addressed only the proceedings regarding the 1998-1999 cable funds and the 1999 satellite funds.

---

[2] IPG was served copies of the Office's Orders in the other proceedings in accordance with the service lists for those proceedings as they existed in September 2005.

Exhibit G

Page 24

IPG, however, gave the Order a much more expansive reading, as the majority of its Response opposes and/or objects to filings made in proceedings other than the two just mentioned.[3]  What IPG fails to appreciate is that any opposition or objection to filings made in proceedings other than those regarding the 1998-1999 cable funds or the 1999 satellite funds are untimely and would not be considered even if the Response were to be accepted.  The Office already has afforded all parties, including IPG, the opportunity to file objections or oppositions to filings made in response to the September Orders in those other proceedings.  See, Order in above-captioned proceedings at 2 (December 8, 2005).  Such objections or oppositions were to be filed with the Office by December 22, 2005.[4]  Id.  IPG filed nothing in response to that Order and, therefore, has forfeited its right to file such objections or oppositions now; the February 8 Order does not provide them with a second bite of the apple.

We turn now to IPG's motion as it relates to the single portion of its Response that falls within the scope of the February 8 Order.

### IPG's Motion to Accept its Late-Filed Response

We note at the outset that IPG is not the first party to make an untimely filing.  Indeed, on other occasions, the Office has accepted documents filed later than IPG's Response.  See, e.g., Orders, in Docket No. 2003-2 CARP CD 2001 (April 6, 2005 and October 9, 2003).  When evaluating a party's request to accept a late filing, the Office looks to the totality of the circumstances, such as the party's track record of timeliness in CARP proceedings and the party's compliance with the CARP rules, in addition to the arguments made in a party's motion.  Here, the Office finds IPG's arguments unpersuasive, and examination of the totality of circumstances reveals a disturbing pattern of instances where IPG has not followed the proper procedure or has purported to operate under a misapprehension of the Office's rules.  Consequently, as discussed below, the Office denies IPG's request to accept its Response.

In both its motion and reply, IPG argues that it made a good faith effort to comply with the Office's February 8 Order, even though that Order imposed on IPG the "leviathan task" of having to "review approximately forty (40) different filings . . . relating to [several] separate cable or satellite pools."  Motion at 1; see also Reply brief at 2.  The Office is unsympathetic to this argument as IPG was required to review the comments in only two proceedings.  See supra.  Moreover, IPG was served copies of these comments in December 2005.  So, rather than having two business days, as IPG asserts, to review these comments, IPG had nearly two months to do so.  If IPG chose not to review these comments until it received the Office's February 8 Order, then it is IPG, and not the Office, who made the task "leviathan."  Moreover, had IPG determined

---

[3]  Specifically, IPG opposes or objects to the following documents: Phase I Claimants' Notice of Partial Settlement and Motion for Further Distribution of 2000, 2001, and 2002 Cable Royalties; MPAA's Joint Notices of Withdrawal of Intention to Participate Regarding 2000 and 2001 Cable Royalties (withdrawing the Notices of Intent of O. Atlas Enterprises, Inc.; Sandra Carter Productions, Inc.; Ward Productions, Inc.; and Fintage Publishing); and MPAA's Motion for Final Distribution of 1996-1997 Satellite Funds.

[4]  MPAA's Joint Notices of Withdrawal of Intention to Participate Regarding 2000 and 2001 Cable Royalties were not covered by the Office's December 8 Order, as they were filed on December 14, 2005.  However, in accordance with § 251.44(g), oppositions or objections to these filings were due by no later than December 23, 2005.

-3-

Exhibit G
Page 26

that it was unable to comply with the Order within the specified time, it could have requested an extension of time in which to file its Response; yet it chose not to do so. For the foregoing reasons, IPG's assertion that the Office's deadline was "unreasonable" does not provide a sufficient basis upon which to grant IPG's motion to accept its late-filed response to the September Orders.

IPG's second argument for acceptance of its Response is two pronged: First, IPG asserts that the Response was "less than three business hours" late; and, second, "IPG understood that the filing need only have been served by February 13, 2006." Motion at 2. With regard to the first prong, IPG fails to appreciate that late is late; and any time a pleading is late, whether by minutes or days, the late party must move for the acceptance of the late pleading and all other parties afforded an opportunity to weigh in on the motion. As such, late-filed pleadings slow down the process–here, the Office's decision on the Phase I Parties' motion for further distribution of the 2000-2002 cable royalties–and require the expenditure of Office resources in ruling on the motion, especially where, as here, other parties file an opposition. Therefore, while the Office does consider, among other factors, the lateness of a pleading in making its determination on whether or not to accept it late, no party should assume, as seems to be the case here, that a filing made a few minutes or hours late will be accepted as a matter of course.

With regard to the second prong, the Office notes that it is the responsibility of those participating in a Copyright Arbitration Royalty Panel ("CARP") proceeding to familiarize themselves with the requirements for such participation, including compliance with filing deadlines. As such, IPG's misapprehension that it had complied with the Office's February 13 deadline by mailing its Response on that date is not a sufficient reason to grant IPG's motion. As the Phase I Parties point out, IPG's position is made more untenable by virtue of its participation in the 1997 cable distribution proceeding where the Office defined for all parties what constituted a timely filing. Order, in Docket No. 2000-2 CARP CD 93-97 (January 12, 2000).

Consequently, IPG's arguments supporting acceptance of its late-filed Response are not particularly persuasive and are less so when coupled with IPG's pattern of noncompliance with the Office's rules.

*IPG's Noncompliance with Office Rules*

As mentioned above, IPG has exhibited a seeming indifference to the Office and its rules, as evidenced by its repeated failure to comply with the rules governing the service of pleadings.[5] Most disturbing, however, is the fact that IPG blatantly ignored an Office Order. On December 8, 2005, because many parties, including IPG, failed to properly serve their comments in response to the September Orders, the Office issued an order in the above-captioned proceedings directing all parties who had filed comments to effect proper service in accordance

---

[5] In addition to the service problems discussed herein, the Phase I Parties raise two other issues, namely, IPG's failure to comply with the Office's Order dated February 22, 2006 (requiring IPG to refile and re-serve its Response due to missing pages; IPG served only the missing pages instead of the entire document) and its failure to comply with § 251.44(e)(2) (requiring provision of party's address and telephone number). Opposition at 4 n.3 and 6 n.5. While the Phase I Parties are correct, the Office will focus on IPG's more egregious transgressions. See infra.

-4-

Exhibit G

Page 26 /.

with 37 C.F.R. § 251.44(g) by December 13, 2005. See, Order, in above-captioned proceedings, dated December 8, 2005. IPG failed to comply with this Order and to date has offered no explanation for its failure to do so.[6]

IPG's disdain toward effecting proper service is evidenced further by the fact that none of the filings made by IPG since issuance of the December 8 Order have been served properly, despite the Office's reference to the regulation governing service in the December 8 Order. For example, the motion at issue here, according to the certificate of service,[7] was served on the other parties by first-class mail, in direct contravention to 37 C.F.R. § 251.44(g), which states, in pertinent part, that "all motions, . . ., oppositions, and replies [must be served] on the other parties or their counsel by means no slower than overnight express mail on the same day the pleading is filed." All pleadings filed by IPG have been served either by first-class or priority mail, neither of which is an acceptable means under the regulations. IPG defends its use of these alternative means by arguing that the rule

> requires that service be accomplished no later than the day (presumably business day) following filing with the Copyright Office. Notwithstanding, if a filing schedule is set by the CARP, and IPG files its document prior to its deadline, as long as service is accomplished prior to the deadline otherwise directed by the CARP, no prejudice has occurred.

IPG reply brief at 4 n.6.

IPG's interpretation simply is wrong. Again, the rule states that service must be "by means no slower than overnight express mail on the **same day the pleading is filed**" with the Office. 37 C.F.R. § 251.44(g) (emphasis added.) Therefore, in order for a party to be in compliance with the rule, the other parties must receive the pleading the next business day after it is filed with the Office, even if the pleading is filed prior to a deadline set by the Office. No party, including IPG, can circumvent the rule by a unilateral determination that no prejudice to the other parties will result from its use of alternative service methods. Parties are bound by the regulations and may not vary from their requirements unless allowed to do so by the Office. Consequently, a party who uses first-class or priority mail simply does not comply with the rule.

While the Office will excuse a party's occasional lapse in following the regulations, even those governing proper service, the Office cannot and will not tolerate a party's persistent failure to comply as is the case here. IPG's repeated failure to effect proper service even after the Office had cited the appropriate rules demonstrates a flagrant disregard of the rules governing these proceedings and of Orders issued therein, as well as a lack of respect for the Office and the other

---

[6] IPG cannot claim that it was unaware of the December 8, 2005, Order or of its failure to comply with said Order, as IPG confirmed receipt of the Order, and the Office has made reference to its noncompliance. See Order, in above-captioned proceedings, dated February 8, 2006, at 2 n.1.

[7] The Certificate of Service actually refers to the service of IPG's Response but the Office presumes that the motion was served in a similar fashion based on statements made in the Phase I Parties' opposition. Opposition at 4 n.3.



Exhibit G
Page 27

parties in these proceedings.  Administrative proceedings cannot be run effectively or efficiently where parties to the proceeding disregard the carefully developed procedures governing the process, and a party will be, and indeed has been, dismissed from a proceeding for failure to adhere to its rules and comply with its orders.  See, Order, in Docket No. 2002-1 CARP DTRA3 (August 15, 2003) (dismissing party in rate adjustment proceeding for failure to comply with Office Order and with service requirements); Order, in Docket No. 95-1 CARP DD 92-94 (May 9, 1996) (dismissing two participants in a distribution proceeding for failure to comply with procedural and substantive rules for the submission of written direct cases, including failure to effect proper service on the parties in the proceeding).  Accordingly, any future failure by IPG to comply with the Office's regulations, especially those governing the proper service of pleadings, will result in IPG's dismissal from these proceedings.

In relation to the motion at hand, the Office will not reward IPG for its repeated transgressions by accepting its late-filed Response.

Wherefore, **IT IS ORDERED** that IPG's Motion for Acceptance of Late-Filed Response to the September Orders and Notification of Sports Claimants is **GRANTED IN PART, DENIED IN PART.**  The Office accepts IPG's Notification of Sports Claimants because its request was unopposed; it does not accept IPG's Response to the September Orders.

**SO ORDERED.**

Marybeth Peters
Register of Copyrights

BY:    _Tanya M. Sandros_
Tanya M. Sandros
Associate General Counsel

DATED: June 26, 2006

-6-

Exhibit G
Page 28

# EXHIBIT H



Exhibit H
Page 29

4-3-07



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

| In the Matter of | } | | |
|---|---|---|---|
| | } | | |
| Distribution of the 1998-2002 Cable | } | Docket Nos. | **2001-8 CARP CD 98-99** |
| Royalty Funds | } | | **2002-8 CARP CD 2000** |
| | } | | **2003-2 CARP CD 2001** |
| and | } | | **2004-5 CARP CD 2002** |
| | } | | |
| Distribution of the 1996-2000 Satellite | } | Docket Nos. | **2000-7 CARP SD 96-98** |
| Royalty Funds | } | | **2001-5 CARP SD 1999** |
| | } | | **2001-7 CARP SD 2000** |
| _____ | } | | |

## ORDER

On June 26, 2006, the Copyright Office issued an Order in the above-captioned proceedings[1] denying, in pertinent part, the motion of the Independent Producers Group ("IPG") to accept its late-filed Response to the September Orders[2] ("Response"). The Office based its decision on what it found to be a pattern of IPG's failure to comply with the rules governing the Copyright Arbitration Royalty Panel ("CARP") process, especially with regard to service of filings on other parties.[3]

On July 17, 2006, the Office received from IPG a motion seeking reconsideration of the Office's June 26 Order, arguing that the denial was based on "mistatements (sic) and mischaracterizations" contained therein. On July 21, 2006, the Office issued an Order setting forth the pleading cycle for this motion and instructing the parties on the proper way to file and

---

[1] The caption of the June 26 Order did not reference Docket No. 2000-7 CARP SD 96-98 as that proceeding is closed. The Office has made a final distribution of those funds. *See,* Order in Docket No. 2000-7 CARP SD 96-98 (dated January 12, 2006). Although the June 26 Order did include Docket No. 2001-5 CARP SD 99 in its caption, that proceeding also is closed as the Office determined that no further distribution of those funds would be made. *See* Order in Docket No. 2001-5 CARP SD 99 (dated June 26, 2006).

[2] In September 2005, the Office issued Orders in each of the above-captioned proceedings establishing a negotiation period and requesting from the parties an update on the status of any remaining Phase I and Phase II controversies in an effort to distribute whatever monies it could before terminating these proceedings and jurisdiction assumed by the Copyright Royalty Judges. The parties were required to notify the Office of the continued existence and the extent of Phase I and Phase II controversies and/or file any notices of settlement and motions seeking a full or further partial distribution of the royalty funds.

[3] The Office also noted that the majority of IPG's Response was beyond the scope of the February 8, 2006, Order to which it was responding. *See* Order in above-captioned proceedings at 2-3 (June 26, 2006).

Exhibit H
Page 30

serve the responsive papers. In accordance with this Order, the Phase I Parties[4] filed a joint opposition to IPG's motion for reconsideration basically stating that IPG had raised no new arguments which would warrant the Office's reversal of its decision. Similarly, IPG timely filed its reply.

On July 17, 2006, the Office also received from IPG a motion to compel production of agreements relating to settlements of devotional programming category funds. Devotional Claimants filed its opposition to the motion on August 2, 2006, and IPG filed a timely reply.

## IPG's Motion for Reconsideration

### Parties' Positions

IPG argues that the Office should reconsider its denial of IPG's motion to accept its late-filed Response for several reasons. First, IPG asserts that the Office contributed significantly to and was responsible in part for IPG's confusion surrounding the existence of and its obligation to respond to the aggregate of the September Orders. Motion at 3-6. Second, IPG asserts that the Office used the wrong criteria in evaluating IPG's motion to accept a late filing; specifically, the Office should have evaluated the motion under the same two-part test that it applies in evaluating a late-filed Notice of Intent to Participate. *Id.* at 6-15. Third, IPG contends that the Office "dramatically overstates 'IPG's Noncompliance with Office Rules.'" *Id.* at 15-20. Finally, IPG asserts that the Office exceeded its authority by issuing the September Orders to "the extent that the Office relies thereon to terminate proceedings." *Id.* at 20-22.

In their Joint Opposition, the Phase I Parties urge the Office to stand behind its June 26 Order in its entirety as the determinations made therein were justified. Opposition at 2-4. The Phase I Parties argue that IPG brings forth no new arguments justifying its disregard of the Office's rules and therefore provides no persuasive grounds for the Office to reverse its decision. *Id.* at 4. The Phase I Parties also point out that the Office was not required to nor should it have published in the **Federal Register** the September Orders. *Id.* at 4-5. Finally, the Phase I Parties emphasize the extent of the prejudice they have suffered as a result of IPG's conduct. *Id.* at 5.

In its reply, IPG asserts that the Phase I Parties' failure to address certain facts raised in its motion amounts to a concession to their veracity.

### Discussion

---

[4]     The Phase I Parties are comprised of the representatives of the Phase I claimant categories, namely, Program Suppliers, Joint Sports Claimants, Public Television Claimants, National Association of Broadcasters and Broadcaster Claimants Group, the American Society of Composers, Authors and Publishers, Broadcast Music, Inc., SESAC, Inc., Canadian Claimants, National Public Radio and the Devotional Claimants.

-2-

Much of IPG's motion consists of arguments that were addressed by the Office in its June 26 Order. To that extent, such arguments will not be revisited here. Therefore, the Office sees no need to, and indeed will not, address the arguments made by IPG concerning the proper standard under which to evaluate its Motion to Accept its Late-Filed Response to the September Orders. These arguments, or variations thereof, were fully addressed in the June 26 Order. Similarly, the Office stands behind its findings regarding IPG's pattern of non-compliance with the Office's rules, especially when that pattern continues, as evidenced by IPG's service of the instant motion by priority mail.[5]

The Office does feel compelled, however, to briefly address IPG's two remaining arguments. We turn to them now.

*IPG's Receipt of the September Orders*

The Office now clarifies the record with regard to IPG's receipt of the September Orders. The Office served each of the September Orders on the parties in each of the above-captioned proceedings in accordance with the contact information as it existed on the respective service lists at the time of their issuance. In September 2005, the Office's records showed IPG as an active participant in only four of the seven proceedings, namely, the proceedings to determine the distribution of the 2000 satellite funds, the 2000 cable funds, the 2001 cable funds and the 2002 cable funds. IPG's current representative, however, was listed as such on only the service list with regard to the 2002 cable funds. Consequently, the current representative received Orders only for those proceedings for which she was listed as IPG's representative.[6] The Office conveyed this information in a communication with IPG. *See* E-mail from Gina Giuffreda, Attorney Advisor, U.S. Copyright Office, to Lisa Katona Galaz, President, Independent Producers Group (February 10, 2006, 1:18:39 PM EST) (on file with the Office).

Subsequently, the Office, on its own, provided the remainder of the September Orders to IPG. First, once the Office discovered its error that IPG had erroneously been removed from the service lists for the proceedings to determine the distribution of the 1998 and 1999 cable funds as well as the 1999 satellite funds, it provided IPG with copies of the September Orders for those proceedings and afforded IPG an opportunity to respond to them. *See* Order in above-captioned proceedings at 3 (February 8, 2006). Soon thereafter, the Office, again on its own, provided to IPG the September Orders pertaining to the 2000 and 2001 cable funds. *See* E-mail from Gina Giuffreda, Attorney Advisor, U.S. Copyright Office, to Lisa Katona Galaz, President, Independent Producers Group (February 10, 2006, 1:18:39 PM EST) (on file with the Office) ("For your convenience, I am forwarding to you the September Orders issued by the Office

---

[5]   IPG also served its motion seeking to compel production of a settlement agreement among the Devotional Claimants by priority mail.

[6]   Actually, IPG's current representative received two of the September Orders. The Office has discovered that it also inadvertently served her with the Order regarding the distribution of the 2000 satellite funds even though Raul Galaz was listed as the sole representative on the service list.

Exhibit H

Page 32

regarding the distribution of the 2000 and 2001 cable royalties. Consequently, you will now have all of the Orders issued in September.'"[7]). Moreover, in a further effort to assist IPG, the Office offered to, and did, provide to IPG a copy of the service lists for the four proceedings in which it had IPG listed as an active participant. *See* E-mail from Gina Giuffreda, Attorney Advisor, U.S. Copyright Office, to Lisa Katona Galaz, President, Independent Producers Group (December 21, 2005, 12:11:54 PM) (on file with the Office).

At no time did the Office state that certain of the September Orders did not exist. Indeed, such statement would contradict the plain language of subsequent orders. *See* Orders in above-captioned proceedings at 1 (dated December 8, 2005, and February 8, 2006) ("In September 2005, the Office issued Orders in each of the above-captioned distribution proceedings establishing a negotiation period . . ."). The Office answered all of IPG's questions as clearly as possible. If IPG still had questions or believed that the Office was providing "misinformation," then IPG could have requested copies of the Orders referenced in the December 8 and February 8 Orders and/or the dockets in each proceeding to ascertain what Orders had been issued by the Office. While the Office will assist a party where it can, it is the responsibility of a party appearing before the Office, and that party's responsibility alone, to keep track of the proceedings in which it is an active participant and to determine which documents are needed in order to prosecute its claim and to request such documents from the Office.

Most, if not all, of IPG's confusion could have been avoided had IPG simply updated its contact information in a timely manner as required by 37 C.F.R. § 351.44(f). IPG admits that it did not fully appreciate this fact.[8] Motion at 6 n.8.

IPG also appears to be confused about a party's responsibilities when participating in a CARP proceeding. IPG argues that many of the actions that the Office found objectionable in its June 26 Order were the result of IPG's unawareness of its obligation to take certain actions. For instance, IPG states that it did not respond to the Office's December 8 Order because it "was genuinely confused as to its obligation to respond."[9] Motion at 6. Similarly, it explains that it

---

[7]    IPG has not received the September Orders regarding the distribution of the 1996-1998 satellite royalty fees, as the only remaining controversies with respect to these funds existed in the Program Supplier category. IPG withdrew from this proceeding on May 10, 2004. Moreover, as noted earlier, this proceeding is closed as the Office has made a final distribution of these funds. *See supra* n.1. In any event, IPG was served with a copy of the motions seeking final distribution of these funds and had ample opportunity to object if it so chose. *See* Order in above-captioned proceedings (dated December 8, 2005).

[8]    When IPG did attempt to update its contact information, the letter was sent to the Office's street address, which was not proper under the Office's rules. *See* 37 C.F.R. § 251.1(c).

[9]    IPG states that it just recently discovered that its December 2005 filings did not have a "Proof of Service" attached to it. The Office finds this puzzling because it noted in the February 8 Order that IPG had not responded to the December 8 Order. Moreover, in a subsequent communication with IPG, the Office specifically stated that no certificate of service was attached to its initial comments. *See* E-mail from Gina Giuffreda, Attorney
(continued...)

Exhibit H
Page 33

"satisfactorily" complied with the regulations governing proper service "after being alerted to the regulation's applicability." *Id.* at 18. The Office notes that it is the responsibility of those interested in participating in a CARP proceeding, and theirs alone, to familiarize themselves with the requirements for such participation. Therefore, despite IPG's arguments to the contrary, it is not the Office's responsibility to point out to the parties which regulations apply to a particular situation. Rather, parties are bound by all of the regulations at all times and may not vary from their requirements unless allowed to do so by the Office. *See* Order in above-captioned proceedings at 5 (June 26, 2006).

### *Office' Authority to Issue the September Orders*

IPG's argument that the Office exceeded its authority by issuing the September Orders to terminate the above-captioned proceedings and failing to publish them in the **Federal Register** illustrates IPG's misapprehension of the Office's goal here and the CARP process in general.

The Library has the authority "[d]uring the pendency of any proceeding . . . to proceed to distribute any amounts that are not in controversy." 17 U.S.C. § 111(d)(4)(C). The distribution of funds under this provision is an administrative task, which the Library, through the Copyright Office, may undertake at any time during a proceeding, upon its own or the parties' motion, even before the institution of a formal CARP proceeding.[10] Before making an initial distribution, the Office must ascertain the parties to a particular proceeding. The Office accomplishes this task by the solicitation of notices of intent to participate in a proceeding, which it publishes in the **Federal Register** pursuant to 37 C.F.R. § 251.45(a). Since the Office had taken this step in each of the above proceedings, thereby defining the universe of participants in each proceeding, it was not required to publish the September Orders in the **Federal Register**.

After considering IPG's motion, the Office finds that IPG has not presented any new arguments which would persuade the Office to reconsider its denial of IPG's late-filed Response.

### IPG's Motion to Compel Production of Agreements

On December 6, 2005, the Office received a notice of partial settlement from Phase I Claimants and a motion for further distribution of 2000, 2001, and 2002 cable royalty fees. IPG

---

[9]   (...continued)
Advisor, U.S. Copyright Office, to Lisa Katona Galaz, President, Independent Producers Group (February 10, 2006, 1:18:39 PM EST) (on file with the Office) ("[O]ur records indicate that you provided no such certificate of service when you filed your comments initially or in response to the December 8 Order.")

[10]   IPG does not understand why the Office would "solicit the exact same information" in the September Orders as provided in the initial Notices of Intent to Participate instead of "feel[ing] satisfied to rely on the previously filed 'Notice of Intent' filings." Motion at 21. In an effort to encourage settlement, the Office afforded parties an opportunity to negotiate to see if previously outstanding controversies could be resolved and directed the parties to notify the Office of the outcome of their negotiations.

Exhibit H

Page 34

claims that "counsel for several unidentified parties purported to represent the aggregate of the Devotional Programming category" and joined the December 6 motion on behalf of all Devotional Claimants without informing IPG of the settlements or disclosing the terms. Motion at 2. IPG seeks access to the settlements negotiated on behalf of the Devotional Claimants to determine "whether IPG needs to challenge the Phase I Settlement, or whether IPG instead desires to accept the Phase I settlement and negotiate terms of its Phase II participants in the Devotional Programming category." *Id*. at 3.

Devotional Claimants dispute IPG's underlying contention that it had no knowledge of the terms of the settlement agreement. They contend that IPG and its current principal received the information it now seeks, i.e., the precise percentage amounts for which Devotional claims settled with other Phase I parties, by letter and email during confidential settlement negotiations in December 2005. They also maintain that IPG's reliance on a previous CARP order is misplaced since the order merely required the disclosure of the amount in the disputed fund and did not require the disclosure of the actual settlement. Moreover, Devotional Claimants maintain that IPG had timely notice of the settlement details and sufficient time to object to the settlements, noting that IPG did not file a timely objection upon receiving the relevant information. Devotional Claimants also take issue with IPG's implication that they had not disclosed the identities of their claimants and assert that it is IPG that has failed to provide this information to the detriment of those who have identified themselves.

*Discussion*

The distribution process relies on good faith negotiations by the claimants and their representatives. IPG had filed its notice of intent to participate in the distribution proceedings of the 2000, 2001 and 2002 royalty fees and, as a result, it has a reasonable expectation that other claimants will negotiate and consult with it concerning any settlement agreement among the Phase I claimants.

Both sides make factual representations about the facts surrounding the negotiations that purportedly did take place. However, the Office was not apprised of any these disputed actions during the pleading cycle established by the Office regarding the Notice of Partial Settlement and the Motion for Further Distribution. *See* Order in above-captioned proceedings (dated December 8, 2005). IPG had an opportunity to raise its concerns with the Office at that time, but it did not do so and cannot be allowed at this late date to undo the settlements that have been reached to date and upon which additional distributions are now based.

Nevertheless, IPG has a valid interest in this information for future negotiations concerning the distribution of the royalty fees among the Devotional claimants and the Office has withheld sufficient funds to address any outstanding controversies between IPG and these claimants. However, as indicated in the initial September orders, the Copyright Office will not be administering further proceedings in this matter. Its intent is only to consider one further distribution of the cable royalty fees in the open proceedings before terminating the proceedings

-6-

under the Copyright Arbitration Royalty Panels program and vesting authority for any further proceedings in the Copyright Royalty Judges, the entity created by Congress pursuant to the Copyright Royalty and Distribution Reform Act of 2004. Moreover, such questions, being a mixed question of fact and law, are more suited for resolution before the Copyright Royalty Judges.

Wherefore, **IT IS ORDERED** that IPG's Motion to Compel Production of Agreements relating to Settlements of Devotional Programming Category Funds **IS DENIED, WITHOUT PREJUDICE.** Additional motions concerning these proceedings will not be accepted by the Copyright Office and should be addressed in the future to the Copyright Royalty Judges.

Wherefore **IT IS FURTHER ORDERED** that IPG's Motion to Reconsider Denial of Motion for Acceptance of Late-Filed Response to the September Orders **IS DENIED.**

**SO ORDERED.**

Marybeth Peters,
Register of Copyrights.

BY:    ~~Tanya M. Sandros~~

Tanya M. Sandros,
General Counsel.

DATED: April 3, 2007

Exhibit _H._
Page _36_

# EXHIBIT I

Exhibit I
Page 37

4-3-07



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

| In the Matter of | } | | |
|---|---|---|---|
| | } | | |
| Distribution of the 1998-2002 Cable | } | Docket Nos. | **2001-8 CARP CD 98-99** |
| Royalty Funds | } | | **2002-8 CARP CD 2000** |
| | } | | **2003-2 CARP CD 2001** |
| _____ | } | | **2004-5 CARP CD 2002** |

### ORDER

On September 20, 2005, the Office issued Orders in each of the above-captioned distribution proceedings establishing a negotiation period and requesting from the parties an update on the status of any remaining Phase I and Phase II controversies in an effort to distribute whatever monies it could before the Office terminated these proceedings and jurisdiction is assumed by the Copyright Royalty Judges. The parties were required to notify the Office of the continued existence and the extent of Phase I and Phase II controversies and/or file any notices of settlement and motions seeking a full or further partial distribution of the royalty funds.

On December 6, 2005, in response to the Orders, the Copyright Office received a Notice of Partial Settlement and Motion for Further Distribution from representatives of the Phase I claimant categories to which royalties have been allocated in prior distribution proceedings ("Phase I Parties"). The Phase I Parties informed the Office of the settlement of all outstanding Phase I controversies with the exception of the Canadian Claimants' share. In addition, the settlement calls for National Public Radio ("NPR") to receive 0.18% of each of the 2000-2002 funds and for the Devotional Claimants to receive 0.5% of each of these funds. The Phase I Parties requested that the Office maintain only a 6% reserve of each of the 2000-2002 funds remaining after the distribution to NPR. The requested 6% reserve includes the 0.5% due to the Devotional Claimants.[1]

On March 7, 2007, the Copyright Office received a letter from representatives of the claimant groups that historically have participated in Phase I of the cable royalty distribution proceedings requesting a meeting to discuss the pending motions in the open proceedings. See also letter from Brian D. Boydston, counsel for Independent Producers Group ("IPG"), dated March 7, 2007. However, in light of this anticipated forthcoming distribution, no meeting or discussions with the representatives of these groups were held.

---

[1] The Devotional Claimants do not seek a further partial distribution at this time and have requested that the Office hold their share pending resolution of their Phase II controversies. See Motion at 2.

Exhibit I
Page 38

**Discussion**

Section 111(d)(4)(C) of the Copyright Act,[2] title 17 of the United States Code, authorizes the Librarian of Congress to distribute royalty fees to the copyright owners entitled to receive them, after deducting reasonable administrative costs, upon making a determination that no controversy exists with respect to the distribution of funds. Pursuant to this authority, prior motions for partial distributions have been granted after it has been ascertained that sufficient funds would remain in the royalty pools to satisfy all claims which remain in controversy. See, e.g., Order, Docket No. 2004-5 CARP CD 2002 (September 7, 2004); Order, Docket No. 2003-2 CARP CD 2001 (October 1, 2003); Order, Docket No. 2002-8 CARP CD 2000 (October 10, 2002); Order, Docket No. 2001-6 CARP CD 99 (October 17, 2001); and Order, Docket No. 2000-6 CARP CD 98 (October 12, 2000).

After considering the comments filed by the parties regarding the current status and extent of remaining Phase I and Phase II controversies, the Office agrees that a further partial distribution of the 2000, 2001, and 2002 cable royalties may be made. However, the Office is denying the Phase I Parties' request that it retain only a 6% reserve for each of the years 2000, 2001, and 2002 because the Office cannot determine whether such reserve would cover adequately the outstanding controversies identified by the parties in each proceeding and any administrative costs of resolving such controversies. The amounts withheld, as set forth below, will accomplish these goals.[3]

Before turning to the identified controversies, we address the Phase I Parties' request that the Office allocate any further distribution amount "so that prior to taking account of any royalties withheld for Phase II controversies," the Canadian Claimants receive specified percentages of each of the 2000-02 Basic and 3.75 funds, specifically, 1.8567851 percentage of the Basic royalties and 0.25039574 percentage of the 3.75 Fund royalties. We regard this request as an acknowledgment that this amount represents a settlement between the Canadian Claimants and the other Phase I Parties' with respect to this amount and, therefore, grant the request on this basis.

**Outstanding Phase II Controversies**

After reviewing the comments filed by the parties in response to the September 20 Orders, the Office's records indicate the following remaining Phase II controversies:

---

[2] All references to the Copyright Act are to the provisions as they existed prior to May 31, 2005, the effective date of the Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341.

[3] The Phase I Parties requested that the Office specify the amounts set aside for each controversy. The Office denies this request.

Exhibit 1
Page 39

<u>Docket Nos. 2002-8 CARP CD 2000 and 2003-2 CARP CD 2001</u>

For each of the fund years 2000 and 2001, the following Phase II controversies remain: In the sports programming category, a controversy exists between the Joint Sports Claimants ("JSC") and Independent Producers Group ("IPG"). In the program suppliers category, separate controversies exist between the Motion Picture Association of America ("MPAA")-represented Program Suppliers and (1) the National Association of Broadcasters ("NAB") and (2) IPG. Finally, in the devotional category, a controversy remains between the Devotional Claimants and NAB.

The Office has determined that it will withhold $10 million from each of the fund years 2000 and 2001 to cover the value of the outstanding controversies at both Phase I and Phase II any administrative costs needed to resolve them.

<u>Docket No. 2004-5 CARP CD 2002</u>

With regard to the 2002 cable royalties, controversies remain as follows: In the sports programming category, a controversy exists between JSC and IPG. In the program suppliers category, separate controversies exist between the MPAA-represented Program Suppliers and (1) NAB, (2) HSN, LP, Home Shopping En Espagnol GP, AST LLC, USA Broadcasting Productions, Studios USA and InterActive Corp., jointly, (3) IPG, and (4) Univision. Finally, in the devotional category, a controversy remains between the Devotional Claimants and (1) NAB and (2) IPG.

The Office has determined that it will withhold $15 million to cover the value of the outstanding controversies at both Phase I and Phase II and any administrative costs needed to resolve them.

**1998-1999 Cable Royalties**

Although not a subject of the motion, the Office will address the status of the 1998 and 1999 cable royalties.

As noted in the Office's September 22, 2005, Order, the distribution of the 1998 and 1999 cable royalties was determined by a Copyright Arbitration Royalty Panel and such determination was accepted by the Librarian of Congress. Now that all appeals of the Librarian's decision have been exhausted, we look to the remaining Phase II controversies for each claim year to determine what, if any, monies can be distributed from each fund year.

a.    <u>Adjustment of the percentages</u>

Before examining the Phase II controversies, there is an outstanding issue concerning the final determination for the distribution of the 1998 and 1999 cable distribution decision issued in

-3-

Exhibit I
Page 40

2004. *See* 68 FR 3606, 3620 (January 26, 2004). Namely, the final distribution percentages for the 1998 and 1999 Cable Basic Funds and the 1999 Cable 3.75% Fund add up to 100.00002% rather than 100%. Thus, an adjustment must be made to account for the discrepancies before any distributions can be made. The Office has considered the problem and proposes adjusting for the discrepancy on a pro rata basis. Such an adjustment would yield the following percentages:

| 1998 Cable Basic Fund | Per Order | Prorated |
|---|---|---|
| Devotional Claimants | 1.19375 | 1.19375% |
| Program Suppliers | 37.80114 | 37.80113% |
| Joint Sports Claimants | 35.78076 | 35.78075% |
| NAB | 13.96836 | 13.96836% |
| PBS | 5.49125 | 5.49125% |
| Music Claimants | 4.00000 | 4.00000% |
| Canadian Claimants | 1.76476 | 1.76476% |
| Total | 100.00002 | 100.00000% |

| 1999 Cable Basic Fund | Per Order | Prorated |
|---|---|---|
| Devotional Claimants | 1.19375 | 1.19375% |
| Program Suppliers | 36.00037 | 36.00036% |
| Joint Sports Claimants | 37.62758 | 37.62757% |
| NAB | 13.77736 | 13.77736% |
| PBS | 5.49125 | 5.49125% |
| Music Claimants | 4.00000 | 4.00000% |
| Canadian Claimants | 1.90971 | 1.90971% |
| Total | 100.00002 | 100.00000% |

| 1999 Cable 3.75% Fund | Per Order | Prorated |
|---|---|---|
| Devotional Claimants | 0.90725 | 0.90725% |
| Program Suppliers | 39.13977 | 39.13976% |
| Joint Sports Claimants | 40.47418 | 40.47417% |
| NAB | 15.12731 | 15.12731% |
| PBS | 0.00000 | 0.00000% |
| Music Claimants | 4.00000 | 4.00000% |
| Canadian Claimants | 0.35151 | 0.35151% |
| Total | 100.00002 | 100.00000% |

Exhibit I
Page 41

b.    Phase II controversies

With regard to the 1998 cable royalties, Phase II controversies remain in only one category: the Program Suppliers category. Two such controversies remain between the MPAA-represented Program Suppliers and (1) NAB and (2) Station KNLJ of Jefferson City, Missouri. The Office's inclination is to make a final distribution to the other categories, who have settled their Phase II controversies, the remainder of the funds allocated to them in accordance to the Librarian's final determination. See 68 FR 3606, 3620 (January 26, 2004).

With regard to the 1999 cable royalties, Phase II controversies remain in the sports programming category (between JSC and IPG), the program suppliers category (between the MPAA-represented Program Suppliers and NAB), and the devotional category (between the Devotional claimants and NAB). As the Office has received no information from these claimant groups concerning the distribution of the 1999 cable royalty fees, it cannot ascertain the extent of the Phase II controversies for 1999 for purposes of a further distribution. Motions for distribution of these funds should be directed to the Copyright Royalty Judges upon termination of this proceeding under the Copyright Arbitration Royalty Panel program.

On the other hand, Phase II controversies in the music category, the commercial television category, the public television category and the Canadian claimant category have been resolved. Because no Phase II controversies exist in any of these categories, the Office determines that it is appropriate to make a final distribution of the remaining 1999 cable royalty funds allocated to each of the following categories in accordance with the Librarian's final determination: Music, Commercial Television, Public Television, and the Canadian Claimants. See 68 FR 3606, 3620 (January 26, 2004).

c.    Overpayment related to the 1998 cable royalty fees

The Office is aware of one outstanding issue which may prevent a final distribution of the 1998 cable royalties at this time. Specifically, an overpayment of funds was made to the Program Suppliers in the partial distribution authorized by the Office in October 2000. See Comments of NAB (December 6, 2005); See also, Order in Docket No. 2000-6 CARP CD 98 (October 12, 2000). However, the Office has no additional information concerning any overpayment to Program Suppliers and will make a final distribution based upon the adjusted percentages to all claimant categories but the Program Suppliers, unless it is notified that it is not feasible in light of the noted alleged overpayment by no later than Monday, April 9, 2007.

**Agreements related to partial distributions**

The Office makes the partial distributions of the 2000, 2001, and 2002 cable royalties with the understanding that the parties agree to return any payment in excess of what a party should have received in addition to the interest the payments would have earned had they not been distributed. Therefore, each party who is to receive a partial distribution of the 2000, 2001,

-5-

Exhibit I
Page 42

and 2002 cable royalty fees prior to the determination of the final percentages must sign an agreement stating that any overpayment that results from the partial distribution shall be repaid to the Copyright Office with interest according to the amount that would have accrued if the principal had remained in the fund prior to the scheduled distribution. The Licensing Division of the Copyright Office is faxing a copy of the agreement, under separate cover, to a representative of each Phase I Party.

**Determination**

Wherefore, **IT IS ORDERED** that the Phase I Claimants' Notice of Partial Settlement and Motion for Further Distribution **IS GRANTED IN PART, DENIED IN PART.** The Copyright Office shall make a further distribution of NPR's 0.18 percent share of each of the 2000, 2001, and 2002 cable royalty fees, adjusted to account for the prior partial distribution made in each fund. In addition, a further distribution of the 2000, 2001, and 2002 cable royalty fees, less $10 million from each of the fund years 2000 and 2001 and $15 million from the fund year 2002, shall be made on behalf of the Phase I Parties with the exception of the Devotional Claimants. Such distributions shall be made to the common agent identified by the Phase I Parties. The fees retained by the Office shall be used to settle the outstanding Phase I controversy and Phase II controversies in each fund year and to cover any administrative costs needed to resolve the remaining controversies.

The Copyright Office shall make these distributions on or after April 12, 2007, **provided that** each of the Phase I Parties receiving a share of these funds provides a signed agreement prepared by the Copyright Office no later than April 9, 2007, stating that any overpayment that results from the distribution of these funds shall be repaid to the Copyright Office with interest according to the amount that would have accrued if the principal had remained in the fund. In addition, all pertinent information to effect the transfer of the funds must be provided to the Licensing Division of the Copyright Office no later than April 9, 2007. The partial distribution made pursuant to this Order shall be without prejudice concerning the final distribution percentages that shall be determined at a future time.

**IT IS FURTHER ORDERED** that a final distribution of the 1999 cable royalty fees shall be made to the Music Claimants, the Commercial Television Claimants, the Public Television Claimants and the Canadian Claimants in accordance with the percentages set forth in the Librarian's decision of January 26, 2004, as adjusted herein, on or after April 19, 2007, provided that no objections are received to the adjustment of the percentages and each of the parties receiving these funds submits all pertinent information to effect the transfer of funds to the Licensing Division of the Copyright Office no later than April 13, 2007.

**IT IS FURTHER ORDERED** that a final distribution of the 1998 cable royalty fees minus Program Suppliers' share shall be made on or after April 19, 2007, provided that each of the parties receiving these funds submits all pertinent information to effect the transfer of funds to the Licensing Division of the Copyright Office no later than April 13, 2007, and provided

-6-

Exhibit I
Page 43

further that the Office has not received any notification by April 13, 2007, that a final distribution of the 1998 cable royalties should not be made in light of the overpayment issue to those categories with no Phase II controversies.

**SO ORDERED**.

Marybeth Peters
Register of Copyrights

DATED: April 3, 2007.

-7-

Exhibit I
Page 44

# EXHIBIT J

Exhibit J
Page 45

4-6-07



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

In the Matter of          }

**Distribution of the 1998-2002 Cable** }  Docket Nos.
**Royalty Funds**              }

| | |
|---|---|
| **2001-8 CARP CD 98-99** | |
| **2002-8 CARP CD 2000** | |
| **2003-2 CARP CD 2001** | |
| **2004-5 CARP CD 2002** | |

## CLARIFICATION ORDER

On April 3, 2007, the Office issued an order in the above-captioned proceedings concerning the distribution of the 1998-2002 cable royalty fees. The Order specified in the discussion section that the Office was granting the request for a further distribution of the 2000-2002 cable royalty fees to the Canadian Claimants according to the percentages specified in the December 6 Motion for Further Distribution, and this grant should have been restated in the determination section. To avoid any confusion on this point, the Office is reissuing its determination concerning the further distribution of the 2000-2002 cable royalty fees.

Wherefore, **IT IS ORDERED** that the Phase I Claimants' Notice of Partial Settlement and Motion for Further Distribution **IS GRANTED IN PART, DENIED IN PART.** The Copyright Office shall make a further distribution of NPR's 0.18 percent share of each of the 2000, 2001, and 2002 cable royalty fees, adjusted to account for the prior partial distribution made in each fund. In addition, the Office shall make a further distribution to the Canadian Claimants of the 2000, 2001, and 2002 cable royalty fees on hand as agreed upon by the Phase I Claimants, of 1.856781 percentage of the Basic royalty funds and 0.25039574 percentage of the 3.75 royalty funds. Thereafter, a further distribution of the 2000, 2001, and 2002 cable royalty fees, less $10 million from each of the fund years 2000 and 2001 and $15 million from the fund year 2002, shall be made on behalf of the Phase I Parties with the exception of the Devotional Claimants. Such distributions shall be made to the common agent identified by the Phase I Parties. The fees retained by the Office shall be used to settle the outstanding Phase I controversy and Phase II controversies in each fund year and to cover any administrative costs needed to resolve the remaining controversies.

The Copyright Office shall make these distributions on or after April 12, 2007, **provided that** each of the Phase I Parties receiving a share of these funds provides a signed agreement prepared by the Copyright Office no later than April 9, 2007, stating that any overpayment that results from the distribution of these funds shall be repaid to the Copyright Office with interest according to the amount that would have accrued if the principal had remained in the fund. In addition, all pertinent information to effect the transfer of the funds must be provided to the Licensing Division of the Copyright Office no later than April 9, 2007. The partial distribution made

Exhibit   J

Page 46

pursuant to this Order shall be without prejudice concerning the final distribution percentages that shall be determined at a future time.

**SO ORDERED**.

Marybeth Peters
Register of Copyrights


By: *Tanya M. Sandros*
Tanya M. Sandros
Acting General Counsel

DATED:  April 6, 2007

2

Exhibit J
Page 47

# EXHIBIT K

Exhibit K

Page 48



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

4-10-07

4-10-07

| | | | |
|---|---|---|---|
| In the Matter of | } | | |
| | } | | |
| **Distribution of the 1998-2002 Cable** | } | Docket Nos. | **2001-8 CARP CD 98-99** |
| **Royalty Funds** | } | | **2002-8 CARP CD 2000** |
| | } | | **2003-2 CARP CD 2001** |
| ——————————————— | } | | **2004-5 CARP CD 2002** |

## Order

On April 9, 2007, the Office received a Joint Motion for Modification of the April 3 and 6th Orders authorizing the further distribution of the 2000-2002 cable royalty funds from Program Suppliers, Joint Sports Claimants, National Association of Broadcasters, Public Television Claimants, Devotional Claimants, Music Claimants (the American Society of Composers, Authors and Publishers, Broadcast Music, Inc. and SESAC, Inc.), Canadian Claimants, and National Public Radio ("NPR") (collectively, "Phase I Parties"). The Phase I Parties request that the sequence of the distribution set out in the Office's April 3 Order and the Clarification Order be modified so that the distribution to the Canadian Claimants is combined with the further distribution made to the other claimant groups through a common agent, rather than as a separate distribution.

As all affected parties have agreed to this modification in the sequence of the distribution of the 2000-2002 cable royalty funds, the Office is granting the Phase I Parties' Joint Motion as requested.

Wherefore, **IT IS ORDERED** that the Phase I Claimants' Joint Motion for Modification of Order for Further Distribution of the 2000-2002 Cable Royalty Funds **IS GRANTED**. The Copyright Office shall first make a distribution of NPR's 0.18 percent share of each of the 2000, 2001, and 2002 cable royalty fees, adjusted to account for the prior partial distribution made in each fund. The Office shall then make a further distribution of the 2000, 2001, and 2002 cable royalty fees, less $10 million from each of the fund years 2000 and 2001 and $15 million from the fund year 2002, shall be made on behalf of all remaining Phase I Parties with the exception of the Devotional Claimants, to the common agent identified by these Phase I Parties. The fees retained by the Office shall be used to settle the outstanding Phase I controversy and Phase II controversies in each fund year and to cover any administrative costs needed to resolve the remaining controversies.

The Copyright Office shall make these distributions on or after April 19, 2007, provided that each of the Phase I Parties receiving a share of these funds provides a signed agreement prepared by the Copyright Office no later than April 13, 2007, stating that any overpayment that

results from the distribution of these funds shall be repaid to the Copyright Office with interest according to the amount that would have accrued if the principal had remained in the fund. In addition, all pertinent information to effect the transfer of the funds must be provided to the Licensing Division of the Copyright Office no later than April 13, 2007. The partial distribution made pursuant to this Order shall be without prejudice concerning the final distribution percentages that shall be determined at a future time.

**SO ORDERED.**

Marybeth Peters
Register of Copyrights

DATED: April 10, 2007.

# EXHIBIT L

Exhibit L
Page 51

S-24-07



**United States Copyright Office**
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

| | |
|---|---|
| In the Matter of | } |
| | } |
| **Distribution of the 1998-1999 Cable** | } **Docket Nos.  2001-8 CARP CD 98-99** |
| **Royalty Funds** | } |
| | } |

## ORDER

*Introduction and background.*  On April 3, 2007, the Copyright Office authorized a final distribution of the remaining 1998 and 1999 cable royalty fees to all settled claimant groups based upon an adjustment to the final percentages.  On April 18, 2007, prior to the distribution, the representatives of the Phase I claimant categories,[1] filed a Joint Notice of Settlement and Motion for Further Distribution of the 1998 Cable Royalty Fund ("Notice of Settlement and Motion") responding to issues raised in the April 3 Order. In light of this filing, the Office did not distribute the 1998 cable royalty fees. It did, however, make a further distribution of the 1999 cable royalty fees to the Phase I claimant groups that had no Phase II controversies.

The Notice of Settlement and Motion informs the Office that the Phase I Parties have resolved the alleged overpayment to Program Suppliers noted in the April 3 Order, and therefore, no Phase I controversies remain as to the distribution of the 1998 cable royalty fees. The Notice of Settlement and Motion also addresses the outstanding Phase II disputes in the Program Supplier category. It states that in light of past partial distributions the Office need only retain $200,000 to cover the amount in controversy between MPAA and NAB and $25,000 to cover KNLJ's outstanding Phase II controversy within the Program Suppliers category.   Based upon these developments and the parties' reevaluation of past distributions, the Phase I Parties request a further distribution of the 1998 cable royalty fees minus $800,000 pending the resolution of the outstanding Program Suppliers Phase II controversies, subject to the condition that Program Suppliers agree "to refund with interest any overpayment that results from any distribution of royalties within the Program Suppliers category that they have received to date."  Notice of Settlement and Motion at 4.

The Office has also received two additional motions for further distribution of the 1999 cable royalty fees.  On April 16, 2007, the Program Suppliers represented by the Motion Picture Association of America, Inc. ("MPAA") and the NAB filed a joint motion for reconsideration, requesting a further partial distribution of its remaining 1999 cable royalty fees minus $300,000. Similarly, the Office of the Commissioner of Baseball, the National Basketball Association, the National Football League, The National Collegiate Athletic Association, the National Hockey League and the Women's National Basketball Association (collectively, the "Joint Sports

---

[1]  These representatives include Program Suppliers, Joint Sports Claimants ("JSC"), National Association of Broadcasters ("NAB"), Public Television Claimants ("PBS"), Devotional Claimants (the American Society of Composes, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc.), Canadian Claimants, and National Public Radio (collectively, "Phase I Parties").

Exhibit  L
Page  52

Claimants" or "JSC") filed a separate motion for a further partial distribution of at least 95% of its remaining share of the 1999 cable royalty fees.

No oppositions were filed to any of the motions for further distributions.

*Discussion.* Section 111(d)(4)(C) of the Copyright Act,[2] title 17 of the United States Code, authorizes the Librarian of Congress to distribute royalty fees to the copyright owners entitled to receive them, after deducting reasonable administrative costs, upon making a determination that no controversy exists with respect to the distribution of funds. Pursuant to this authority, prior motions for partial distributions have been granted after it has been ascertained that sufficient funds would remain in the royalty pools to satisfy all claims which remain in controversy. *See, e.g., Order,* Docket Nos. 2001-8 CARP CD 98-99, 2002-8 CARP CD 2000, 2003-2 CARP CD 2001, and 2004-5 CARP CD 2002 (April 3, 2007); *Order,* Docket No. 2004-5 CARP CD 2002 (September 7, 2004); *Order,* Docket No. 2003-2 CARP CD 2001 (October 1, 2003); *Order,* Docket No. 2002-8 CARP CD 2000 (October 10, 2002); *Order,* Docket No. 2001-6 CARP CD 99 (October 17, 2001); and *Order,* Docket No. 2000-6 CARP CD 98 (October 12, 2000).

Having received motions from the parties for further distributions and upon consideration of the comments filed by the parties regarding the current status and extent of the remaining controversies, the Office agrees that a further partial distribution of the 1998 and 1999 cable royalties may be made. In light of the parties' representations concerning the extent of the remaining 1998 Phase II controversies, the only outstanding controversies in this proceeding, the Office agrees that retention of $800,000 shall be sufficient to satisfy the outstanding controversies in the Program Suppliers' category and to cover the attendant administrative costs. However, based upon the determination in the Phase I proceeding concerning the distribution of the 1998 and 1999 cable royalty fees, 69 FR 3606 (January 26, 2004), and the earlier partial distribution of the 1998 cable royalty fees, *see Order,* Docket No. 2000-6 CARP CD 98 (October 12, 2000), insufficient funds remain in the Program Suppliers' 1998 category to cover the request to withhold $800,000 pending resolution of the remaining Phase II controversies in the Program Suppliers category. Nevertheless, we will grant the motion as requested to a single agent for the claimant categories that are fully settled.

However, further proceedings to settle the outstanding Phase II controversies in the Program Suppliers category cannot be initiated at this time. First, Program Suppliers, in accordance with the parties' 1998 royalty fund settlement agreement, must repay from its share of the earlier partial distribution, funds to cover the value of the outstanding controversies and the associated administrative costs of conducting a proceeding to resolve these issues. Only then can a proceeding be convened to settle the disputes concerning the distribution of the fees allocated to the Program Suppliers' category as a result of the Phase I determination.

---

[2]  All references to the Copyright Act are to the provisions as they existed prior to May 31, 2005, the effective date of the Copyright Royalty and Distribution Reform Act of 2004, Pub. L. No. 108-419, 118 Stat. 2341.

-2-

Exhibit L
Page 53

Commencement of a distribution proceeding to resolve Program Suppliers Phase II controversies, however, is not imminent; thus, the Office is not requesting repayment at this time.

With respect to the 1999 cable royalty fees, the Office shall make a further distribution of all but 5% of the Joint Sports Claimants share of the royalty fees, this being the largest amount asserted by any party against the fund with the understanding that retention of this amount would be sufficient to cover any administrative costs incurred in resolving the controversy between Joint Sports Claimants and Independent Producers Group, the only controversy within this Claimants' Group. The Office will also make a further distribution of the 1999 funds allocated to the Program Suppliers, retaining $500,000 to satisfy the controversy between MPAA and NAB and cover the administrative costs to resolve this controversy.

*Agreements related to partial distributions.* In addition to the conditions set forth above, the Office makes a further partial distribution of the 1999 cable royalties with the understanding that the parties agree to return any payment in excess of what a party should have received in addition to the interest the payments would have earned had they not been distributed. Therefore, each party who is to receive a partial distribution of the 1999 cable royalty fees prior to the determination of the final percentages must sign an agreement stating that any overpayment that results from the partial distribution shall be repaid to the Copyright Office with interest according to the amount that would have accrued if the principal had remained in the fund prior to the scheduled distribution. The Licensing Division of the Copyright Office shall fax a copy of the agreement, under separate cover, to a representative of the appropriate parties.

The Office, however, is not requiring agreements from the recipients of the further distribution of the 1998 royalty fees. The distribution of these funds is not in dispute.

*Determination.* Wherefore, **IT IS ORDERED** that the Phase I Parties' Joint Notice of Settlement and Motion for Further Distribution of the 1998 Cable Royalty Fund **IS GRANTED,** with conditions, and that the MPAA/NAB Joint Motion for Reconsideration **IS GRANTED IN PART.** Accordingly, the Copyright Office shall distribute to a common agent identified by the Phase I Parties the total amount available for distribution of the 1998 cable royalty fund, less $800,000 which is being withheld at the request of the parties pending resolution of Program Suppliers' Phase II controversies with the understanding that further proceedings to resolve the Phase II controversies in the Program Suppliers category can commence only upon receipt of additional funds from Program Suppliers to cover the costs of these controversies and the cost of the proceeding. The Office shall also make a further partial distribution of the remaining Program Suppliers' share of the 1999 cable royalty fee, less $500,000. The 1999 fees retained by the Office shall be used to settle the outstanding 1999 Phase II controversies in the Program Suppliers category and to cover any administrative costs needed to resolve the remaining controversies.

**IT IS FURTHER ORDERED** that JSC's Motion for Reconsideration and Further Distribution of 1999 Cable Royalties **IS GRANTED.** The Office shall distribute the remaining

-3-

Exhibit L
Page 54

1999 cable royalty fees allocated to the Joint Sports Claimants, less 5 percent of its share to cover the cost of the outstanding Phase II controversy between JSC and Independent Producers Group and any administrative costs needed to resolve this controversy.

The Copyright Office shall make these distributions on or after June 7, 2007, **provided that** the parties to the Phase II controversy concerning the distribution of the Joint Sports Claimants' share of the 1999 royalty fees provide a signed agreement prepared by the Copyright Office no later than May 31, 2007, stating that: (1) any overpayment that results from the distribution of these funds shall be repaid to the Copyright Office with interest according to the amount that would have accrued if the principal had remained in the fund. In addition, all pertinent information to effect the transfer of the funds must be provided to the Licensing Division of the Copyright Office no later than May 31, 2007. The partial distribution made pursuant to this Order shall be without prejudice concerning the final distribution percentages that shall be determined at a future time.

**SO ORDERED.**

MaryBeth Peters,
Register of Copyrights.

DATED: May 24, 2007.

-4-

Exhibit L
Page 551

# EXHIBIT M

Exhibit M

Page 51



United States Copyright Office
Library of Congress · 101 Independence Avenue SE · Washington, DC 20559-6000 · www.copyright.gov

7-11-07

In the Matter of

Distribution of the 1998 Cable
Royalty Fund

}
}
}  Docket Nos.  2001-8 CARP CD 98-99
}
}

## ACKNOWLEDGEMENT OF REALLOCATION OF 1998 CABLE ROYALTY FUNDS

*Introduction and background.* On April 3, 2007, the Copyright Office ("Office") issued an Order authorizing a final distribution of the remaining 1998 cable royalty fees to all settled claimant groups based upon an adjustment to the final percentages. On April 18, 2007, prior to the distribution, the representatives of the Phase I claimant categories,[1] filed a Joint Notice of Settlement and Motion for Further Distribution of the 1998 Cable Royalty Fund ("Joint Notice") responding to issues raised in the April 3 Order.

The Joint Notice informed the Office that the Phase I Parties had resolved the alleged overpayment to Program Suppliers noted in the April 3 Order, and therefore, no Phase I controversies remain as to the distribution of the 1998 cable royalty fees. The Joint Notice also addressed the outstanding Phase II disputes in the Program Supplier category. It stated that in light of past partial distributions, the Office need only retain $200,000 to cover the amount in controversy between MPAA and NAB and $25,000 to cover KNLJ's outstanding Phase II controversy within the Program Suppliers category. Based upon these developments and the parties' reevaluation of past distributions, the Phase I Parties requested a further distribution of the 1998 cable royalty fees minus $800,000 pending the resolution of the outstanding Program Suppliers Phase II controversies, subject to the condition that Program Suppliers agreed to "refund with interest any overpayment that results from any distribution of royalties within the Program Suppliers category that they have received to date." *See* Joint Notice at 4.

On May 24, 2007, the Office issued an Order ("Order") stating that it would distribute the remainder of the 1998 funds, less the $800,000 withheld pending the resolution of the Program Suppliers Phase II controversies. However, the Office noted that further proceedings to settle the outstanding Phase II controversies in the Program Suppliers category could not be initiated at that

---

[1] These representatives include Program Suppliers, Joint Sports Claimants ("JSC"), National Association of Broadcasters ("NAB"), Public Television Claimants ("PBS"), Devotional Claimants, Music Claimants (the American Society of Composers, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc.), Canadian Claimants, and National Public Radio (collectively, "Phase I Parties").

Exhibit M

Page 57

time. The Office explained that Program Suppliers, in accordance with the claimants' 1998 royalty fund settlement agreement, must repay from its share of the earlier partial distribution, funds to cover the value of the outstanding controversies and the associated administrative costs of conducting a proceeding to resolve such issues. The Office stated that only after this matter had been addressed may a proceeding be convened to settle the disputes concerning the distribution of the fees allocated to the Program Suppliers' category as a result of the Phase I determination. The Office also noted that the commencement of a distribution proceeding to resolve Program Suppliers Phase II controversies was not imminent and thus the Office was not requesting repayment at that time.

On June 7, 2007, the claimants filed a Supplement to their Joint Notice of Settlement and Motion for Further Distribution of the 1998 Cable Royalty Fund ("Supplement"). They wrote to clarify the Joint Notice and Motion and to request that the Office consider the entire reserve amount attributable to the Program Suppliers category for purposes of allowing the commencement of a 1998 Phase II proceeding. Specifically, the claimants have advised the Office that, pursuant to, and in accordance with, their confidential resolution of outstanding disputes, which was reported in the Joint Motion, the claimants other than Program Suppliers relinquish any claim to any portion of the $800,000 reserve amount withheld by the Office to cover Phase II controversies in the Program Suppliers category. Program Suppliers acknowledge and affirm this relinquishment, pursuant to, and in accordance with, the confidential resolution of outstanding disputes. The Supplement states that all parties join in the request that the Office treat the reserve amount as entirely attributable to the Program Suppliers category for purposes of allowing the commencement of a 1998 Phase II proceeding.

*Discussion.* Section 111(d)(4)(C) of the Copyright Act, title 17 of the United States Code, authorizes the Librarian of Congress to distribute royalty fees to the copyright owners entitled to receive them, after deducting reasonable administrative costs, upon making a determination that no controversy exists with respect to the distribution of funds.

In the May 24th Order, after having received motions from the claimants for further distributions and upon consideration of the comments filed by the parties regarding the current status and extent of the remaining controversies, the Office agreed that a further partial distribution of the 1998 cable royalties may be made. At that time, in light of the parties' representations concerning the extent of the remaining 1998 Phase II controversies, the Office agreed that retention of $800,000 shall be sufficient to satisfy the outstanding controversies in the Program Suppliers' category and to cover the attendant administrative costs. The Office noted, however, that there were insufficient fund in the Program Suppliers' 1998 category to cover the request to withhold $800,000 pending resolution of the remaining Phase II controversies. *See* Order at 2.

-2-

Exhibit M
Page 58

The situation has now changed.  In light of the claimant's June 7, 2007 Supplement and the agreement among the parties reached therein, we acknowledge that all parties, other that Program Suppliers, have relinquished a claim to any portion of the $800,000 reserve amount. Consequently, we shall consider the reserve amount as entirely attributable to the Program Suppliers category.  As such, a Phase II proceeding may commence at any time.

**SO ACKNOWLEDGED.**

Marybeth Peters,
Register of Copyrights.

DATED: July 11, 2007

-3-

Exhibit M
Page 59

# EXHIBIT N

762224
0015
7P

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
2002 MAY 29  PM 4: 45

NANCY
MAYER-WHITTINGTON
CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Raul C. GALAZ, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Criminal No:

**0 2 - 2 3 0**

**FILED**

MAY 3 0 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## PLEA AGREEMENT

The defendant,  defense counsel and the undersigned on behalf of the United

States have executed the attached plea agreement in resolving criminal prosecution

of the identified activities.

May 29, 2002
DATE

ROSCOE C. HOWARD, JR.
United States Attorney
for the District of Columbia

By: _William H. Bowne III_
William H. Bowne, III
Trial Attorney, Crim. Div., Fraud Section
1400 New York Avenue, N.W.
Washington, D.C.
Tel: 202-514-7023

- 1 -

Exhibit ___N___
Page _(o)_

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the Plea Agreement in this case was served this

day by first-class mail on counsel for defendant Raul C. Galaz at the following address:

Whitney C. Ellerman, Esq.
Janis, Schuelke & Wechsler
1728 Massachusetts Avenue, N.W.
Washington, D.C.

Dated:   May 29, 2002

William H. Bowne, III
Trial Attorney, U.S. Dept. Of Justice
Criminal Division, Fraud Section
10th and Constitution Avenues, N.W.
Bond Building
Washington, D.C.  20530
Tel: (202) 514-7023

- 2 -

Exhibit  N
Page  62

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: |
| v. | ) | VIOLATION |
| | ) | 18 U.S.C. § 1341 |
| RAUL GALAZ | ) | (Mail Fraud) |

PLEA AGREEMENT

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States of America, by the Fraud Section and the defendant, Raul Galaz, and his attorney agree as follows:

1. Defendant Galaz will waive Indictment and plead guilty in the United States District Court for the District of Columbia to the crime charged in the Information filed in the matter charging one count of Mail Fraud in violation of Title 18 United States Code § 1341.

2. Defendant Galaz is entering this agreement and is pleading guilty freely and voluntarily without promise or benefit of any kind, other than contained herein, and without threats, force, intimidation, or coercion of any kind.

3. The defendant knowingly, voluntarily, and truthfully admits the facts contained in the attached Information as the factual basis for Plea.

4. The defendant shall enter a plea of guilty to a one-count Information charging defendant with mail fraud, (18 U.S.C. § 1341), for engaging in a scheme and artifice to defraud the United States and the Motion Picture Association of America of money and property by making false statements and representations to the United States Copyright Office and to the Motion Picture Association of America and by giving materially false sworn testimony in a statutorily mandated administrative proceeding convened by the Library of Congress.

5. The defendant understands the nature of the offense to which he is pleading guilty, and the elements thereof, including the penalties provided by law. The charge

Exhibit N
Page 63

carries a maximum sentence of imprisonment for a term not to exceed five (5) years, a $250,000 fine, or both, with a mandatory special assessment of $100. The defendant understands that the Court may impose a term of Supervised Release to follow any incarceration, in accordance with Title 18, United States Code, Section 3583, and that, in this case, the authorized term of supervised release is not more than three years.

6.    The defendant agrees to cooperate completely, candidly, and truthfully in the present investigation of a scheme to defraud the United States Copyright office and the Motion Picture Association of America. Specifically, the defendant agrees:

a.    To provide complete, truthful, and candid disclosure of information and all records, writings, tangible objects, or other requested materials of any kind or description that he has which relate directly or indirectly to the subject of this investigation;

b.    To answer completely, truthfully, and candidly all questions put to him by attorneys and law enforcement officials during the course of this investigation;

c.    To make himself available for interviews by attorneys and law enforcement officers of the government upon request and reasonable notice;

d.    Not to attempt to protect any person or entity through false information or omission, nor falsely to implicate any person or entity;

e.    To comply with any and all reasonable requests from federal government authorities with respect to the specific assistance that he shall provide;

f.    To answer, at trial, before the grand jury, or at any hearing or administrative proceeding arising out of this investigation, all questions put to him by the court or by the attorney for any party completely, truthfully, and candidly; and

2

Exhibit   N
Page   64

g.  To provide a full and complete accounting of all assets to the Probation Office including real or intangible, held by him or in any other name for his benefit.

7.  Pursuant to U.S.S.G. § 1B1.8, the United States and defendant agree that since defendant has agreed to cooperate with the United States, information provided by defendant about: 1) fraudulent claims and representations made in the name of Bill Taylor and Tracee Productions; 2) fraudulent claims and representations made in the names of eight other fictitious persons and associated companies identified paragraph 11 of Count 1 of the attached Information; and 3) false statements made during an administrative hearing conducted by a Copyright Arbitration Royalty Panel convened by the Library of Congress to determine 1997 copyright cable and satellite retransmission royalty distribution, shall not be held against him, except as follows:

a.  information that was known to the United States prior to the date this plea agreement and the interview of the defendant pursuant to an interview agreement;

b.  in a prosecution for perjury or giving a false statement pursuant to paragraph 12 of this agreement; and

c.  if there is a breach of this agreement by defendant as determined under the provisions of paragraphs 11 and 12. In the event of such a breach, the United States retains the right to make use of information and statements provided by defendant as described in paragraph 11.

8.  Nothing in this plea agreement restricts the Court's or the Probation Office's access to information and records in the possession of the United States. Further, nothing in this agreement prevents the government in any way from prosecuting the defendant should the defendant provide false, untruthful or perjurious information or testimony.

3

9.      In return for the defendant's full and truthful cooperation and his plea of guilty to the charges described in paragraph 1 of this agreement, the Fraud Section agrees to bring no additional criminal charges in the District of Columbia or any other judicial district against the defendant relating to or arising from the matters identified in the Criminal Information to which the defendant will plea guilty.

10.     Should any other prosecuting jurisdiction attempt to use truthful information the defendant provides pursuant to this agreement against the defendant, the United States agrees, upon request, to contact that jurisdiction and ask that jurisdiction to abide by the provision contained in paragraph 8 of this agreement. The parties understand that the prosecuting jurisdiction retains discretion over whether to use such information.

11.     If defendant fails to make a complete, truthful, and candid disclosure of information to federal law enforcement officers, government attorneys, and grand juries conducting this investigation, or to the Court, and/or if he fails to comply with any other of the material conditions and terms set forth in this agreement, he will have committed a material breach of the agreement which will release the government from its promises and commitments made in this agreement. Upon defendant's failure to comply with any of the terms and conditions set forth in this agreement, the government may fully prosecute him on all criminal charges that can be brought against him. In such a prosecution, the United States will have the right to make derivative use of any statement made by defendant pursuant to this cooperation agreement, and to impeach defendant with any such statements. Defendant waives any right to claim that evidence presented in such prosecution is tainted by virtue of the statements he has made.

12.     In the event of a dispute as to whether defendant has knowingly given materially false, incomplete or misleading information in fulfilling the terms of his cooperation agreement or whether defendant has knowingly committed any other material breach of this agreement, and if the United States wants to exercise its rights under

4

Exhibit N
Page 66

paragraph 11, and if defendant so requests, the matter shall be submitted to the Court and shall be determined by the Court in an appropriate proceeding at which defendant's disclosures and documents shall be admissible and at which time the United States shall have the burden to establish the same by a preponderance of the evidence.

13.    At all briefing and interviewing sessions conducted by investigators and/or attorneys for the government, defendant shall be entitled to the presence, advice, and assistance of counsel, unless waived.

14.    This agreement is premised on the assumption that up to the time of sentencing defendant will have committed no new offenses since pleading guilty in this matter.  Should it be determined, using a probable cause standard, that defendant has committed new offenses, the government may take whatever position it believes appropriate as to the sentence and terms of release.  In addition, if in this plea agreement the United States has agreed to recommend or refrain from recommending to the sentencing judge a particular resolution of any sentencing issue, the Government reserves the right to full allocution in any post-sentence litigation in order to defend the sentencing judge's ultimate decision on such issues.

15.    The defendant understands and acknowledges that the offenses with which he will be charged are subject to the provisions and guidelines of the "Sentencing Reform Act of 1984," Title 28, United States Code, Section 994(a).

16.    The United States cannot and does not make any promise or representation as to what sentence the defendant will receive or what fines or restitution, if any, he may be ordered to pay.  The defendant understands that the sentence and the sentencing guidelines applicable to his case will be determined solely by the Court, with the assistance of the United States Probation office, and that he will not be permitted to withdraw his plea regardless of the sentence calculated by the United States Probation office or imposed by the Court.

Exhibit  N
Page  67

17.     Defendant Galaz understands and acknowledges that he may receive any sentence within the statutory maximums for the offenses of conviction.

18.     Defendant and the United States agree to recommend the following regarding the Sentencing Guidelines, but the Defendant understands such recommendations are not binding on the Probation Office or the Court, and further, that the Court may impose any sentence within the maximum statutory sentence for the offense of conviction:

a.     The applicable Guideline is § 2F1.1.

b.     The base offense level under § 2F1.1 is 6.

c.     The amount of loss and intended loss to the government was more than $320,000 and less than $350,000 and increases the offense level by 8 under § 2F1.1(b)(1).

d.     The offense involved more than minimal planning and warrants a 2 level increase under § 2F1.1(b)(2).

e.     The government reserves the right to argue and present evidence at sentencing demonstrating that the Defendant attempted to obstruct the administration of justice by providing materially false sworn testimony in a statutorily mandated administrative proceeding sanctioned by the Library of Congress and warrants a 2 level increase under § 3C1.1.  However, the defendant reserves the right to argue the non-applicability of this enhancement.

f.     The United States will recommend a reduction of 3 levels under § 3E1.1(b), if the Defendant clearly demonstrates acceptance of responsibility for the instant offense, including cooperating fully with the presentence report writer, with the Court, and the Library of Congress in all proceedings arising from this matter, and by complying with the other provisions of this Agreement.  If

6

Exhibit N
Page 68

the Defendant fails to do so, the United States may take any position it deems appropriate with respect to this reduction.

g.    The parties agree that no other sentencing enhancement provisions apply and recognize however, that their determination is not binding on either the Court or the Probation Department.

h.    The government reserves the right to argue at sentencing that correct adjusted offense level is 15 and that the Defendant should receive a sentence that includes an 18 month period of incarceration.

19.    Defendant understands that the recommendations contained in paragraph 18 is not binding on the sentencing judge or the Probation Office, and that he will not be entitled to withdraw his plea in the event that either the sentencing judge or the Probation Office does not accept or follow these recommendations.

20.    At the time of sentencing, the United States will advise the sentencing judge and the probation office of the full nature, extent, and value of any cooperation provided by defendant to the United States.

21.    Defendant Galaz understands that the Court may impose a fine, restitution, costs of incarceration, and costs of supervision.

22.    The United States reserves the right to allocute in all respects as to the nature and seriousness of the offense and to make a recommendation as to sentencing. The attorney for the United States will inform the sentencing Judge and the Probation Office of (1) this agreement; (2) the nature and extent of defendant Galaz's activities with respect to this case; and (3) all other information in its possession relevant to sentencing.

23.    Defendant Galaz agrees that if the Court does not accept his plea of guilty to the Information, this agreement shall be null and void.

24.    Defendant understands that this agreement is binding only upon the Fraud Section of the Department of Justice.  This agreement does not bind the Civil Division of

7

any United States Attorney's Office, the Tax Division of the Department of Justice, nor does it bind any state or local prosecutor. It also does not bar or compromise any civil or administrative claim pending or that may be made against the defendant. The United States will, however, bring this agreement and the full extent of defendant's cooperation to the attention of other prosecuting offices if requested.

25. This agreement constitutes the entire agreement between the United States and defendant Galaz. No other promises, agreements, or representations exist or have been made to defendant Galaz or his attorneys by the Department of Justice in connection with this case. This agreement may be amended only by a writing signed by all parties.

Dated this 29th day of May, 2002.

FOR THE DEFENDANT

RAUL GALAZ

WHITNEY C. ELLERMAN
Janis, Schuelke & Wechsler
1728 Massachusetts Ave., N.W.
Washington, D.C. 20036
(202) 861-0600

FOR THE UNITED STATES

JOSHUA R. HOCHBERG
CHIEF, FRAUD SECTION
FOR THE DEPARTMENT OF JUSTICE

By: 
WILLIAM H. BOWNE
Trial Attorney, Fraud Section
U.S. Department of Justice
1400 New York Ave., N.W., Rm. 4114
Washington, D.C. 20005
(202) 514-7023

8



Exhibit N

Page 70

# EXHIBIT O

Exhibit O
Page 71

262224-0045

(FP)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

U.S. DISTRICT COURT
DISTRICT OF COLUMBIA
2002 MAY 29 PM 4: 45

MAYER-WHITTINGTON
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Criminal No:   0 2 - 2 3 0** |
| Plaintiff, | ) | |
| | ) | **Count 1: 18 U.S.C. § 1341** |
| v. | ) | **(Mail Fraud)** |
| | ) | |
| Raul C. GALAZ, | ) | **FILED** |
| | ) | |
| Defendant. | ) | MAY 3 0 2002 |
| | ) | |

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

KENNEDY, JR. U.S. JUDGE

**INFORMATION**

The defendant having waived in open court prosecution by indictment, the United

States Attorney for the District of Columbia charges:

**COUNT 1 (Mail Fraud)**

At all times relevant to this Information:

Background

1.      Defendant Raul C. GALAZ resided in either California or Texas and was an

attorney licenced to practice law in the State of California specializing in the field of

entertainment law.

2.      The United States Copyright Office (hereinafter "Copyright Office") is located

in the District of Columbia and is a component of the Library of Congress, a part of the

legislative branch of the Government of the United States.  The Copyright Office collects

copyright royalty payments from cable and satellite companies that retransmit programs to

system subscribers and distributes royalty fees to the owners of the copyrighted programs.

- 1 -

Exhibit ___O___

Page ___72___

3.     During July of each calender year, copyright owners must file claims with the Copyright Office for the prior calendar year which identify the program copyright owner, the program claimed, one cable or satellite system involved in the program's retransmission, and date of retransmission.

4.     The Motion Picture Association of America (hereinafter "MPAA") is located in the District of Columbia and is a non-profit trade organization which, on behalf of represented parties, collects copyright royalty payments from the Copyright Office and distributes the funds to copyright owners and/or beneficial interest holders.

5.     In or about March 1998, defendant Raul C. GALAZ, as principal founder, started Artist Collections Group, a California limited liability company, created to collect cable and satellite copyright retransmission royalties and other secondary royalty rights throughout the world.  Artist Collections Group conducted business under the name Worldwide Subsidy Group.

6.     In or about August, 1999, defendant Raul C. GALAZ, as the principal founder, started Worldwide Subsidy Group, a Texas limited liability company created to collect cable and satellite copyright retransmission royalties in the United States. Worldwide Subsidy Group conducted business under the name Independent Producers Group.

<u>The Scheme and Artifice to Defraud</u>

7.     Beginning in or about July 1995, and continuing through in or about March 2001, the exact dates being unknown, in the District of Columbia and elsewhere, the defendant,

- 2 -



Exhibit_____ ◯

Page ___73

Raul C. GALAZ,

devised and intended to devise a scheme and artifice to defraud and to obtain money and

property from the Copyright Office and the MPAA, by means of materially false and

fraudulent pretenses, representations and promises.

<u>Purpose of the Scheme and Artifice</u>

8.    It was the purpose of the scheme for defendant Raul C. GALAZ to

fraudulently obtain cable and satellite retransmission royalties from the Copyright Office

and the MPAA by falsely representing that fictitious business entities were owners, or

agents of owners, of copyrighted programs and were entitled to receive royalty fees, which

fees defendant Raul C. GALAZ converted to his own personal use.

<u>Manner and Means of the Scheme and Artifice</u>

9.    It was a part of the scheme and artifice that defendant Raul C. GALAZ

identified programs retransmited on cable and satellite systems for which retransmission

royalties were previously unclaimed.

10.    It was a further part of the scheme and artifice that defendant Raul C. GALAZ

made fraudulent submissions to the Copyright Office in which he used false and fraudulent

aliases and fictitious business entities to claim entitlement to cable and satellite system

retransmission royalties as detailed below:

| MAILING DATE | CLAIM YEAR | ALIAS | FICTITIOUS BUSINESS ENTITY | PROGRAM |
|---|---|---|---|---|
| 7/28/95 | 1994 | Bill Taylor | Tracee Productions | Garfield and Friends |
| 7/30/96 | 1995 | Bill Taylor | Tracee Productions | Garfield and Friends |

- 3 -

| 7/05/97 | 1996 | Bill Taylor | Tracee Productions | Garfield and Friends |
|---------|------|-------------|--------------------|----------------------|
| 7/20/97 | 1996 | Bennett Stablish | Agman Animation | Bone Chillers |
| 7/10/98 | 1997 | Bennett Stablish | Agman Animation | Bone Chillers |
| 7/22/97 | 1996 | Harry Lough | BAL Productions | Unsolved Mysteries |
| 7/18/97 | 1996 | John Motoran | Blink Productions | Blinky Bill |
| 7/28/98 | 1996 | John Motoran | Blink Productions | The People's Court |
| 7/08/97 | 1996 | Helen Reed | Golden Parachute Distribution | Goosebumps |
| 7/08/98 | 1997 | Helen Reed | Golden Parachute Distribution | Goosebumps |
| 7/13/97 | 1996 | George Palt | KickFilm Distribution | Walker, Texas Ranger |
| 7/13/97 | 1996 | James Hitchman | Pointe Media | Moesha |
| 7/24/97 | 1996 | Joel Sachs | Sachs Associates | Bananas In Pajamas |
| 7/12/98 | 1997 | Joel Sachs | Sachs Associates | Bananas In Pajamas |
| 7/03/97 | 1996 | Fred Demann | Tier Media | Teenage Mutant Ninja Turtles |
| 7/13/98 | 1997 | Fred Demann | Tier Media | Teenage Mutant Ninja Turtles |

11.    It was a further part of the scheme and artifice that defendant Raul C. GALAZ used various methods, means, and devices to misrepresent to the Copyright Office and the MPAA that cable and satellite retransmission royalties were due and owing, including but not limited to:

(a) the use of false aliases in applications to and in correspondence with the Copyright Office and the MPAA;

(b) the use of a telephone answering service in the name of fictitious business entities;

- 4 -

Exhibit ___O___

Page ___75___

(c) the rental of private mail depositories in the name of fictitious business entities for the purpose of receiving correspondence from the Copyright Office and the MPAA;

(d) the opening of accounts at stock brokerage firms for Tracee Productions using the alias Francisco Dias;

(e) the opening of additional stock brokerage accounts under multiple false aliases by transferring stolen proceeds;

(f) the opening of an offshore bank account in Antigua in the name of Artist Collections Group, a Bahamas corporation;

(g) the transferring of $129,000.00 of stolen proceeds to the Artist Collections Group offshore bank account;

(h) arranging the retention of an attorney to negotiate a settlement with the original owners of the copyright royalty rights to "Garfield and Friends."

12.    It was a further part of the scheme and artifice that defendant Raul C. GALAZ converted to his own benefit the following sums of money to which he was not entitled, based on his fraudulent submission of claims relating to "Garfield and Friends":

| MPAA Check Number | Date | Amount of the Check |
|---|---|---|
| (1) 00005813 | 12/17/96 | $80,700.00 |
| (2) 00005907 | 4/07/97 | $17,916.00 |
| (3) 00006324 | 2/09/98 | $189,984.00 |
| (4) 00006419 | 4/23/98 | $39,703.00 |

13.    It was a further part of the scheme and artifice that defendant Raul C. GALAZ concealed and perpetuated his scheme by testifying falsely under oath at a statutorily convened Copyright Arbitration Royalty Panel administrative proceeding that: (1) he was not Bill Taylor; (2) he did not have any involvement or interest in companies he represented in particular, Tracee Productions and the other companies identified in paragraph 10; and (3) he never filed a claim without authorization.

- 5 -

Exhibit  C
Page  76

<u>Execution of the Scheme and Artifice to Defraud</u>

14.    On or about July 31, 1997, the exact date being unknown, in the District of

Columbia and elsewhere, the defendant,

<div align="center">Raul C. GALAZ,</div>

for the purpose of executing the above-described scheme and artifice, and attempting to

do so, placed and caused to be placed in an authorized depository for mail matter, to wit,

an envelope containing a Tracee Productions claim for 1996 copyright retransmission

royalties for the program "Garfield and Friends" and caused such matter to be delivered by

the United States Postal Service according to the directions thereon from California to the

United States Copyright Office located in Washington, D.C.

All in violation of Title 18, United States Code, Sections 1341 and 2.


*May 29, 2002*
DATE

<div style="margin-left: 40%;">

ROSCOE C. HOWARD, JR.
United States Attorney
for the District of Columbia


By: *William H. Bowne*
William H. Bowne, III
Trial Attorney, Crim. Div., Fraud Section
1400 New York Avenue, N.W.
Washington, D.C.
Tel: 202-514-7023

</div>

<div align="center">- 6 -</div>

Exhibit    O
Page    77

# EXHIBIT P

Exhibit P

Page 78

AO 245 S (Rev. 11/00 DC) Sheet 1 - Judgment ... a Criminal Case

# UNITED STATES DISTRICT COURT
## for the District of Columbia

UNITED STATES OF AMERICA

    v.

RAUL C. GALAZ

    Defendant.

Case Number   CR 02-0230-01

FILED

DEC 2 3 2002

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

U.S. DISTRICT COURT

The defendant, RAUL C. GALAZ, was represented by Whitney C. Ellerman, Esquire.

The defendant pled guilty to count 1 of the Information on June 20, 2002. Accordingly, the defendant is adjudged guilty of such count, involving the following offense:

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18 USC 1341 | MAIL FRAUD | July 28, 1998 | 1 |

As pronounced on NOVEMBER 15, 2002, the defendant is sentenced as provided in pages 2 through 6 of this Judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

The mandatory special assessment is included in the portion of this Judgment that imposes the Criminal Monetary Penalties.

It is further ordered that the defendant shall notify the United States Attorney and the Clerk's Office for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this Judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of any material change in the defendant's economic circumstances that might affect the ability to pay.

Signed this the 23rd day of DECEMBER, 2002.

HENRY H. KENNEDY, JR.
United States District Judge

Defendant's SSN: 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
Defendant's Date of Birth: 11/02/62
Defendant's USM No.: 24950-016
Defendant's address: 2318 Sawgrass Ridge, San Antonio, Texas

Exhibit P = 13

Page 79

AO 245 S (Rev. 11/00 DC) Sheet 2 - Imprisonn.  .

Defendant:  RAUL C. GALAZ
Case Number:   CR 02-0230-01

Judgment--Page 2 of 6

### IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a term of 18 MONTHS.

The Court makes the following recommendations to the Bureau of Prisons: That the defendant shall be imprisoned FCI, in the Western District of Texas.

The defendant shall voluntarily surrender for service of sentence at the institution designated by the Bureau of Prisons when notified to report by the United States Marshal, Probation Office or Pretrial Services Office .

### RETURN

I have executed this Judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this Judgment.

_____
United States Marshal

By _____
Deputy Marshal

Exhibit P
Page 80

AO 245 S (Rev. 11/00 DC) Sheet 3 - Supervised Release

Defendant: RAUL C. GALAZ
Case Number:  CR 02-0230-01

Judgment--Page 3 of 6

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of three (3) years.

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

The defendant shall refrain from any unlawful use of a controlled substance.

The mandatory drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by the probation office of this court set forth on the next page.  The defendant shall also comply with the following special conditions:

The defendant shall file no further claims with the United States Copyright Office unless he presents written authorization from the company verifying his representation.

The defendant shall provide the Probation Office with access to any requested financial information.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation office.

Exhibit P
Page 81

AO 245 S (Rev. 12/96 DC) Sheet 3a - Supervis   elease

Defendant:  RAUL C. GALAZ
Case Number:   CR 02-0230-01

Judgment--Page 4 of 6

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this Judgment:

1)  The defendant shall not leave the judicial district without the permission of the court or probation officer.

2)  The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month.

3)  The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.

4)  The defendant shall support his or her dependents and meet other family responsibilities.

5)  The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons.

6)  The defendant shall notify the probation officer at least ten days prior to any change in residence or employment.

7)  The defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any such controlled substances, except as prescribed by a physician.

8)  The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

9)  The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer.

10) The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer.

11) The defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer.

12) The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court.

13) As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Exhibit  P
Page  82

AO 245 S (Rev. 11/00 DC) Sheet 5, Part A - C        Monetary Penalties

Defendant: RAUL C. GALAZ                                                  Judgment--Page 5 of 6
Case Number:  CR 02-0230-01

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth below under **SCHEDULE OF PAYMENTS** heading.

| Count | Assessment | Fine | Restitution |
|---|---|---|---|
| 1 | $100.00 | $4,000.00 | $$328,303.00 |
| TOTALS: | $100.00 | $4,000.00 | $328,303.00 |

## FINE

The interest requirement was not waived or modified.

The defendant shall pay interest on any fine of more than $2,500, unless the fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options under Schedule of Payments section may be subject to penalties for default and delinquency pursuant to 18 U.S.C. § 3612(g).

## RESTITUTION

The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportional payment unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment

| Name of Payee | * Total Amount of Loss | Amount of Restitution Ordered | Priority Order or Percentage of Payment |
|---|---|---|---|
| Motion Picture Association of America 1600 Eye Street NW, Washington, D.C. 20006 Attn: Marsha E. Kessler | $328,303.00 | $328,303.00 | |
| **TOTALS:** | | $328,303.00 | |

## SCHEDULE OF PAYMENTS

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest, (7) penalties, and (8) costs, including cost of prosecution and court costs.

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows: No less than $500.00  a month.

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of

Exhibit ___P___
Page **83**

AO 245 S (Rev. 12/96 DC) Sheet 7 - Statemen.  . Reasons

Defendant:  RAUL C. GALAZ
Case Number:   CR 02-0230-01

Judgment--Page 6 of 6

## STATEMENT OF REASONS

☑ The court adopts the factual findings and guideline application in the presentence report.
OR

☐ The court adopts the factual findings and guideline application in the presentence report except (see attachment, if necessary):

## Guideline Range Determined by the Court:

Total Offense Level: _15_

Criminal History Category: _1_

Imprisonment Range: _18_ to _24_ months

Supervised Release Range: _2_ to _3_ years

Fine Range: $ _4,000_ to $ _40,000_

☐ Fine is waived or is below the guideline range, because of the defendant's inability to pay.

Total Amount of Restitution: $ _325,303.00_

☐ Discretionary restitution is not ordered because the complication and prolongation of the sentencing process resulting from the fashioning of a restitution order outweighs the need to provide restitution to any victims, pursuant to 18 U.S.C. § 3663(a)(B)(ii). (or in offenses committed before April 23, 1996, pursuant to 18 U.S.C. § 3663(d)).

☐ Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because the number of identifiable victims is so large as to make restitution impracticable, pursuant to 18 U.S.C. § 3663A(c)(3)(A).

☐ Restitution pursuant to the mandatory victim restitution provisions is not ordered in this title 18 property offense because determining complex issues of fact and related to the cause of amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process, pursuant to 18 U.S.C. § 3663A(c)(3)(B).

☐ For offenses committed on or after September 13, 1994 but before April 23, 1996 that require the total amount of loss to be stated, pursuant to Chapters 109A, 110, 110A, and 113A of Title 18, restitution is not ordered because the economic circumstances of the defendant do not allow for the payment of any amount of a restitution order, and do not allow for the payment of any or some portion of a restitution order in the foreseeable future under any reasonable schedule of payments.

☐ Partial restitution is ordered, pursuant to 18 U.S.C. § 3553(c), for the following reasons(s):

☑ The sentence is within the guideline range, that range does not exceed 24 months, and the court finds no reason to depart from the sentence called for by application of the guidelines.
OR

☐ The sentence is within the guideline range, that range exceeds 24 months, and the sentence is imposed for the following reason(s):

OR
The sentence departs from the guideline range:

☐ upon motion of the government, as a result of defendant's substantial assistance.

☐ for the following specific reason(s):
imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States Attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

Exhibit P
Page 84

# EXHIBIT Q

1  LAW OFFICES OF DAVID C. HINSHAW
   David C. Hinshaw, State Bar No. 92713
2  1329 Georgina Avenue
3  Santa Monica, California 90402-2121
   (213) 229-2500
4
   PICK & BOYDSTON, LLP
5  Brian D. Boydston, State Bar No. 155614
   523 West Sixth Street, Suite 1134
6  Los Angeles, California 90014
   (213) 624-1996
7
   Attorneys for plaintiffs
8

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

NOV 09 2006

John A. Clarke, Executive Officer/Clerk

By J.L. Allen, Deputy

INITIAL CASE MANAGEMENT REVIEW
AND CONFERENCE   Feb 26, 2007
@8:30am
Dept O

9            SUPERIOR COURT OF THE STATE OF CALIFORNIA
10                  COUNTY OF LOS ANGELES

11  LISA KATONA GALAZ, an individual,
    WORLDWIDE SUBSIDY GROUP, LLC,
12  a California limited liability company, and
    WORLDWIDE SUBSIDY GROUP dba
13  INDEPENDENT PRODUCERS GROUP,
    a Texas limited liability company,
14
15            Plaintiffs,
16            vs.
17  JEFFREY C. BOGERT, and DOES 1
    through 20,
18
19            Defendants.

Case No.  SC091734

Assigned for All Purposes To
Hon.

COMPLAINT FOR PROFESSIONAL
NEGLIGENCE (LEGAL
MALPRACTICE)

JURY TRIAL DEMANDED

RICHARD NEIDORF

20      Plaintiffs allege as follows:
21
22      1.      Plaintiff LISA KATONA GALAZ (hereafter "Galaz") is an individual

23  residing in the State of Texas.  Plaintiff WORLDWIDE SUBSIDY GROUP, LLC

24  (hereafter "WSG") is a California limited liability company and plaintiff WORLDWIDE

25  SUBSIDY GROUP dba INDEPENDENT PRODUCERS GROUP (hereafter "IPG") is a

26  Texas limited liability company.  WSG and IPG are sometimes referred to herein as "the

27  Companies."

1
COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

2.     The Companies collect a narrow form of royalty distributed by governmental agencies around the world, a highly specialized area in which only two other companies exist, worldwide. The primary area of activity is the collection and distribution of cable/satellite secondary transmission royalties on behalf of film and television producers.

3.     Plaintiffs are informed and believe, and thereupon allege that defendant JEFFREY C. BOGERT (hereafter "Bogert") is an individual attorney working and residing in the State of California, County of Los Angeles, that he is licensed to practice law in the State of California and that his offices are located in Santa Monica, California.

4.     Plaintiff are informed and believe, and thereupon allege, that Does 1-20 were, at all times mentioned herein, the agents, employees, servants, employers, partners, alter-egos and/or representatives of each of the other defendants. In doing the things hereinafter alleged, each of the defendants named as Does 1-20 was acting within the scope of his, her or its authority as such agent, employee, servant, partner and/or representative and with the permission and consent of his, her or its principal.

5.     Plaintiffs are informed and believe, and thereupon allege, that at all times mentioned herein, defendants, and each of them, were the agents, employees, servants and/or representatives of each of the other defendants. In doing the things hereinafter alleged, each of the defendants was acting within the scope and course of his authority as such agent, employee, servant and/or representative and with the permission and consent of each of the other defendants. The term "Defendants" as used herein refers to all named defendants jointly as well as each such defendant separately.

6.     In or about October 2002, Bogert was retained by WSG in order to represent WSG in an arbitration matter filed against Fintage House, a matter in which plaintiff Galaz actively participated. At the time of such engagement, plaintiff Galaz was an acknowledged owner of no less than 37.5% of the Companies. Marian Oshita (hereafter "Oshita") was then an acknowledged co-owner of 25% of the Companies. A dispute then existed as to whether plaintiff Galaz or Oshita was the owner of the remaining 37.5% of the Companies.

2

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

7.      Bogert's retention in or about October 2002 was at the joint direction of Galaz and Oshita. Following partial resolution of the arbitration matters in December 2002, and without Galaz's knowledge or consent, Oshita hired Bogert to represent the Companies in a variety of other matters. Among such matters, Oshita hired Bogert to represent the Companies when they and Oshita were sued by Galaz in June 2003 (referenced herein as "the *Galaz v. Oshita* action").

8.      Commencing in early 2003, Bogert began systematically denying Galaz access to the books and records of the Companies and refused to provide information regarding the activities of the Companies, apparently at the behest of Oshita. Galaz made multiple oral and written requests for such information from Bogert who, despite explicit awareness that Galaz was an acknowledged co-member of the Companies, ignored her requests for records relating to the Companies' records.

9.      Counsel for Galaz notified Bogert that his conduct was contrary to both California and Texas law, which both require that a co-member of a limited liability company be provided equal access to the books and records of the limited liability company, irrespective of the size of their ownership share. Cal. Corp. Code Section 17106; Texas Limited Liability Company Act, Art. 2.22.C. Notwithstanding the clarity of the law, Bogert continued to deny Galaz access to the books and records of the companies.

10.     Following Bogert's failure to provide Galaz with information relating to the Companies, Galaz instructed Bogert in writing to take no further actions on behalf of the Companies, which instructions Bogert ignored.

11.     On June 2, 2003, counsel for Galaz informed Bogert in writing that Oshita had no authority to act unilaterally on behalf of the Companies and that Bogert could not act on Oshita's instruction without the agreement of Galaz. Bogert was given the legal grounds for that instruction and Bogert was notified in writing that any actions taken at the direction of Oshita without the consent of Galaz could damage the Companies.

12.     Plaintiff Galaz sued Oshita by filing the *Galaz v. Oshita* action on or about

3

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

1  June 5, 2003.  Plaintiffs are informed and believe and on that basis allege that, without

2  informing Galaz of the terms or obtaining the consent of Galaz, Oshita engaged Bogert to

3  represent Oshita and the Companies in the *Galaz v. Oshita* action.  Bogert has refused to

4  provide the terms of that retention or any bills to plaintiffs.  Part of the relief sought by

5  plaintiffs in the *Galaz v. Oshita* action was confirmation and determination that Galaz was

6  a 75% owner of the Companies.  Bogert failed to recognize or properly address the

7  conflicts of interest presented by the dispute represented by the *Galaz v. Oshita* action.

8        13.    After the *Galaz v. Oshita* action was filed and Bogert was formally aware of

9  plaintiffs' claims as to ownership and control of the Companies and of his duties to

10  plaintiffs, Bogert nevertheless continued to  refuse to provide plaintiffs information and

11  documents regarding certain critical matters pertaining to the Companies and to plaintiffs.

12        14.    On January 26, 2005, a Judgment was rendered in the *Galaz v. Oshita* action

13  determining that Galaz was 75% owner of the Companies and directing that Oshita deliver

14  all books and records relating to the Companies to Galaz.  Bogert failed to advise Oshita to

15  do so, which was a breach of his fiduciary duties to the Companies and a failure to exercise

16  the care and prudence of a reputable attorney practicing under similar circumstances.

17        15.    Bogert was aware on January 26, 2005 that plaintiff Galaz was the majority

18  owner and exclusive representative of Companies because Bogert was counsel of record in

19  the *Galaz v. Oshita* action when the Court determined that fact as part of its judgment.

20  Bogert was aware of plaintiffs' allegations in that regard and the evidence plaintiffs

21  provided in discovery.  Bogert was further aware of the evidence that Bogert possessed in

22  his capacity as counsel for the Companies.

23        16.    Bogert repeatedly ignored the lawful directions of plaintiff Galaz despite his

24  knowledge of the evidence and the judgment in the *Galaz v. Oshita* action, and committed

25  the following violations of the California Rules of Professional Conduct, and in doing so,

26  failed to use the care, skill and judgment ordinarily used by attorneys practicing in Los

27  Angeles under similar circumstances in the particulars alleged in this complaint.

4

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

Exhibit Q

Page 89

17.   On January 27, 2005 plaintiffs informed Oshita and Bogert that a formal vote had been taken and Oshita was no longer an officer of either one of the Companies and that Oshita was to cease and desist from all further actions on behalf of the Companies.

18.   Also on January 27, 2005, plaintiffs' counsel directed Bogert to turn over the Companies' records to plaintiffs, informed Bogert that any contract he had retaining him as legal counsel for the Companies was immediately terminated, directed Bogert not to take any further actions as counsel for the Companies, and for Bogert to forward all inquiries relating to the Companies to plaintiffs' counsel.

19.   On February 9, 2005 Bogert announced that he refused to produce the Companies' records on the basis that Oshita might appeal or sue to dissolve the Companies and on the ground that he had not been assured that he would be paid legal fees that he alleged he was owed.  This conduct by Bogert was a breach of his fiduciary duties to the Companies and a failure to exercise the care and prudence of a reputable attorney practicing under similar circumstances. On May 6, 2005, the Court in the *Galaz v. Oshita* action ordered Bogert to produce the records and to provide an accounting of the Companies' funds.

20.   On May 24, 2005, Bogert made an incomplete and inadequate production of records, representing them to be the aggregate of documents in his possession relating to the Companies, but which only related to the arbitration matter for which he was initially engaged. No documents were produced relating to scores of matters that have been uncovered since the Judgment of January 26, 2005 in which Bogert's involvement is either established, or likely.  This conduct by Bogert was a breach of his fiduciary duties to the Companies and a failure to exercise the care and prudence of a reputable attorney practicing under similar circumstances.

21.   As regards financial matters, Bogert produced a ledger that plaintiffs presume to be from Bogert's client trust account, which reflected the receipt and subsequent disbursement of Three Hundred Eighty One Thousand Four Hundred Fifty One Dollars

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

Exhibit Q

Page 90

($381,451) into such account, including six deposits and thirty-five disbursements, during the time period of April 2004 through January 2005. No documents associated therewith were produced, e.g., account statements, documents identifying the bank or the account number, evidence of disbursements, etc. Accepting the accuracy of the ledger, it was revealed that one week prior to the trial mentioned above, and again during the trial, Mr. Bogert withdrew the sums of $25,000 for an aggregate of $50,000 out of such unidentified account. Despite plaintiffs' requests, no documents have been produced reflecting any of the legal services ostensibly rendered which apply to such payments. This conduct by Bogert was a breach of his fiduciary duties to the Companies and a failure to exercise the care and prudence of a reputable attorney practicing under similar circumstances.

22.    On June 15, 2005 plaintiffs' counsel informed Bogert of the multiple specific deficiencies with his production. Bogert responded by asserting that he had no obligation to produce any further information because he was no longer counsel for the Companies.

23.    Despite plaintiffs' explicit requests, Bogert intentionally refused to keep plaintiffs informed about significant developments relating to the Companies, including information vital to the survival to the Companies' business, and detrimental the success of the Companies' clients. Bogert simply ignored his legal obligation under California and Texas law, his discovery obligations, and his obligation to comply with the Judgment and the May 2005 Order in the *Galaz v. Oshita* action. This conduct by Bogert was a breach of his fiduciary duties to the Companies and a failure to exercise the care and prudence of a reputable attorney practicing under similar circumstances.

24.    As a medical malpractice and personal injury attorney, Bogert did not have the degree of skill and learning ordinarily possessed by counsel doing what Bogert purported to be doing for plaintiffs, namely litigating, negotiating and settling claims on behalf of the Companies for which he had an inadequate level of understanding, and as to which Bogert could not competently represent the Companies. This failure of knowledge, diligence and prudence by Bogert was professional negligence.

6

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

Exhibit Q

Page 91

25. For one example only, Bogert ignored the demands of Galaz and counsel for Galaz that he retain competent counsel and inform them of all matters relating to the Companies. In connection therewith, Jeffrey Bogert negotiated a settlement of certain claims pending before the federal Court of Appeals for the District of Columbia and several other significant claims held by the Companies extraneous to the appellate dispute. The scope and nature of this settlement or these settlements was not known to plaintiffs until February 2006. The failure to employ a qualified specialist was professional negligence. At no time prior to the referenced settlement of the federal appellate court matter or other settlements did Mr. Bogert inform Galaz of the settlement negotiations or inform Galaz of the settlement offer or offers that had been made. The failure to inform plaintiffs of vital and necessary information and settlement offers was professional negligence and a breach of fiduciary duty. Due to Bogert's absolute lack of understanding in the copyright royalty collections area, and his failure to even review documents relating to underlying proceedings that were the basis of the appellate court matter, the Companies have been harmed and damaged by its current inability to collect *millions of dollars of royalty proceeds.*

26. From April 2004 through January 2005, Bogert received $381,451 of funds otherwise owing to the Companies into his client trust account, and subsequently disbursed all those funds. Plaintiffs are informed and believe, and on that basis allege that Bogert may have come into possession of other monies belonging to plaintiffs, but that cannot be determined with the information and documents that plaintiffs now have in their possession. Twelve disbursements were made by Bogert after the Judgment in the *Galaz v. Oshita* action deeming plaintiffs' the majority and controlling owner of the Companies, after Bogert was dismissed as counsel for the Companies, after plaintiffs' direction to Bogert to take no more actions on behalf of the Companies, and after plaintiffs' demanded, and this Court ordered in the *Galaz v. Oshita* action, that Bogert to prepare an accounting of any monies he has in his possession relating to the Companies. Bogert has offered no

<div align="center">7</div>

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

1    explanation for his conduct. This conduct by Bogert was a breach of his fiduciary duties to

2    the Companies and a failure to exercise the care and prudence of a reputable attorney

3    practicing under similar circumstances.

4         27.    Bogert failed to turn over the funds in his possession after plaintiffs

5    demanded that he do so and after he was ordered by this Court to do so. Bogert's records

6    reflect that, for a period of nine months, Bogert ran the Companies' business through his

7    client trust account. During the course of the Galaz v. Oshita action, discovery was

8    propounded related to such moneys, which Bogert failed to produce. Additionally, on or

9    about September 14, 2005, almost eight (8) months after Bogert was discharged of any

10    further duties, Bogert received and deposited two checks representing plaintiffs'

11    commission funds, and possibly more than two such checks, into an account controlled by

12    him, ostensibly as payment for outstanding legal fees. Bogert never informed plaintiffs

13    that he had their commission funds in his possession or that he had negotiated them.

14    Despite explicit requests therefor, Bogert has refused to deliver billing statements reflecting

15    legal services rendered for the Companies. At no time has Bogert ever asserted that legal

16    fees were outstanding. This conduct by Bogert was a breach of his fiduciary duties to the

17    Companies and a failure to exercise the care and prudence of a reputable attorney

18    practicing under similar circumstances.

19         28.    Bogert's conduct as alleged herein constituted professional negligence (legal

20    malpractice) in that Bogert did not have the degree of learning and skill necessary to

21    undertake the legal work Bogert attempted to do on behalf of the Companies. Bogert's

22    conduct as alleged herein also constituted professional negligence (legal malpractice) in

23    that Bogert did not use the care and skill ordinarily used in like matters by reputable

24    attorneys practicing in the same or similar localities under similar circumstances. Bogert's

25    conduct as alleged herein also constituted professional negligence (legal malpractice) in

26    that Bogert did not use the diligence and judgment ordinarily used in like matters by

27    reputable attorneys practicing in the same or similar localities under similar circumstances.

<div align="center">8</div>

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

Exhibit Q

Page 93

1 Bogert's conduct as alleged was a breach of his fiduciary duties to the Companies and a

2 failure to exercise the care and prudence of a reputable attorney practicing under similar

3 circumstances.

4      29.    As a direct and proximate result of Bogert's professional negligence (legal

5 malpractice) as alleged herein, plaintiffs were harmed by the loss of income, revenue,

6 profits and opportunities that the Companies would have enjoyed but for Bogert's

7 professional negligence (legal malpractice).

8      30.    As a further direct and proximate result of defendants' conduct as alleged

9 herein, plaintiffs have sustained other damages and harm, in an amount to be proven at trial.

10

11     WHEREFORE, plaintiffs pray for judgment against defendants, and each of them,

12 as follows:

13     1.    For damages according to proof at trial, but not less than $1 million;

14     2.    For prejudgment interest thereon;

15     3.    For their reasonable attorneys' fees;

16     4.    For costs of suit incurred herein; and

17     5.    For such further and other relief as the court deems proper.

18

19

20                               PICK & BOYDSTON, LLP

21                               LAW OFFICES OF DAVID C. HINSHAW

22

23 Dated:  November 9, 2006

                                 By:  David C. Hinshaw
24                               Attorneys for plaintiffs

25

26

27

---

9

COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

1

## DEMAND FOR JURY TRIAL

2    Plaintiffs demand that their claims be tried to a jury.

3

4                                    PICK & BOYDSTON, LLP

5                                    LAW OFFICES OF DAVID C. HINSHAW

6

7    Dated:  November 9, 2006

8                                    By:  David C. Hinshaw
                                     Attorneys for plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## COMPLAINT FOR PROFESSIONAL NEGLIGENCE (LEGAL MALPRACTICE)

Exhibit Q

Page 96

# EXHIBIT R

Exhibit R

Page 96

1  LAW OFFICES OF DAVID C. HINSHAW
   David C. Hinshaw, State Bar No. 92713
2  1329 Georgina Avenue
   Santa Monica, California 90402-2121
3  (213) 229-2500

4  PICK & BOYDSTON, LLP
   Brian D. Boydston, State Bar No. 155614
5  523 West Sixth Street, Suite 1134
   Los Angeles, California 90014
6  (213) 624-1996

7  Attorneys for plaintiffs

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                    COUNTY OF LOS ANGELES

11  LISA KATONA GALAZ, an individual,        Case No. SC091734
    WORLDWIDE SUBSIDY GROUP, LLC,
12  a California limited liability company, and   Assigned for All Purposes To
    WORLDWIDE SUBSIDY GROUP dba             Hon. Richard Neidorf
13  INDEPENDENT PRODUCERS GROUP,
    a Texas limited liability company,           STATEMENT OF DAMAGES
14
                 Plaintiffs,                       [Cal. Code Civ. Proc. §425.11]
15
                      vs.
16
    JEFFREY C. BOGERT, and DOES 1
17  through 20,
18               Defendants.
19

20        Plaintiffs appear and make their Statement of Damages against defendants Jeffrey C.

21  Bogert and Does 1 through 20, and each of them ("Defendants") as follows:

22

23        1.      Plaintiffs claim the following items of special damages from Defendants:

24        a.   Plaintiffs' funds were received by Defendants from Marian Oshita in September

25  2005 and then spent and disbursed from Defendants' accounts in the total sum of

26  $30,110.58;

27        b.   In approximately 2003, Defendants incorrectly and incompetently settled claims

                                        1

Exhibit B

Page 97

1  pending before the United States Court of Appeals for the District of Columbia after

2  Defendants knew of Plaintiffs' claims to control of Plaintiffs, depriving Plaintiffs of

3  royalties in the total sum of $4,162,500.00;

4          c.  As a result of the settlements referenced in the preceding paragraph, Plaintiffs

5  have been deprived of interest on royalties that would have been collected and paid by the

6  U.S. Copyright Office in the sum of $92,920.00; and

7          d.  Plaintiffs' funds were spent and disbursed from Defendants' accounts between

8  November 24, 2004 and December 15, 2004 without authority in the total sum of

9  $77,290.00.

10         Plaintiffs' special damages thus total $4,362,820.58.

11         2.  Plaintiffs claim general damages in the amount of $2,000,000.00.

12

13         **Adding the Special Damages detailed in paragraph 1 above and the General**

14  **Damages claimed in paragraph 2 above yields total damages claimed by Plaintiffs**

15  **against Defendants in the amount of $6,362,820.58.**

16

17                                      PICK & BOYDSTON, LLP
                                        LAW OFFICES OF DAVID C. HINSHAW
18

19  Dated: February 6, 2007

20                                      By:  David C. Hinshaw
                                        Attorneys for plaintiffs

21

22

23

24

25

26

27

Exhibit F
Page 98

# EXHIBIT S

Exhibit  S
Page 99

# Case Summary

**Case Number:** SC091734
LISA KATONA GALAZ ET. AL. VS. JEFFREY C. BOGERT

**Filing Date:** 11/09/2006
**Case Type:** Legal Malpractice (General Jurisdiction)
**Status:** Pending

---

## Future Hearings

**08/19/2008** at 09:00 am in department WEF at 1725 Main Street, Santa Monica, CA 90401
Motion for Protective Order

**10/03/2008** at 09:15 am in department WEF at 1725 Main Street, Santa Monica, CA 90401
Final Status Conference (5 DAY JURY TRIAL 10-6-08)

**10/06/2008** at 09:00 am in department WEF at 1725 Main Street, Santa Monica, CA 90401
Jury Trial (5 DAYS)

---

Documents Filed | Proceeding Information

## Parties

BOGERT JEFFREY C. - Defendant

BOGERT JEFFREY C. LAW OFFICES OF - Attorney for Defendant

GALAZ LISA KATONA - Plaintiff

HINSHAW DAVID C. LAW OFFICES - Attorney for Plaintiff

INDEPENDENT PRODUCERS GROUP - Pltf's DBA

REBACK MCANDREWS & KJAR LLP - Attorney for Defendant

WORLDWIDE SUBSIDY GROUP - Plaintiff

---

Case Information | Party Information | Proceeding Information

## Documents Filed (Filing dates listed in descending order)

**05/30/2008** Notice of Motion (AND MOTION FOR PROTECTIVE ORDER REGARDING SPECIALLY PREPARED INTERROGATORIES; MEMO OF POINTS AND AUTH IN SUPPORT; DECL OF DAVID C. HINSHAW; PROPOSED PROTECTIVE ORDER)

Exhibit __S__

Page __100__

Filed by Attorney for Plaintiff

**05/30/2008** Declaration (OF DAVID C. HINSHAW IN SUPPORT OF MOTION FOR
PROTECTIVE ORDER REGARDING SPECIALLY PREPARED INTERROGATORIES )
Filed by Attorney for Plaintiff

**01/10/2008** Notice of Ruling (AT EX PARTE )
Filed by Attorney for Defendant

**10/31/2007** Notice (NOTICE OF ENTRY OF ORDER ON STIPULATION )
Filed by Attorney for Defendant

**10/02/2007** Notice of Ruling
Filed by Attorney for Defendant

**09/14/2007** Notice of Change of Address
Filed by Attorney for Plaintiff

**09/14/2007** Statement-Case Management
Filed by Attorney for Plaintiff

**09/12/2007** Statement-Case Management
Filed by Attorney for Defendant

**08/24/2007** Answer to Unverified Complaint (FEES PAID ON 4-17-07 )
Filed by Attorney for Defendant

**08/24/2007** Notice of Motion (AND MOTION TO STRIKE )
Filed by Attorney for Defendant

**08/23/2007** Notice (NOTICE OF ENTRY OF ORDER ON STIPULATION TO SET
ASIDE DEFAULT JUDGMENT AND SET ASIDE DISMISSAL OF DOE DEFENDNATS. )
Filed by Attorney for Defendant

**08/20/2007** Notice (OF ENTRY OF ORDER ON STIPULATION TO SET ASIDE
DEFAULT JUDGMENT )
Filed by Attorney for Plaintiff

**06/05/2007** Abstract of Judgment Issued ( ABSTRACT OF jUDGMENT ISSUED (2)
Vertified with the file. (GM) ABSTRACT VACATED BY ORDER 8-6-07)
Filed by Attorney for Plaintiff

**05/15/2007** Notice of Entry of Judgment (JUDGMENT VACATED BY STIPULATION
AND ORDER 8-6-07 )
Filed by Attorney for Plaintiff

**05/01/2007** Declaration (OF RAUL GALAZ IN SUPPORT OF REQUEST FOR ENTRY
OF JUDGMENT )
Filed by Attorney for Plaintiff

**05/01/2007** Summary (CASE SUMMARY )
Filed by Attorney for Plaintiff

Exhibit __S__

Page __101__

Los Angeles Superior Court - Civil Case Summary

**05/01/2007** Judgment (FOR PLAINTIFF LISA KATONA GALAZ, WORLDWIDE
SUBSIDY GROUP, LLC, WORLDWIDE SUBSIDY GROUP AND AGAINST DEFENDANT
JEFFRY C. BOGERT IN THE TOTAL SUM OF $6,363,290.58 JUDGMENT
VACATED:STIP.ORDER 8-6-07)
Filed by Attorney for Plaintiff

**04/27/2007** Notice-Case Reassignment and Order
Filed by Clerk

**04/17/2007** Answer (AND AFFIRMATIVE DEFENSES TO COMPLAINT )
Filed by Attorney for Defendant

**03/29/2007** Notice (NOTICE OF REJECTION OF DEFAULT JUDGMENT )
Filed by Court

**03/22/2007** Partial Dismissal (w/o Prejudice) (WITHOUT PREJUDICE, AS TO DOES
1 THROUGH 20 DISMISSAL VACATED BY STIPULATION AND ORDER ON 8-6-07 )
Filed by Attorney for Plaintiff

**12/06/2006** Proof-Service/Summons
Filed by Attorney for Plaintiff

**11/09/2006** Complaint Filed

---

Case Information | Party Information | Documents Filed

**Proceedings Held** (Proceeding dates listed in descending order)

**03/18/2008** at 08:30 am in Department WEF, John H. Reid, Presiding
Conference-Post Mediation Status (2. TRIAL SETTING CONFERENCEMEDIATION
COMPLETED BY 3-17-08) - **Matter continued**

**01/08/2008** at 08:30 am in Department WEF, John H. Reid, Presiding
Ex-Parte Application - **Motion Granted**

**10/25/2007** at 02:00 pm in Department WEF, John H. Reid, Presiding
Non-Appearance (Case Review) (RE CONTINUANCE OF PLAINTIFF'SMOTION TO
STRIKE) - **Court Makes Order**

**10/02/2007** at 08:30 am in Department WEF, John H. Reid, Presiding
Conference-Case Management - **Conf. held & cont-case refd to Med**

**05/08/2007** at 09:00 am in Department WEO, Richard Neidorf, Presiding
Order to Show Cause (RE: DEFAULT.) - **Off Calendar**

**04/10/2007** at 02:15 pm in Department WEO, Richard Neidorf, Presiding
Non-Appearance (Case Review) (RE CONTINUANCE OF OSC REFAILURE TO
PROCEED WITH DEFAULTJUDGMENT) - **Order Issued**

**02/26/2007** at 08:30 am in Department WEO, Richard Neidorf, Presiding
Initial Status Conference - **Completed**

Exhibit **S**

Page **102**

Case Information  |  Party Information  |  Documents Filed  |  Proceeding Information

Exhibit __S__

Page __103__