1  PICK & BOYDSTON, LLP
   Brian D. Boydston (State Bar No. 155614)
2  1000 Wilshire Boulevard, Suite 600
   Los Angeles, CA 90017
3  (213) 624-1996
   (213)624-9073 facsimile
4
   Attorneys for Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company,
5  dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC

6

7

8                      UNITED STATES DISTRICT COURT
                        CENTRAL DISTRICT OF CALIFORNIA
9

10 WORLDWIDE SUBSIDY GROUP, LLC a        )  CASE NO.  CV08-3701 FMC(MANx)
   Texas Limited Liability Company, dba   )
11 INDEPENDENT PRODUCERS GROUP,           )  OPPOSITION OF PLAINTIFFS TO
   WORLDWIDE SUBSIDY GROUP, LLC a         )  MOTION TO DISMISS
12 California Limited Liability Company,   )
   formerly named ARTIST COLLECTIONS      )
13 GROUP, LLC,                            )
                                          )
14        Plaintiffs,                     )
                                          )
15     v.                                 )  Hearing Date: July 14, 2008
                                          )  Time:          10:00 a.m.
16 MOTION PICTURE ASSOCIATION OF          )  Courtroom:     750 Roybal Federal
   AMERICA, INC., a New York Corporation  )                 Building
17 doing business in California, and DOES 1 )
   through 10, inclusive,                 )
18                                        )
          Defendants.                     )
19 _____)

20
          Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba
21
   INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC a California
22
   Limited Liability Company, formerly named ARTIST COLLECTIONS GROUP, LLC (hereinafter
23
   collectively referred to as "IPG")[1],hereby oppose the motion of Defendant MOTION PICTURE
24

25        [1]In May of 1998, ARTIST COLLECTIONS GROUP, LLC was formed in Los Angeles,
26 California. In March of 1999, WORLDWIDE SUBSIDY GROUP, LLC was formed in Helotes, Texas.
27 On March 12, 2001, WORLDWIDE SUBSIDY GROUP, LLC filed an Assumed Name Certificate in
28 Bexar County, Texas, whereby it represented that it would do business as INDEPENDENT

                                          1

1  ASSOCIATION OF AMERICA, INC. ("MPAA") to dismiss this action.

2

3                          **INTRODUCTION**

4        This action is a simple one for rescission of an agreement allegedly entered into in the absence

5  of actual or ostensible authority.  In its motion, MPAA tries to dress up the complaint to make it look

6  like a complex claim involving detailed issues of copyright law.  However, while the subject matter of

7  the agreement was rights to royalties administered by the United States Copyright Office, the legal and

8  factual issues raised by IPG's complaint are strictly those of a garden variety contract action.

9

10                        **FACTUAL BACKGROUND**

11       IPG is in the business of collecting cable and satellite re-transmission royalties for "independent"

12  owners of television shows, movies, sporting events, etc. ("independent" refers to them being

13  "independent" of the six large movie studios that comprise the MPAA).  Each year, the United States

14  Copyright Office, a department of the Librarian of Congress, collects royalties for (among many other

15  things) the re-transmission of media content via cable and satellite.  It then allows the owners of the

16  media content to make applications for a share of the overall royalty "pie".  In that process, IPG and

17  MPAA are adversaries in that they represent different owners of different television shows, movies, etc.

18  For each annual royalty pool, IPG and MPAA engage in negotiations over how much of the royalty pie

19  each should get for their clients.  If they cannot agree, they then engage in litigation over those claims

20  via arbitration before the Copyright Arbitration Royalty Panel ("CARP") [2] and may appeal any ruling

21  thereby to the Librarian of Congress (and beyond that, if so desired, into the Federal Court system).

22

23  PRODUCERS GROUP.  On November 15, 2002, ARTIST COLLECTIONS GROUP, LLC filed a

24  Certificate of Amendment with the California Secretary of State, changing its name to WORLDWIDE

25  SUBSIDY GROUP, LLC.

26       [2]Since these events, the CARP's duties to administer these proceedings have been transferred

27  to a new entity, the Copyright Royalty Board ("CRB"), however, the issues and proceedings related to

28  the present action only concerned the CARP.

                                            2

1    In 2000, IPG and MPAA could not agree on a distribution of 1997 Cable royalties. [3]  The
2    disagreement concerned the methodology by which the Copyright Office determined how much the
3    various claimants to royalties were entitled to receive. The MPAA's methodology was an antiquated
4    and flawed formula that grossly overcompensated the large studios, while giving independent owners
5    of content a pittance. IPG proposed an alternative formula based on superior databases which would
6    produce a more fair, just and equitable result.

7    Unable to agree, on November 1, 2000, IPG and MPAA initiated a CARP proceeding over
8    distribution of 1997 Cable royalty distributions (see Moving Papers, page 3, lines 10-13). The CARP
9    issued a ruling in which it wholly rejected the MPAA methodology and largely adopted the IPG
10   methodology, with limited objections. This ruling was appealed to the Librarian and, ultimately, the
11   Librarian rejected the CARP's findings regarding the 1997 cable royalties and remanded the matter for
12   consideration by a new CARP. IPG and MPAA both appealed that ruling by the Librarian to the United
13   States Court of Appeals for the District of Columbia Circuit (Moving Papers, page 3, lines 13-21).

14   In 2003, Marian Oshita, a minority member of IPG wrongfully gained control of IPG, and, out
15   to try and get a quick buck, entered into an agreement with MPAA that effectively surrendered IPG's
16   rights as an independent claimant of royalties, in favor of allowing MPAA to represent IPG in the
17   proceedings for royalty distributions for 1998 and 1999 cable royalties and 1997, 1998 and 1999 satellite
18   royalties. Specifically, on March 31, 2004, MPAA and Ms. Oshita and her counsel, Jeffrey Bogert, Esq.,
19   entered into two separate agreements entitled "Settlement Agreement-Part I", and "Settlement
20   Agreement-Part II" (collectively "the Agreement", attached as Exhibit A to the Declaration of Gregory
21   O. Oliniran, filed in support of the Moving Papers). Settlement Agreement-Part I provides that MPAA
22   will pay IPG a specifically stated sum of money for IPG claims pursuant to the 1997 Cable Royalty
23   Funds upon execution of Settlement Agreement-Part I, and additional sums to be calculated later for IPG
24   claims on 1997-1999 Satellite Royalty Funds and 1998 and 1999 Cable Royalty Funds. Settlement

25

26   _____

27   [3]Such delays in resolution of royalties is commonplace. As set forth herein, royalty distributions
     for 1997-1999 satellite retransmissions, and for 1998 and 1999 cable retransmissions are still not
28   resolved to this day.

3

1  Agreement-Part I also contains a confidentiality clause, an arbitration agreement, and a choice of law

2  provision regarding the law of the District of Columbia.

3  Settlement Agreement-Part II provides that IPG will withdraw its notices of intent to participate

4  in the proceeding to distribute the 1997, 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and

5  1999 Satellite Royalty Funds, instead being represented by the MPAA for such distributions, and

6  provides that the parties would move to dismiss their above referenced appeals to the United States

7  Court of Appeals for the District of Columbia Circuit.  Since the Librarian was technically a party to

8  those Appeals, the Librarian was also a party to Settlement Agreement-Part II.

9  In sum, Settlement Agreement-Part I set forth what and in what manner IPG would be paid

10  money by MPAA and Settlement Agreement-Part II stated that IPG would drop its own independent

11  royalty claims and appeals.

12  However, almost six months prior to the execution of the Agreement, and during its negotiation,

13  MPAA was notified by counsel for Lisa Galaz, the majority member of IPG, that Marian Oshita and Mr.

14  Bogert were not authorized to enter an agreement with MPAA on behalf of IPG.  Specifically, on

15  November 3, 2003, James C. Sun, Esq. of Pick & Boydston, LLP, acting as counsel for Lisa Galaz, wrote

16  to Gregory O. Olaniran, Esq. and Michael Tucci, Esq., of Stinson Morrison Hecker, LLP, counsel for

17  MPAA (then and herein) and explicitly stated that neither Marian Oshita nor Jeffrey Bogert had the

18  authority to bind IPG to any settlement agreement.  Specifically, Mr. Sun's letter stated:

19  "Any acts undertaken by Ms. Oshita or by Ms. Oshita through IPG's counsel of record, Jeffrey

20  Bogert, which acts are not authorized by [Lisa Katona Galaz], are ineffective to bind IPG if the

21  person(s) with whom Ms. Oshita and/or Mr. Bogert is/are dealing with have knowledge of this

22  lack of authority. [Texas Civil Statutes, Title 32, Article 2.21.D.(1)-(2)]  By way of this letter,

23  I am placing you on notice that Ms. Oshita and Mr. Bogert lack the authority to unilaterally bind

24  IPG to any settlement agreement in this matter."

25  In addition, the mediator in the underlying dispute between MPAA and IPG, Deanne Siemer,

26  with whom the Agreement was negotiated, was also placed on notice that Ms. Oshita and Mr. Bogert

27  lacked authority to enter into a settlement agreement in the underlying  matter. In a letter dated August

28  8, 2003 to Ms. Siemer, Mr. Sun explained that Ms. Oshita had only a 25% voting interest in IPG and that

4

any other additional interest Ms. Oshita might have in IPG did not confer voting rights to Ms. Oshita beyond her 25% voting interest.  Accordingly, and because Ms. Galaz had a greater voting interest in IPG, Ms. Siemer was advised that, ". . .IPG cannot make any decisions or take any action with respect to the mediation. . .without Ms. Galaz's authorization."  These facts are alleged, verbatim, in the Complaint herein (and in the Amended Complaint (*see, infra*)), and the referenced letters are attached as Exhibits A and B thereto.

Despite these clear statements of Ms. Oshita's lack of authority, MPAA entered the Agreement anyway.  The Agreement is highly detrimental to IPG's interests, and its clients, in that it surrenders IPG's control of its destiny in the distribution proceedings to MPAA, specifically, allowing MPAA to determine the amount of royalties to which IPG is entitled by use of MPAA's unfair and discredited methodology.[4]

After the execution of the Agreement, the Librarian entered an order vacating its "Agency Determination" (the ruling on the appeal of the CARP finding regarding the competing methodologies over 1997 cable royal distributions), and, unfettered by that dispute, distributed the 1997 cable royalties. IPG (vis-a-vis Ms. Oshita) and MPAA dismissed their appeals of the Librarian's "Agency Determination" (Moving Papers, page 4, lines 10-18), and IPG (vis-a-vis Ms. Oshita) withdrew its notices of intent to participate in distribution proceedings for cable and satellite royalties for 1997, 1998 and 1999 (since, as per the Agreement, IPG would be represented by the MPAA for such claims (see Settlement Agreement Part I, section 2 b)) (Moving Papers, page 4, lines 19-21). Two years later the Librarian made distributions of satellite royalties for 1998 and 1999 (Moving Papers, page 4, line 22, page 5, lines 1-2).

On January 26, 2005, the Los Angeles Superior Court issued a judgment after a jury trial which confirmed that Lisa Galaz was a 75% owner of IPG and that Ms. Oshita was never more than a 25%

---

[4]At no time following its entering o f the Agreement did MPAA attempt to notify the legitimately authorized representatives of IPG that the MPAA had entered into an agreement, much less the specifics of such agreement.  Lisa Galaz only made such determination after issuing a subpoena upon MPAA, requesting a copy of any such agreement, which was provided in December 2004.

5

1  owner, and that Ms. Oshita *never* held a majority "membership" interest in IPG.

2

3                                    **MPAA'S MOTION**

4           The gravamen of MPAA's motion is that IPG failed to join the Librarian as a party hereto, and

5  that the Librarian is a necessary party because rescinding the Agreement would require the Librarian to

6  re-work the distribution of 1997 Cable Royalties and it would renew the appeals to which the Librarian

7  was technically a party (as stated, two years after the Agreement, 1997 and 1998 Satellite Royalties were

8  distributed; 1998 and 1999 Cable Royalties, as well as 1999 Satellite Royalties, have not yet been

9  distributed). MPAA goes on to argue that, although indispensable, the Librarian cannot be joined based

10 on sovereign immunity.

11          MPAA then argues that because the Librarian is an indispensable party, Federal Common law

12 applies to the dispute and IPG's claim is barred by the Federal Common law statute of limitations of

13 three years.

14          Finally, MPAA argues that IPG's allegation that the Agreement was not executed by authorized

15 representatives of IPG is contradicted by (1) a letter to MPAA from Mr. Bogert, the purported counsel

16 for IPG at the time, stating that the execution of the Agreement was "duly authorized", and (2) the

17 January 26, 2005 judgment from the Los Angeles Superior Court confirming that Lisa Galaz owned 75%

18 of IPG.

19          In short, the procedural issues raised by MPAA regarding the necessity of the Librarian as a party

20 arise only out of IPG's plea that the 1997 Cable Royalty distribution be rescinded and that the

21 withdrawal of the appeals regarding that distribution be retracted. Similarly, the statute of limitations

22 argument is dependent on the Librarian being an indispensable party, and, thus, hooking Federal

23 Common law. The MPAA's final argument is, first, substantive, and thus, inappropriate at this stage,

24 and, second, inaccurate, as MPAA claims contradictions where they do not exist: Mr. Bogert's letter

25 never stated that Lisa Galaz had authorized the execution of the Agreement; and the January 26, 2005

26 Judgment confirmed, among other things, that in addition to Lisa Galaz owning 75% of IPG, the

27 purported transfer of a majority "membership" interest to Marian Oshita was never authorized (see

28 "Plaintiff's Judgment", page 6, lines 12-19, attached hereto as Exhibit A).

                                              6

**IPG'S AMENDED COMPLAINT OBVIATES THE NECESSITY OF THE LIBRARIAN AS A PARTY**

Rather than hash out the issues raised by MPAA regarding the Librarian, on June 26, 2008, IPG filed its Amended Complaint, in which IPG no longer seeks rescission of Settlement Agreement-Part I and Settlement Agreement-Part II with regard to the 1997 Cable Royalty Funds distribution and dismissal of appeals thereof (see paragraphs 16, 23, 25, 26 and 27 of the Amended complaint, a copy of which is attached hereto for convenience as Exhibit "B"). As a result, the bases for MPAA's argument that the Librarian is an indispensable party to this action are no longer present.

This is confirmed by reference to the facts as set forth in the moving papers regarding the involvement of the Librarian and its interests herein, which are limited to the following:

-On November 1, 2000, the CARP arbitration regarding 1997 cable royalties was initiated (Moving Papers, page 3, lines 10-13);

-Librarian rejected the CARP's findings and remanded the matter for consideration by a new CARP; IPG and MPAA then both appealed that ruling (Moving Papers, page 3, lines 13-21);

-IPG, MPAA and the Librarian entered the Agreement on March 31, 2004, and pursuant thereto the Librarian (1) entered an order vacating its "Agency Determination" regarding 1997 cable royal distributions, (2) distributed the 1997 cable royalties, and (3) with IPG and MPAA dismissed the appeals regarding the 1997 cable royalties (Moving Papers, page 4, lines 10-18); and

-The Librarian made later distributions of satellite royalties for 1998 and 1999 (Moving Papers, page 4, line 22, page 5, lines 1-2).

Because the Amended Complaint explicitly does not seek any relief with regard to the 1997 Cable Royalty Distribution, or the withdrawal of the Appeals regarding that distribution, adjudication of this action, as amended, will not affect the Librarian's rights and obligations in any way. Specifically, since the distribution proceedings for the 1998 and 1999 Cable royalties and the 1999 Satellite Royalties are still open and the Librarian has not yet made any final distributions therefor, the Librarian's rights and obligations will not be changed, influenced or affected in any way should IPG obtain the relief it seeks here; rather, IPG would simply be able to participate directly in those proceedings, rather than by way of representation by the MPAA (as per Settlement Agreement Part I, section 2 b). With regard to

7

the Librarian's later distributions of 1997 and 1998 Satellite royalties, should the Agreement be rescinded, then, and only then, an issue may, or may not, arise between IPG and the Librarian as to a possible need to reopen proceedings regarding the distributions of 1997 and 1998 Satellite royalties. However, until the matter of rescission is determined, there is no need to burden the Librarian in this action as a witness or a party, since the Librarian has nothing to do with the facts regarding rescission.

In sum, the Amended Complaint seeks to do nothing with regard to any act the Librarian has taken; IPG merely seeks to extricate itself from being forced to have MPAA represent it in these proceedings before the Librarian.

## THE AMENDED COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM

**1. Statute of Limitations**

As set forth above, MPAA's statute of limitations argument is based upon the application of the three year federal common law statute, which is not applicable now that the Amended Complaint excludes any issues requiring the Librarian as a party. IPG was unaware of the provisions of the Agreement until the MPAA finally complied with a subpoena on the eve of the trial between Lisa Galaz and Marian Oshita in December of 2004, well within California's four year statute for actions on a written contract. *See* California Code of Civil Procedure §337.

MPAA tries to argue that IPG's causes of action arose in the District of Columbia. However, this is based primarily on factors relating solely to issues regarding the Librarian, which are no longer part of IPG's claim (i.e., the Librarian's presence in Washington. D.C., and the 1997 Cable proceeding taking place in Washington, D.C.).

The only other factors raised by MPAA on this point are that the mediator who brokered the Agreement was located in Washington, D.C. and the Agreement contains a choice of law provision for Washington, D.C. Neither of these are persuasive. The mediator may not be in Washington, D.C. any longer, but, more importantly, she is not a witness to the facts at issue here, which have nothing to do with the negotiations over the Agreement itself, but only as to whether or not Ms. Oshita and Mr. Bogert were authorized to negotiate it and whether or not MPAA was on notice that

8

they lacked such authority.  With regard to the choice of law provision, it, like the arbitration clause and the rest of the Agreement do not control the determination as to whether or not it was valid in the first place.  (See Will-Drill Resources, Inc. v. Samson Resources Co., 352 F.3d 211, 212, 218-219 (5th Cir. 2003) (courts must determine the gateway issues of the existence of an agreement before compelling specific provisions).

**2. The Evidence Confirms IPG's Allegations Regarding Ms. Oshita's Lack of Authority**

MPAA points to the self serving letter of Mr. Bogert, attached to the Agreement, which states that the execution of the Agreement was "duly authorized by all requisite corporate action", as evidence which contradicts IPG's claim that MPAA was on notice that Ms. Oshita and Mr. Bogert did not have authority to bind IPG.  The strained logic proffered by the MPAA is that counsel for Ms. Galaz merely told counsel for the MPAA that an agreement entered by Ms. Oshita or Mr. Bogert would not be valid without the authorization of Ms. Galaz, and that Mr. Bogert's letter provided such authorization because it said that the execution of the Agreement was "duly authorized by all requisite corporate action".

The argument is specious: obviously, Mr. Bogert's letter did not say that "Ms. Galaz had authorized the Agreement", and at no time did counsel for Ms. Galaz ever say that Mr. Bogert was "authorized" to speak for Ms. Galaz.  To the extreme contrary, the letter of November 1, 2003 from Ms. Galaz counsel to MPAA's counsel said verbatim: "The only way that IPG can be bound to any settlement agreement in the cases above is _**if Ms. Galaz provides her authorization thereto**_." [emphasis in original and added]  To suggest that the MPAA reasonably believed that Mr. Bogert's letter constituted authorization by Ms. Galaz to enter the Agreement is simply ridiculous.

MPAA's final argument is that the January 26, 2005 Judgment confirming Lisa Galaz' 75% interest in IPG is "silent as to Ms. Oshita's interest in the IPG entities at the time IPG entered the contract", and is "silent regarding Ms. Oshita's authority to bind IPG to the Contract".

First, neither argument defeats IPG's claim since the letters of IPG's counsel unquestionably establish that IPG put MPAA on notice that Ms. Oshita and Mr. Bogert lacked authority to bind IPG, and explained exactly why, legally, that was the case.  The subsequent judgment vindicated that explanation.

9

1      Second, the Judgment is not silent in that one of the interrogatories put to the jury in that

2 case, which is incorporated into the Judgment itself, asked whether or not the purported transfer of

3 "membership interest" to Ms. Oshita was approved; the jury's answer was "no", thus establishing

4 that at the time the Agreement was entered, Ms. Oshita held only the 25% membership interest she

5 had always possessed.   (See Plaintiff's Judgment, page 6, lines 12-19, attached hereto as Exhibit A).

6

7 **CONCLUSION**

8      Based on the foregoing, MPAA's motion should be denied.

9

Dated: June 30, 2008          PICK & BOYDSTON, LLP

10

11                  By_____

                      Brian D. Boydston

12                      Attorneys for Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas

13                      Limited Liability Company, dba INDEPENDENT PRODUCERS

14                      GROUP, WORLDWIDE SUBSIDY GROUP, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

wsgvmpaa9.p3.wpd          OPPOSITION OF PLAINTIFFS TO MOTION TO DISMISS

**EXHIBIT A**

F I L E D

LOS ANGELES SUPERIOR COURT

JAN 2 6 2005

JOHN A. CLARKE, CLERK

BY J. LORENZ, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| LISA KATONA GALAZ, an individual, | CASE NO. BC 297015 |
| Plaintiff, | PLAINTIFF'S JUDGMENT ON JURY VERDICT |
| v. | |
| MARIAN OSHITA, an individual; WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC a California Limited Liability Company, formerly named ARTIST COLLECTIONS GROUP, LLC, and DOES 1 through 10, inclusive, | |
| Defendants. | |

This action came on regularly for trial on December 6, 2004, in Department 14 of the Superior Court, the Hon. Alan Buckner Judge Presiding; the plaintiff appearing by attorney Brian D. Boydston, Esq. defendant MARIAN OSHITA appearing by attorney Michael Harris, Esq., and defendants WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC

1

1  a  California  Limited  Liability  Company,  formerly  named  ARTIST

2  COLLECTIONS GROUP, LLC appearing by attorney Jeffrey Bogert, Esq.  A

3  jury of twelve persons and two alternates was regularly impaneled and

4  sworn.   Witnesses  were  sworn  and  testified.    After  hearing  the

5  evidence and arguments of counsel, the jury was duly instructed by the

6  Court  and  the  cause  was  submitted  to  the  jury  with  directions  to

7  return  a  verdict  on  special  issues.   The  jury  deliberated  and

8  thereafter returned into court with its verdict as follows:

9

10

11      We answer the questions submitted to us as follows:

12

13      (1)  Did Marian Oshita represent to Raul Galaz that $50,000 was

14  then owed to her for unreimbursed expenses?

15

16          _____ Yes    _____ No

17

18      Answer: Yes

19

20      If your answer to question 1 is yes, then answer question 2. If

21  you answered no, go to Question 8.

22

23      (2)  Was Marian Oshita's representation false?

24

25          _____ Yes    _____ No

26

27      Answer: Yes

28

2

1    If your answer to question 2 is yes, then answer question 3. If
2  you answered no, go to Question 8.
3
4    (3)  Did Marian Oshita know that this representation was false
5  when she made it, or that she made the representation recklessly and
6  without regard for its truth?
7
8    _____ Yes    _____ No
9
10    Answer: Yes
11
12    If your answer to question 3 is yes, then answer question 4. If
13  you answered no, go to Question 8.
14
15    (4)  Did Marian Oshita intend that Raul Galaz rely on the
16  representation?
17
18    _____ Yes    _____ No
19
20    Answer: Yes
21
22    If your answer to question 4 is yes, then answer question 5. If
23  you answered no, go to Question 8.
24
25    (5)  Did Raul Galaz reasonably rely on Marian Oshita's
26  representation?
27
28    _____ Yes    _____ No

3

1    Answer: No

2

3    If your answer to question 5 is yes, then answer question 6. If

4    you answered no, go to Question 8.

5

6    (6)  Was Raul Galaz harmed as a result?

7

8    _____ Yes    _____ No

9

10    Answer: No answer

11

12    If your answer to question 6 is yes, then answer question 7. If

13    you answered no, go to Question 8.

14

15    (7)  Was Raul Galaz' reliance on Marian Oshita's representation

16    a substantial factor in causing Raul Galaz to enter into the Rights

17    Purchase Agreement?

18

19    _____ Yes    _____ No

20

21    Answer: No answer

22

23    Go to the next Question.

24

25    (8)  Did Marian Oshita breach her fiduciary duties by failing to

26        provide Lisa Katona Galaz with, or allow Lisa Katona Galaz

27        to inspect, any of the following:

28        (a) Current lists of business and residence addresses of

4

1  each member of the companies;

2      (b) Copies of the companies' articles of organization and
3  all amendments thereto;

4      (c) Copies of all the companies' tax returns, if any, for
5  the last six years;

6      (d) Copies of the companies' financial statements, if any,
7  for the last six years; and

8      (e) The books and records of the companies as they relate
9  to the internal affairs of the companies for the current and last four
10 years.

11

12      _____ Yes    _____ No

13

14      Answer: Yes

15

16      If your answer to question 8 is yes, then answer question 9. If
17 you answered no and your answer to any of Questions 1 through 7 was
18 no, go to Question 10.  If you answered no and your answer to Question
19 7 was yes, have the presiding juror sign and date this form.

20

21      (9)  What damages, if any, do you award Lisa Galaz for Marian
22 Oshita's breach of fiduciary duties: $_____.

23

24      Answer: $18,750

25

26      If your answer to any of Questions 1 through 7 was no go to
27 Question 10.  If your answer to Question 7 was yes, have the presiding
28 juror sign and date this form.

C:\Docs\galaz\vwsg9.p41.wpd      PLAINTIFF'S JUDGMENT ON JURY VERDICT

(10) Do you find that both Marian Oshita and Raul Galaz consented to the transfer of Raul Galaz' membership interest, as opposed to merely an economic interest, in Worldwide Subsidy Group-Texas to Lisa Galaz?


_____ Yes    _____ No


Answer: Yes


Go to the next question.


(11) Do you find that both Lisa Galaz and Raul Galaz consented to the transfer of Raul Galaz' membership interest, as opposed to merely an economic interest, in Worldwide Subsidy Group-Texas to Marian Oshita?


_____ Yes    _____ No


Answer: No


Got to Question 12.


(12) Do you find that Raul Galaz consented to the transfer of Raul Galaz' membership interest, as opposed to merely an economic interest, in Worldwide Subsidy Group-California to Lisa Galaz?


_____ Yes    _____ No

6

1        Answer: Yes

2

3        If your answer to Question 12 is yes, go to Question 13.  If your

4   answer is no, have the presiding juror sign and date this form.

5

6        (13) Do you find that Lisa Galaz consented to the transfer of

7   Raul Galaz' membership interest, as opposed to merely an economic

8   interest, in Worldwide Subsidy Group-California to Marian Oshita?

9

10       _____ Yes    _____ No

11

12       Answer: No

13

14       The presiding juror must now sign and date this form.

15  Dated: 12/17/04    .    /s/Michael L. Taylor, Presiding Juror

16

17       The jury was polled and answered in agreement with the verdict

18  as read.

19       It appearing by reason of said verdict that the plaintiff LISA

20  KATONA GALAZ is entitled to a judgment against the defendant MARIAN

21  OSHITA,

22       NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED BY THIS COURT

23  as follows:

24

25       (1)  that the sale from plaintiff, LISA KATONA GALAZ's assignor,

26  Raul Galaz, to defendant MARIAN OSHITA, of a 37.5% interest in

27  WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba

28  INDEPENDENT PRODUCERS GROUP, and a 37.5% interest in WORLDWIDE SUBSIDY

                                    7

1  GROUP, LLC a California Limited Liability Company, formerly named
2  ARTIST COLLECTIONS GROUP, LLC, is hereby rescinded;

3      (2)  that by virtue of such rescission, from the date of entry
4  of this judgment, plaintiff, LISA KATONA GALAZ, is the owner of a 75%
5  economic and membership interest in WORLDWIDE SUBSIDY GROUP, LLC a
6  Texas Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, and
7  a 75% economic and membership interest in WORLDWIDE SUBSIDY GROUP, LLC
8  a California Limited Liability Company, formerly named ARTIST
9  COLLECTIONS GROUP, LLC;

10     (3)  that the books of WORLDWIDE SUBSIDY GROUP, LLC a Texas
11  Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, and
12  WORLDWIDE SUBSIDY GROUP, LLC a California Limited Liability Company,
13  formerly named ARTIST COLLECTIONS GROUP, LLC be adjusted to reflect
14  that on May 14, 2002, Mr. Galaz received a draw of $50,000; and

15     (4)  that plaintiff, LISA KATONA GALAZ, have and recover from
16  said defendant, MARIAN OSHITA, the sum of $18,750, with interest
17  thereon at the rate of ten percent (10%) per annum from the date of
18  entry of this judgment until paid.

19
20  DATED:  Jan 26, 2005

         Judge of the Superior Court

**EXHIBIT B**

1 | PICK & BOYDSTON, LLP
2 | Brian D. Boydston (State Bar No. 155614)
1000 Wilshire Boulevard, Suite 600
3 | Los Angeles, CA 90017
(213) 624-1996
4 | (213) 624-9073 facsimile

RECEIVED
JUN 2 6 2008
BY:

5 | Attorneys for Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited
Liability Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY
6 | GROUP, LLC

7

8 | UNITED STATES DISTRICT COURT
9 | CENTRAL DISTRICT OF CALIFORNIA

10

11 | WORLDWIDE SUBSIDY GROUP, LLC a ) CASE NO.  2:08-CV-____ (MANX)
Texas Limited Liability      ) 1st
12 | Company, dba INDEPENDENT      )
PRODUCERS GROUP, WORLDWIDE     ) AMENDED COMPLAINT FOR
13 | SUBSIDY GROUP, LLC a California) DECLARATORY RELIEF AND
Limited Liability Company,    ) RESCISSION
14 | formerly named ARTIST         )
COLLECTIONS GROUP, LLC,       )
15 |                               )
                              )
16 |          Plaintiffs,        )
                              )
17 |      v.                     )
                              )
18 | MOTION PICTURE ASSOCIATION OF )
AMERICA, INC., a New York     )
19 | Corporation doing business in )
California, and DOES 1 through )
20 | 10, inclusive,               )
                              )
21 |          Defendants.        )
    _____ )

22

23

24 |      Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability

25 | Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC

26 | a California Limited Liability Company, formerly named ARTIST

27 | COLLECTIONS GROUP, LLC (hereinafter collectively referred to as

28

1

"IPG")[1], as and for their Amended Complaint alleges as follows:

### THE AGREEMENT

1.    This action concerns an agreement purportedly entered into between Defendant MOTION PICTURE ASSOCIATION OF AMERICA, INC. ("MPAA"), and Plaintiff IPG.  Specifically, on March 31, 2004, MPAA and individuals claiming to represent IPG entered into two separate agreements entitled "Settlement Agreement-Part I", and "Settlement Agreement-Part II" (collectively "the Agreement").  The Agreement concerned a dispute between MPAA and IPG regarding the distribution of copyright royalties from the United States Copyright Office's 1997, 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999 Satellite Royalty Funds.  The Agreement purportedly resolved that dispute.

2.    Specifically, Settlement Agreement-Part I provides that MPAA will pay IPG a specifically stated sum of money for IPG claims pursuant to "Phase II" of the 1997 Cable Royalty Funds upon execution of Settlement Agreement-Part I, and additional sums to be calculated later for IPG claims on 1997 Satellite Royalty Funds and 1998 and 1999

---

[1]In May of 1998, ARTIST COLLECTIONS GROUP, LLC was formed in Los Angeles, California.  In March of 1999, WORLDWIDE SUBSIDY GROUP, LLC was formed in Helotes, Texas.  On March 12, 2001, WORLDWIDE SUBSIDY GROUP, LLC filed an Assumed Name Certificate in Bexar County, Texas, whereby it represented that it would do business as INDEPENDENT PRODUCERS GROUP.  On November 15, 2002, ARTIST COLLECTIONS GROUP, LLC filed a Certificate of Amendment with the California Secretary of State, changing its name to WORLDWIDE SUBSIDY GROUP, LLC.

2

1  Cable and Satellite Royalty Funds.  Settlement Agreement-Part I also
2  contains a confidentiality clause, an arbitration agreement, and a
3  choice of law provision regarding the law of the District of Columbia.
4      3.    Settlement Agreement-Part II provides that IPG will withdraw
5  its notices of intent to participate in the proceeding to distribute
6  the 1997, 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and
7  1999 Satellite Royalty Funds and that the parties would move to
8  dismiss two appeals to the United States Court of Appeals for the
9  District of Columbia Circuit.  It also contained a choice of law
10  provision regarding the law of the District of Columbia, but did not
11  contain a confidentiality clause, or an arbitration agreement.  Those
12  appeals were made from rulings by the Librarian of Congress ("the
13  Librarian") with regard to the distributions of 1997 Cable Royalty
14  Funds (no distribution has yet taken place for 1998 and 1999 Cable
15  Royalties, or 1997, 1998 or 1999 Satellite Royalty Finds).  Since the
16  Librarian was technically a party to those Appeals, the Librarian was
17  also a party to Settlement Agreement-Part II.

18      4.    In sum, Settlement Agreement-Part I set forth what and in
19  what manner IPG would be paid money by MPAA and Settlement Agreement-
20  Part II stated that IPG would drop its own independent royalty claims
21  and appeals.

22

23                        **LACK OF AUTHORITY**

24      5.    However, prior to the execution of the Agreement, and during
25  its negotiation, MPAA was notified by counsel for Lisa Galaz, a member
26  of IPG, that the member of IPG with whom MPAA was negotiating, Marian
27  Oshita, and the attorney that Ms. Oshita had retained, Jeffrey Bogert,
28  Esq., were not authorized to enter an agreement with MPAA on behalf

                                3

1  of IPG.  Specifically, on November 3, 2003, James C. Sun, Esq. of Pick
2  & Boydston, LLP, acting as counsel for Lisa Galaz, wrote to Gregory
3  O. Olaniran, Esq. and Michael Tucci, Esq., of Stinson Morrison Hecker,
4  LLP, counsel for MPAA and explicitly stated that neither Marian Oshita
5  nor Jeffrey Bogert had the authority to bind IPG to any settlement
6  agreement.  Specifically, Mr. Sun's letter states:

7       "Any acts undertaken by Ms. Oshita or by Ms. Oshita through
8       IPG's counsel of record, Jeffrey Bogert, which acts are not
9       authorized by [Lisa Katona Galaz], are ineffective to bind IPG
10       if the person(s) with whom Ms. Oshita and/or Mr. Bogert is/are
11       dealing with have knowledge of this lack of authority. [Texas
12       Civil Statutes, Title 32, Article 2.21.D.(1)-(2)]  By way of
13       this letter, I am placing you on notice that Ms. Oshita and Mr.
14       Bogert lack the authority to unilaterally bind IPG to any
15       settlement agreement in this matter."

16  A copy of Mr. Sun's November 3, 2003 letter is attached hereto as
17  Exhibit A.

18       6.    In addition, the mediator in the underlying dispute between
19  MPAA and IPG, Deanne Siemer, with whom the Agreement was negotiated,
20  was also placed on notice that Ms. Oshita and Mr. Bogert lacked
21  authority to enter into a settlement agreement in the underlying
22  matter.  A copy of an August 8, 2003 letter from Mr. Sun to Ms. Siemer
23  is attached hereto as Exhibit B.

24       7.    In the August 8, 2003 letter to Ms. Siemer, Mr. Sun
25  explained that Ms. Oshita had only a 25% voting interest in IPG and
26  that any other additional interest Ms. Oshita might have in IPG did
27  not confer voting rights to Ms. Oshita beyond her 25% voting interest.
28  Accordingly, and because Ms. Galaz had a greater voting interest in

4

1  IPG- 37.5%, Ms. Siemer was advised that, ". . .IPG cannot make any
2  decisions or take any action with respect to the mediation. . .without
3  Ms. Galaz's authorization."

4      8.     That Ms. Oshita only had a 25% membership or voting interest
5  in IPG was confirmed by a jury in the Los Angeles Superior Court
6  lawsuit filed by Ms. Galaz against Ms. Oshita and IPG entitled Galaz
7  v. Oshita, et al. A copy of the Plaintiff's Judgment on Jury Verdict
8  ("the Judgment") is attached hereto as Exhibit C.  At page 6, lines
9  12-19 of the Judgment, the jury determined that Ms. Oshita had only
10 an "economic interest" and not a "membership interest" in IPG beyond
11 Ms. Oshita's initial 25% interest in IPG.    Therefore, the jury
12 confirmed that, at all times relevant to the purported Agreement
13 between MPAA and IPG, Ms. Galaz had a greater membership interest in
14 IPG than Ms. Oshita did.

15     9.     Despite being placed on notice that neither Ms. Oshita nor
16 Mr. Bogert had the authority to enter into a settlement with MPAA,
17 MPAA nevertheless chose, at its own risk, to disregard this lack of
18 authority and purported to enter into the Agreement with Ms. Oshita
19 and Mr. Bogert purporting to act on behalf of IPG.  Because MPAA was
20 notified that Ms. Galaz' consent was required to bind IPG to the
21 Agreement, and MPAA then chose not to obtain Ms. Galaz's consent, the
22 Agreement is void ab initio and is not binding upon IPG.  Neither
23 MPAA, nor Ms. Oshita or Mr. Bogert, ever informed Ms. Galaz of the
24 terms of the Agreement until the MPAA responded to a subpoena issued
25 by Ms. Galaz on the eve of trial with Ms. Oshita on December 4, 2004,
26 by producing a copy of the Agreement.

27     10.    Nevertheless, MPAA contends that the Agreement is valid and
28 seeks to enforce it.  Specifically, on April 9, 2008, counsel for MPAA

5

1  wrote to counsel for IPG and demanded that IPG withdraw any claims it
2  may have with regard to United States Copyright Office's 1998 and 1999
3  Cable Royalty Funds on the grounds that such claims were barred by the
4  terms of the Agreement.  A copy of that letter is attached hereto as
5  Exhibit D.

6      11.   Therefore, an actual controversy exits between MPAA and WSG
7  as to whether or not the Agreement is enforceable or void *ab initio*.

8

9

10                    **GROUNDS FOR RESCISSION**

11      12.   Settlement Agreement-Part I provided that within thirty
12  days after its execution, IPG was to forward information to MPAA
13  regarding its royalty claims, and then MPAA would evaluate them and
14  state what amount of money it would pay IPG.  If IPG disagreed with
15  MPAA's conclusion, IPG could contest such conclusion through
16  arbitration.  However, Settlement Agreement-Part I was silent on
17  what would occur if IPG failed to forward its information to MPAA
18  with regard to its specific royalty claims.

19      13.   Ultimately, MPAA seized on this uncertainty in the
20  Agreement when IPG failed to submit its information on its 1998 and
21  1999 Cable Royalty Funds and its 1997, 1998 and 1999 Satellite
22  Royalty Funds within thirty days of the execution of the Agreement.
23  Specifically, on December 1, 2004, counsel for MPAA rejected IPG's
24  claims made pursuant to Settlement Agreement-Part I, on the grounds
25  that IPG had submitted its information on those claims more than 30
26  days after the execution of Settlement Agreement-Part I.  This was
27  despite the fact that IPG had nevertheless withdrawn its notices of
28  intent to participate in the proceeding to distribute the 1997,

                              6

1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999 Satellite Royalty Funds, as provided in Settlement Agreement-Part II.

14.    As a result, no consideration existed for IPG's withdrawal pursuant to Settlement Agreement-Part II of its notices of intent to participate in the proceeding to distribute the 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999 Satellite Royalty Funds.

15.    Alternatively, the uncertainty of what would occur should IPG fail to submit its information on its 1998 and 1999 Cable Royalty Funds and its 1997, 1998 and 1999 Satellite Royalty Funds within thirty days of the execution of the Agreement, resulted in a failure of consideration for IPG's withdrawal pursuant to Settlement Agreement-Part II of its notices of intent to participate in the proceeding to distribute the 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999 Satellite Royalty Funds.

16.    As a result, IPG seeks a rescission of Settlement Agreement-Part I and Settlement Agreement-Part II with regard to the 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999 Satellite Royalty Funds, based upon uncertainty, lack of consideration and failure of consideration.  For a variety of reasons, not the least of which is the fact that it has already been distributed and could present a tangle of legal questions were it to be rescinded, IPG does not seek rescission of Settlement Agreement-Part I and Settlement Agreement-Part II with regard to the 1997 Cable Royalty Funds distribution and dismissal of appeals thereof.

wsgvmpaa9.p2.wpd    AMENDED COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION

**PARTIES**

17.   Plaintiff is informed and believes, and thereupon alleges, that MPAA is a New York Corporation doing business in Sherman Oaks, in the State of California.

18.   Plaintiff WORLDWIDE SUBSIDY GROUP, LLC, is a Texas Limited Liability Company, doing business in the states of California and Texas as INDEPENDENT PRODUCERS GROUP with its principal place of business in the County of Bexar, in the State of Texas.

19.   Plaintiff WORLDWIDE SUBSIDY GROUP, LLC, is a California Limited Liability Company, doing business in the states of California and Texas as INDEPENDENT PRODUCERS GROUP with its principal place of business in the County of Bexar, in the State of Texas.

20.   IPG is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sues said Defendants by such fictitious names.   IPG will amend this Complaint, by leave of Court if necessary, to allege their true names and capacities when ascertained.

**FIRST CAUSE OF ACTION**

**(For Declaratory Relief)**

**(Against all Defendants)**

21.   IPG incorporates by reference herein the allegations of paragraphs 1 through 20 as set forth in full.

22.   An actual controversy exists between IPG and MPAA regarding whether or not the Agreement is void.

23.   A judicial declaration as to whether or not the Agreement is void is necessary and appropriate to enable the respective parties to enforce their rights with regard to United States Copyright

8

---

wsgvmpaa9.p2.wpd   AMENDED COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION

1 | Office's 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999
2 | Satellite Royalty Funds.

3

4

5 | ### SECOND CAUSE OF ACTION

6 | ### (For Rescission)

7 | ### (Against all Defendants)

8 |    24.    IPG incorporates by reference herein the allegations of
9 | paragraphs 1 through 20 as set forth in full.

10 |    25.    As set forth above, the Agreement is uncertain as to what
11 | would occur should IPG fail to submit its information on its 1998 and
12 | 1999 Cable Royalty Funds and its 1997, 1998 and 1999 Satellite Royalty
13 | Funds within thirty days of the execution of the Agreement.

14 |    26.    In addition, given that uncertainty, Settlement Agreement-
15 | Part I and Settlement Agreement-Part II lack consideration for IPG's
16 | dismissal of its claims for 1998 and 1999 Cable Royalty Funds and its
17 | 1997, 1998 and 1999 Satellite Royalty Funds.

18 |    27.    In addition,    Settlement Agreement-Part I and Settlement
19 | Agreement-Part II suffer from a failure of consideration for IPG's
20 | withdrawal of its claims for 1998 and 1999 Cable Royalty Funds and its
21 | 1997, 1998 and 1999 Satellite Royalty Funds, since IPG has received
22 | nothing for those withdrawals.

23 |    28.    IPG will suffer substantial financial prejudice and will be
24 | deprived the benefit of the bargain unless  Settlement Agreement-Part
25 | I and Settlement Agreement-Part II are rescinded.

26 |    29.    IPG intends that service of the summons and this amended
27 | complaint will serve as notice of rescission of  Settlement Agreement-
28 | Part II and Settlement Agreement-Part II.

9

1    WHEREFORE, IPG prays for judgment against Defendants as follows:

2    1.    That the Court order that the Agreement was entered into

3    without the consent of a majority in interest of the members of IPG,

4    and is therefore void, except with regard to the 1997 Cable Royalty

5    Funds distribution and dismissal of appeals thereof;

6    2.    That the Court order that Settlement Agreement-Part I and

7    Settlement Agreement-Part II are rescinded, except with regard to the

8    1997 Cable Royalty Funds distribution and dismissal of appeals

9    thereof;

10    3.    For costs of suit;

11    4.    For such other and further relief as the Court may deem

12    proper.

13    Dated: June 26 2008                    PICK & BOYDSTON, LLP

14                                           By _____
15                                              Brian D. Boydston
                                               Attorneys    for    Plaintiffs
16                                             WORLDWIDE SUBSIDY GROUP, LLC
                                               a   Texas   Limited   Liability
17                                             Company,    dba    INDEPENDENT
                                               PRODUCERS   GROUP,   WORLDWIDE
18                                             SUBSIDY GROUP, LLC

19

20

21

22

23

24

25

26

27

28

10