1  PICK & BOYDSTON, LLP
   Brian D. Boydston (State Bar No. 155614)
2  1000 Wilshire Boulevard, Suite 600
   Los Angeles, CA 90017
3  (213) 624-1996
   (213)624-9073 facsimile
4
   Attorneys for Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited
5  Liability Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY
   GROUP, LLC
6

7

8                    UNITED STATES DISTRICT COURT
                    CENTRAL DISTRICT OF CALIFORNIA
9

10

11 WORLDWIDE SUBSIDY GROUP, LLC a )  CASE NO.   2:08-CV-1201 FMC (MANx)
   Texas Limited Liability        )  1ST
12 Company, dba INDEPENDENT        )  AMENDED COMPLAINT FOR
   PRODUCERS GROUP, WORLDWIDE      )  DECLARATORY RELIEF AND
13 SUBSIDY GROUP, LLC a California) RESCISSION
   Limited Liability Company,      )
14 formerly named ARTIST          )
   COLLECTIONS GROUP, LLC,         )
15                                 )
        Plaintiffs,                )
16                                 )
        v.                         )
17                                 )
   MOTION PICTURE ASSOCIATION OF   )
18 AMERICA, INC., a New York       )
   Corporation doing business in   )
19 California, and DOES 1 through  )
   10, inclusive,                  )
20                                 )
        Defendants.                )
21 _____)

22

23
        Plaintiffs WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability
24
   Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC
25
   a  California  Limited  Liability  Company,  formerly  named  ARTIST
26
   COLLECTIONS  GROUP,  LLC  (hereinafter  collectively  referred  to  as
27

28
                                   1

1   "IPG")[1], as and for their Amended Complaint alleges as follows:

2

3                           **THE AGREEMENT**

4       1.    This action concerns an agreement purportedly entered into

5   between  Defendant  MOTION  PICTURE  ASSOCIATION  OF  AMERICA,  INC.

6   ("MPAA"), and Plaintiff IPG.  Specifically, on March 31, 2004, MPAA

7   and individuals claiming to represent IPG entered into two separate

8   agreements entitled "Settlement Agreement-Part I", and "Settlement

9   Agreement-Part II" (collectively "the Agreement").   The Agreement

10  concerned a dispute between MPAA and IPG regarding the distribution

11  of copyright royalties from the United States Copyright Office's 1997,

12  1998  and  1999  Cable  Royalty  Funds  and  the  1997,  1998  and  1999

13  Satellite  Royalty  Funds.   The  Agreement  purportedly  resolved  that

14  dispute.

15      2.    Specifically, Settlement Agreement-Part I provides that MPAA

16  will  pay  IPG  a  specifically  stated  sum  of  money  for  IPG  claims

17  pursuant to "Phase II" of the 1997 Cable Royalty Funds upon execution

18  of Settlement Agreement-Part I, and additional sums to be calculated

19  later for IPG claims on 1997 Satellite Royalty Funds and 1998 and 1999

20

21      [1]In May of 1998, ARTIST COLLECTIONS GROUP, LLC was formed in Los

22  Angeles, California.   In March of 1999, WORLDWIDE SUBSIDY GROUP, LLC

23  was formed in Helotes, Texas.   On March 12, 2001, WORLDWIDE SUBSIDY

24  GROUP, LLC filed an Assumed Name Certificate in Bexar County, Texas,

25  whereby  it  represented  that  it  would  do  business  as  INDEPENDENT

26  PRODUCERS GROUP.  On November 15, 2002, ARTIST COLLECTIONS GROUP, LLC

27  filed  a  Certificate  of  Amendment  with  the  California  Secretary  of

28  State, changing its name to WORLDWIDE SUBSIDY GROUP, LLC.

                                    2

1  Cable and Satellite Royalty Funds.   Settlement Agreement-Part I also
2  contains a confidentiality clause, an arbitration agreement, and a
3  choice of law provision regarding the law of the District of Columbia.

4     3.    Settlement Agreement-Part II provides that IPG will withdraw
5  its notices of intent to participate in the proceeding to distribute
6  the 1997, 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and
7  1999 Satellite Royalty Funds and that the parties would move to
8  dismiss two appeals to the United States Court of Appeals for the
9  District of Columbia Circuit.   It also contained a choice of law
10 provision regarding the law of the District of Columbia, but did not
11 contain a confidentiality clause, or an arbitration agreement.   Those
12 appeals were made from rulings by the Librarian of Congress ("the
13 Librarian") with regard to the distributions of 1997 Cable Royalty
14 Funds (no distribution has yet taken place for 1998 and 1999 Cable
15 Royalties, or 1997, 1998 or 1999 Satellite Royalty Finds).   Since the
16 Librarian was technically a party to those Appeals, the Librarian was
17 also a party to Settlement Agreement-Part II.

18    4.    In sum, Settlement Agreement-Part I set forth what and in
19 what manner IPG would be paid money by MPAA and Settlement Agreement-
20 Part II stated that IPG would drop its own independent royalty claims
21 and appeals.

22
23                         **LACK OF AUTHORITY**

24    5.    However, prior to the execution of the Agreement, and during
25 its negotiation, MPAA was notified by counsel for Lisa Galaz, a member
26 of IPG, that the member of IPG with whom MPAA was negotiating, Marian
27 Oshita, and the attorney that Ms. Oshita had retained, Jeffrey Bogert,
28 Esq., were not authorized to enter an agreement with MPAA on behalf

3

1  of IPG. Specifically, on November 3, 2003, James C. Sun, Esq. of Pick
2  & Boydston, LLP, acting as counsel for Lisa Galaz, wrote to Gregory
3  O. Olaniran, Esq. and Michael Tucci, Esq., of Stinson Morrison Hecker,
4  LLP, counsel for MPAA and explicitly stated that neither Marian Oshita
5  nor Jeffrey Bogert had the authority to bind IPG to any settlement
6  agreement. Specifically, Mr. Sun's letter states:

7      "Any acts undertaken by Ms. Oshita or by Ms. Oshita through
8      IPG's counsel of record, Jeffrey Bogert, which acts are not
9      authorized by [Lisa Katona Galaz], are ineffective to bind IPG
10     if the person(s) with whom Ms. Oshita and/or Mr. Bogert is/are
11     dealing with have knowledge of this lack of authority. [Texas
12     Civil Statutes, Title 32, Article 2.21.D.(1)-(2)] By way of
13     this letter, I am placing you on notice that Ms. Oshita and Mr.
14     Bogert lack the authority to unilaterally bind IPG to any
15     settlement agreement in this matter."

16 A copy of Mr. Sun's November 3, 2003 letter is attached hereto as
17 Exhibit A.

18     6.    In addition, the mediator in the underlying dispute between
19 MPAA and IPG, Deanne Siemer, with whom the Agreement was negotiated,
20 was also placed on notice that Ms. Oshita and Mr. Bogert lacked
21 authority to enter into a settlement agreement in the underlying
22 matter. A copy of an August 8, 2003 letter from Mr. Sun to Ms. Siemer
23 is attached hereto as Exhibit B.

24     7.    In the August 8, 2003 letter to Ms. Siemer, Mr. Sun
25 explained that Ms. Oshita had only a 25% voting interest in IPG and
26 that any other additional interest Ms. Oshita might have in IPG did
27 not confer voting rights to Ms. Oshita beyond her 25% voting interest.
28 Accordingly, and because Ms. Galaz had a greater voting interest in

4

1  IPG- 37.5%, Ms. Siemer was advised that, ". . .IPG cannot make any
2  decisions or take any action with respect to the mediation. . .without
3  Ms. Galaz's authorization."

4      8.    That Ms. Oshita only had a 25% membership or voting interest
5  in IPG was confirmed by a jury in the Los Angeles Superior Court
6  lawsuit filed by Ms. Galaz against Ms. Oshita and IPG entitled <u>Galaz</u>
7  <u>v. Oshita, et al.</u> A copy of the Plaintiff's Judgment on Jury Verdict
8  ("the Judgment") is attached hereto as Exhibit C. At page 6, lines
9  12-19 of the Judgment, the jury determined that Ms. Oshita had only
10 an "economic interest" and not a "membership interest" in IPG beyond
11 Ms. Oshita's initial 25% interest in IPG.    Therefore, the jury
12 confirmed that, at all times relevant to the purported Agreement
13 between MPAA and IPG, Ms. Galaz had a greater membership interest in
14 IPG than Ms. Oshita did.

15     9.    Despite being placed on notice that neither Ms. Oshita nor
16 Mr. Bogert had the authority to enter into a settlement with MPAA,
17 MPAA nevertheless chose, at its own risk, to disregard this lack of
18 authority and purported to enter into the Agreement with Ms. Oshita
19 and Mr. Bogert purporting to act on behalf of IPG. Because MPAA was
20 notified that Ms. Galaz' consent was required to bind IPG to the
21 Agreement, and MPAA then chose not to obtain Ms. Galaz's consent, the
22 Agreement is void *ab initio* and is not binding upon IPG.    Neither
23 MPAA, nor Ms. Oshita or Mr. Bogert, ever informed Ms. Galaz of the
24 terms of the Agreement until the MPAA responded to a subpoena issued
25 by Ms. Galaz on the eve of trial with Ms. Oshita on December 4, 2004,
26 by producing a copy of the Agreement.

27     10.   Nevertheless, MPAA contends that the Agreement is valid and
28 seeks to enforce it. Specifically, on April 9, 2008, counsel for MPAA

5

1  wrote to counsel for IPG and demanded that IPG withdraw any claims it

2  may have with regard to United States Copyright Office's 1998 and 1999

3  Cable Royalty Funds on the grounds that such claims were barred by the

4  terms of the Agreement.  A copy of that letter is attached hereto as

5  Exhibit D.

6      11.   Therefore, an actual controversy exits between MPAA and WSG

7  as to whether or not the Agreement is enforceable or void *ab initio*.

8

9

10                          **GROUNDS FOR RESCISSION**

11     12.   Settlement Agreement-Part I provided that within thirty

12  days after its execution, IPG was to forward information to MPAA

13  regarding its royalty claims, and then MPAA would evaluate them and

14  state what amount of money it would pay IPG.  If IPG disagreed with

15  MPAA's conclusion, IPG could contest such conclusion through

16  arbitration.  However, Settlement Agreement-Part I was silent on

17  what would occur if IPG failed to forward its information to MPAA

18  with regard to its specific royalty claims.

19     13.   Ultimately, MPAA seized on this uncertainty in the

20  Agreement when IPG failed to submit its information on its 1998 and

21  1999 Cable Royalty Funds and its 1997, 1998 and 1999 Satellite

22  Royalty Funds within thirty days of the execution of the Agreement.

23  Specifically, on December 1, 2004, counsel for MPAA rejected IPG's

24  claims made pursuant to Settlement Agreement-Part I, on the grounds

25  that IPG had submitted its information on those claims more than 30

26  days after the execution of Settlement Agreement-Part I.  This was

27  despite the fact that IPG had nevertheless withdrawn its notices of

28  intent to participate in the proceeding to distribute the 1997,

6

1 | 1998 and 1999 Cable Royalty Funds and tl e 1997, 1998 and 1999
2 | Satellite Royalty Funds, as provided i 1 Settlement Agreement-Part
3 | II.

4 |     14.   As a result, no consider cion existed for IPG's
5 | withdrawal pursuant to Settlement Agreement-Part II of its notices
6 | of intent to participate in the proceeding to distribute the 1998
7 | and 1999 Cable Royalty Funds and the 1997, 1998 and 1999 Satellite
8 | Royalty Funds.

9 |     15.   Alternatively, the uncertainty of what would occur should
10 | IPG fail to submit its information on its 1998 and 1999 Cable
11 | Royalty Funds and its 1997, 1998 and 1999 Satellite Royalty Funds
12 | within thirty days of the execution of the Agreement, resulted in a
13 | failure of consideration for IPG's withdrawal pursuant to
14 | Settlement Agreement-Part II of its notices of intent to
15 | participate in the proceeding to distribute the 1998 and 1999 Cable
16 | Royalty Funds and the 1997, 1998 and 1999 Satellite Royalty Funds.

17 |     16.   As a result, IPG seeks a rescission of Settlement
18 | Agreement-Part I and Settlement Agreement-Part II with regard to
19 | the 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999
20 | Satellite Royalty Funds, based upon uncertainty, lack of
21 | consideration and failure of consideration.   For a variety of
22 | reasons, not the least of which is the fact that it has already
23 | been distributed and could present a tangle of legal questions were
24 | it to be rescinded, IPG does not seek rescission of Settlement
25 | Agreement-Part I and Settlement Agreement-Part II with regard to
26 | the 1997 Cable Royalty Funds distribution and dismissal of appeals
27 | thereof.

28 |

7

1

**PARTIES**

2    17.    Plaintiff is informed and believes, and thereupon alleges,

3  that MPAA is a New York Corporation doing business in Sherman Oaks,

4  in the State of California.

5    18.    Plaintiff WORLDWIDE SUBSIDY GROUP, LLC, is a Texas Limited

6  Liability Company, doing business in the states of California and

7  Texas as INDEPENDENT PRODUCERS GROUP with its principal place of

8  business in the County of Bexar, in the State of Texas.

9    19.    Plaintiff WORLDWIDE SUBSIDY GROUP, LLC, is a California

10  Limited Liability Company, doing business in the states of California

11  and Texas as INDEPENDENT PRODUCERS GROUP with its principal place of

12  business in the County of Bexar, in the State of Texas.

13    20.    IPG is unaware of the true names and capacities of

14  Defendants sued herein as DOES 1 through 10, inclusive, and therefore

15  sues said Defendants by such fictitious names.    IPG will amend this

16  Complaint, by leave of Court if necessary, to allege their true names

17  and capacities when ascertained.

18

19                        **FIRST CAUSE OF ACTION**

20                        **(For Declaratory Relief)**

21                        **(Against all Defendants)**

22    21.    IPG incorporates by reference herein the allegations of

23  paragraphs 1 through 20 as set forth in full.

24    22.    An actual controversy exists between IPG and MPAA regarding

25  whether or not the Agreement is void.

26    23.    A judicial declaration as to whether or not the Agreement

27  is void is necessary and appropriate to enable the respective parties

28  to enforce their rights with regard to United States Copyright

8

wsgvmpaa9.p2.wpd    AMENDED COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION

1  Office's 1998 and 1999 Cable Royalty Funds and the 1997, 1998 and 1999
2  Satellite Royalty Funds.

3
4
5              **SECOND CAUSE OF ACTION**
6                **(For Rescission)**
7              **(Against all Defendants)**

8       24.   IPG incorporates by reference herein the allegations of
9  paragraphs 1 through 20 as set forth in full.

10      25.   As set forth above, the Agreement is uncertain as to what
11 would occur should IPG fail to submit its information on its 1998 and
12 1999 Cable Royalty Funds and its 1997, 1998 and 1999 Satellite Royalty
13 Funds within thirty days of the execution of the Agreement.

14      26.   In addition, given that uncertainty, Settlement Agreement-
15 Part I and Settlement Agreement-Part II lack consideration for IPG's
16 dismissal of its claims for 1998 and 1999 Cable Royalty Funds and its
17 1997, 1998 and 1999 Satellite Royalty Funds.

18      27.   In addition, Settlement Agreement-Part I and Settlement
19 Agreement-Part II suffer from a failure of consideration for IPG's
20 withdrawal of its claims for 1998 and 1999 Cable Royalty Funds and its
21 1997, 1998 and 1999 Satellite Royalty Funds, since IPG has received
22 nothing for those withdrawals.

23      28.   IPG will suffer substantial financial prejudice and will be
24 deprived the benefit of the bargain unless Settlement Agreement-Part
25 I and Settlement Agreement-Part II are rescinded.

26      29.   IPG intends that service of the summons and this amended
27 complaint will serve as notice of rescission of Settlement Agreement-
28 Part II and Settlement Agreement-Part II.

9

1    WHEREFORE, IPG prays 1 or judgment against Defendants as follows:

2    1.    That the Court order that the Agreement was entered into
3    without the consent of a majority in interest of the members of IPG,
4    and is therefore void, except with regard to the 1997 Cable Royalty
5    Funds distribution and dismissal of appeals thereof;

6    2.    That the Court order that Settlement Agreement-Part I and
7    Settlement Agreement-Part II are rescinded, except with regard to the
8    1997 Cable Royalty Funds distribution and dismissal of appeals
9    thereof;

10   3.    For costs of suit;

11   4.    For such other and further relief as the Court may deem
12   proper.

13   Dated: June 26 2008                    PICK & BOYDSTON, LLP

14                                          By
15                                             Brian D. Boydston
                                             Attorneys    for    Plaintiffs
16                                           WORLDWIDE SUBSIDY GROUP, LLC
                                             a   Texas   Limited   Liability
17                                           Company,    dba    INDEPENDENT
                                             PRODUCERS   GROUP,   WORLDWIDE
18                                           SUBSIDY GROUP, LLC

19

20

21

22

23

24

25

26

27

28

10

wsgvmpaa9.p2.wpd    AMENDED COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION

**EXHIBIT  A**

A PARTNERSHIP INCLUDING A PROFESSIONAL CORPORATION

523 WEST SIXTH STREET, SUITE 1134

LOS ANGELES, CALIFORNIA 90014

TELEPHONE (213) 624-1996

FACSIMILE (213) 624-9073

November 3, 2003

William Gordon Kanter, Esq.
Anne M. Murphy, Esq.
U.S. Department of Justice
Civil Division, Appellate Staff
601 D Street, NW, Room 9102
Washington, D.C. 20530-0001

Via Facsimile
(202) 514-7964
and U.S. Mail

Gregory O. Olaniran, Esq.
Michael Edward Tucci, Esq.
Stinson, Morrison, Hecker
1150 18th Street, NW, Suite 800
Washington, D.C. 20036-3816

Via Facsimile
(202) 785-9163
and U.S. Mail

Re:   Motion Picture Ass'n of America, Inc. v. Register of Copyrights, et al. (Case No.01-
      1033); and Consolidated Case No. 02-1040

Dear Counsel:

Please be advised that this law firm represents Lisa Katona Galaz.  Ms Galaz is a Member of
Worldwide Subsidy Group, LLC, a Texas Limited Liability Company, dba Independent Producers
Group ("IPG").  The only other Member of IPG is Marian Oshita.

Under the laws of the State of Texas, under which laws IPG filed its Articles of Organization, a
Texas LLC is controlled by a "majority" of its Members.  Texas Civil Statutes, Title 32, Article 2.23.
A "majority" is defined as ". . .more than one-half, by number, of all the members. . ." Id. Article
2.23.F. (emphasis added). Therefore, IPG cannot make any decisions or take any action with respect
to the above-entitled cases unless such actions are authorized by Ms. Galaz.

Any acts undertaken by Ms. Oshita or by Ms. Oshita through IPG's counsel of record, Jeffrey
Bogert, which acts are not authorized by Ms. Galaz, are ineffective to bind IPG if the person(s) with
whom Ms. Oshita and/or Mr. Bogert is/are dealing have knowledge of this lack of authority. Id.
Article 2.21.D.(1)-(2).  By way of this letter, I am placing you on notice that Ms. Oshita and Mr.
Bogert lack the authority to unilaterally bind IPG to any settlement agreement in this matter.

D:\Docs G m galaz\ ltr cappealattys.110303

William Pearson Garred, Esq.
Anne M. Murphy, Esq.
Gregory O. Olaniran, Esq.
Michael Edward Tucci, Esq.
November 1, 2003
Page 2


Simply stated- The only way that IPG can be bound to any settlement agreement in the cases above is if Ms. Galaz provides her authorization thereto. In order for Ms. Galaz to provide her authorization, she must be kept informed of any and all settlement efforts.

I look forward to being kept apprized of such settlement efforts. You may contact me or Brian Boydston of this office with any questions or comments you may have regarding the matters discussed herein.

Sincerely yours,

PICK & BOYDSTON, LLP

James C. Sun


cc:     Deanne C. Siemer, Esq. (via facsimile and U.S. Mail)
        Jeffrey C. Bogert, Esq. (via facsimile and U.S. Mail)
        Michael Harris, Esq. (via facsimile and U.S. Mail)
        Client (via facsimile and U.S. Mail)

**EXHIBIT  B**

PICK & BOYDSTON, LLP

A PARTNERSHIP INCLUDING A PROFESSIONAL CORPORATION

523 WEST SIXTH STREET, SUITE 1134

LOS ANGELES, CALIFORNIA 90014

TELEPHONE (213) 624-1996

FACSIMILE (   ) 624-9073

August 8, 2003

Deanne C. Siemer, Esq.                                          Via Facsimile
Wilsie Co. LLC                                                  (202) 829-7598
4242 Mathewson Drive N.W.                                       and U.S. Mail
Washington, D.C. 20011

Re:    Independent Producers Group, et al. v. The Librarian of Congress, et al.

Dear Ms. Siemer:

I am in receipt of your letter dated July 27, 2003. Please be advised that my client, Lisa Katona
Galaz, is a Member of Worldwide Subsidy Group, LLC, a Texas Limited Liability Company, dba
Independent Producers Group ("IPG"). Ms. Galaz holds a 37.5% interest in IPG (in my letter to you
dated July 15, 2003, I erroneously stated that Ms. Galaz holds a 35% interest in IPG).

IPG has only one other Member- Marian Oshita. Ms. Oshita, over Ms. Galaz's protest, has retained
Jeffrey C. Bogert, Esq. to represent IPG in the above-entitled proceedings. Ms. Oshita has only a
25% membership interest in IPG. Any claims by Ms. Oshita or by Mr. Bogert that Ms. Oshita has
a membership interest in IPG greater than 25% is false.

Under the laws of the State of Texas, under which laws IPG filed its Articles of Organization, all
Members of an LLC must consent to the transfer of any membership interest in order for any
membership powers to attach to the transferred interest. Texas Civil Statutes, Title 32, Article
4.07.A.(1). Ms. Oshita claims, that in May of 2002, she received an 37.5% interest in IPG, which,
when added to her existing 25% interest, gave her a 62.5% interest in IPG.

However, Ms. Galaz never consented to this transfer to Ms. Oshita. As such, under Texas law; the
purported transfer of interest to Ms. Oshita only gave Ms. Oshita the right, as to the additional
37.5% interest, to be "allocated income, gain, loss, credit, or similar items, and receive distributions,
to which the assignor was entitled." Id. Article 4.05.A.(3). Ms. Oshita may not, however, exercise
any membership rights as to the additional 37.5% interest. Id. Article 4.05.A.(2).

Therefore, Ms. Oshita has only a 25% membership interest in IPG and may only exercise authority
commensurate with this 25% interest. In contrast, Ms. Galaz has a 37.5% membership interest in
IPG and, therefore, IPG cannot make any decisions or take any action with respect to the mediation
of the above-entitled lawsuit without Ms. Galaz's authorization. Id. Article 2.23.

D:\Docs\G m\galaz\ltr siemer 080803

Deanne C. Siemer, Esq.
August 8, 2003
Page 2

In light of the above, any acts undertaken by Mr. Bogert and/or Ms. Oshita are ineffective to bind IPG if the person(s) with whom Mr. Bogert and/or Ms. Oshita is/are dealing have knowledge of this lack of authority. <u>Id.</u> Article.2.21.D.(1)-(2). By way of this letter, I am placing you on notice that Mr. Bogert and Ms. Oshita lack the authority to bind IPG to any settlement agreement in this matter.

Simply stated- <u>The only way that IPG can be bound to any settlement agreement you may be working on is if Ms. Galaz provides her authorization thereto.</u> In order for Ms. Galaz to provide her authorization, she must be kept informed of any and all settlement discussions between you and Mr. Bogert and/or Ms. Oshita. Either Ms. Galaz is kept informed and her authority obtained for any settlement, or else your settlement efforts will be wholly ineffectual and an exercise in futility.

Already, pursuant to a notice similar to this one, Merrill Lynch has agreed to not release any funds from IPG's account without Ms. Galaz's authorization.

If you should persist in dealing with Mr. Bogert without involving Ms. Galaz, I will have no choice but to inform the other parties to this action that any settlement efforts they have made to date, or will make, are a waste of time in that Mr. Bogert lacks any authority to deal with them or with you.

If you agree to simply refuse to continue engaging in settlement efforts with Mr. Bogert unless and until Mr. Bogert first obtains Ms. Galaz's authorization therefor, I will place these parties on notice of Mr. Bogert's and Ms. Oshita's lack of authority to bind IPG. I will refrain from sharing this information with the other parties to this action until <u>5:00 p.m. on Tuesday, August 12, 2003</u>. I do hope we are able to resolve this situation by that time.

For ease of reference, I enclose herewith the portions of the Texas Civil Statutes cited herein. I look forward to your timely response to this letter. You may contact me or Brian D. Boydston of this office. Thank you for your attention to this matter.

                Sincerely yours,

                PICK & BOYDSTON, LLP

                James C. Sun

Encls:
cc:    Lisa Katona Galaz (via facsimile and mail (w/o encls.))
      Jeffrey C. Bogert, Esq. (via facsimile and mail)
      Marian Oshita (via facsimile and mail)

D:\Docs\G-m\galaz\ ltr.siemer.080803

E. If mailed, such notice to a member shall be deemed to be delivered when deposited in the United States mail addressed to the member at the member's address that appears on the records of the limited liability company, with postage prepaid.

F. Attendance of a member, manager, or committee member at a meeting shall constitute a waiver of notice of such meeting, except where that member, manager, or committee member attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.

G. The articles of organization and regulations may contain provisions relating to giving notice of the time, place, or purpose of a meeting at which a matter is to be voted on by any members or managers, waiver of notice, action by consent without a meeting, the establishment of a record date, quorum requirements, voting in person or by proxy, or any other matter relating to the exercise of the right to vote.

Art. 2.19 amended by Acts 1997, 75th Leg., ch. 375, § 57, eff. Sept. 1, 1997.

### Indemnification

Art. 2.20. A. Subject to such standards and restrictions, if any, as are set forth in its articles of organization or in its regulations, a limited liability company shall have power to indemnify members and managers, officers, and other persons and purchase and maintain liability insurance for such persons.

B. To the extent that at law or in equity, a member, manager, officer, or other person has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager, such duties and liabilities may be expanded or restricted by provisions in the regulations.

Art. 2.20 amended by Acts 1997, 75th Leg., ch. 375, § 58, eff. Sept. 1, 1997.

### Designation of Officers; Authority and Apparent Authority of Officers, Agents, Managers, and Members

Art. 2.21. A. One or more persons, who may or may not be managers or members, may be designated as officers of the limited liability company by the manager or managers, if management is vested in one or more managers, or by the member or members, if management of the limited liability company is reserved to the members.

B. All officers, agents, managers, and members of the limited liability company, as among themselves and the

Case 1:08-cv-01470-PLF    Document 1    Filed 06/26/2008    Page 18 of 38

... company, have power and perform duties in the management of the limited liability company as may be provided in the articles of organization or the resolution of the manager or managers, if management is vested in one or more managers, or of the member or members, if management is reserved to the members, in each case not inconsistent with the regulations or the articles of organization.

C. Except as otherwise provided in this Article, the following are agents of a limited liability company for the purpose of its business:

(1) any one or more officers or other agents of a limited liability company who are vested with actual or apparent authority;

(2) each manager, to the extent that management of the limited liability company is vested in that manager; and

(3) each member, to the extent that management of the limited liability company has been reserved to that member.

D. An act, including the execution in the name of the limited liability company of any instrument, for the purpose of apparently carrying on in the usual way the business of the limited liability company by any of the persons described in Section C of this Article binds the limited liability company unless:

(1) the officer, agent, manager, or member so acting otherwise lacks the authority to act for the limited liability company; and

(2) the person with whom the officer, agent, manager, or member is dealing has knowledge of the fact that the officer, agent, manager, or member does not have that authority.

## Records to be Kept; Access to Information

Art. 2.22. A. A domestic limited liability company shall keep and maintain the following records in its principal office in the United States or make them available in that office within five days after the date of receipt of a written request under Section E of this Article:

(1) a current list that states:

(a) the name and mailing address of each member;

(b) the percentage or other interest in the limited liability company owned by each member; and

7

regarding the business, affairs, and financial condition of the limited liability company as is just and reasonable for the person to examine and copy.

Case 1:08-cv-00470-PLF Document 18    Filed 06/26/2008    Page 19 of 38

E. On the written request by any member or an assignee of a membership interest made to the person and address designated in the regulations, the limited liability company shall provide to the requesting member or assignee without charge true copies of:

(1) the articles of organization and regulations and all amendments or restatements; and

(2) any of the tax returns described in Subdivision (2) of Section A of this Article.

Art. 2.22, Secs. A, B amended by Acts 1997, 75th Leg., ch. 375, § 59, eff. Sept. 1, 1997.

## Voting, Quorum, and Action

Art. 2.23. A. Except as otherwise provided in this Act, in the articles of organization, or in the regulations, a majority of the members, managers, or members of any committee constitutes a quorum for the transaction of business at any meeting of the members, the managers, or the committee. Except as otherwise provided in the articles of organization or the regulations, an act of a majority of the members entitled to vote, the managers, or the members of a committee, who are present at a meeting of the members, the managers, or the committee at which a quorum is present is the act of the members, the managers, or the committee. Except as otherwise provided in the articles of organization or the regulations, any member may vote either in person or by proxy executed in writing by the member.

B. (1) Unless otherwise provided by the articles of organization or the regulations, any act required or permitted to be taken at any meeting of the members, the managers, or any committee may be taken without a meeting, without prior notice, and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the members, managers, or committee members, as the case may be, having not fewer than the minimum number of votes that would be necessary to take the action at a meeting at which all members, managers, or committee members, as the case may be, entitled to vote on the action were present and voted.

(2) Unless otherwise provided in the regulations, a telegram, telex, cablegram, or similar transmission by a person, or a photographic, photostatic, facsimile, or similar reproduction of a writing signed by a person, shall be regarded as signed by that person for the purposes of this Article.

C. Subject to the provisions required or permitted by this Act, unless otherwise provided in the articles of organization or the regulations, members, managers, or members of any committee may participate in and hold a meeting of the members, managers, or committee by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other. Participation in a meeting pursuant to this Section constitutes presence in person at the meeting except where a person participates in the meeting for the express purpose of objecting to the transaction of any business on

D. Except as provided in the articles of organization or the regulations, the affirmative vote, approval, or consent of a majority of all the members is required to:

(1) change the status of the limited liability company from one in which management is reserved to the members to one in which management is vested in one or more managers, or vice versa;

(2) issue any additional membership interests in the limited liability company subsequent to the issuance of membership interests to the initial members of the limited liability company;

(3) approve any merger, consolidation, share or interest exchange, or other transaction authorized by or subject to the provisions of Part Ten of this Act;

(4) voluntarily cause the dissolution of the limited liability company;

(5) authorize any transaction, agreement, or action on behalf of the limited liability company that is unrelated to its purpose as set forth in the regulations or articles of organization or that otherwise contravenes the regulations; or

(6) authorize any act that would make it impossible to carry on the ordinary business of the limited liability company.

E. Except as provided in the regulations, the affirmative vote, approval, or consent of a majority of all of the managers, if management of the limited liability company is vested in one or more managers, or of the members, if management of the limited liability company is reserved to the members, is required to take any action, other than an action listed in Section D of this Article, that is not apparently for the carrying on of the business of the limited liability company in the usual way.

F. Except as otherwise provided in the articles of organization or the regulations, for purposes of this Act, a "majority" of the members, managers, or any committee of the managers means more than one-half, by number, of all the members, managers, or members of the committee, as the case may be.

G. Except as provided in the articles of organization or the regulations, if no capital has been paid into the limited liability company, a majority of the managers named in the articles of organization may amend the articles of organization or dissolve the limited liability company or if the management has been reserved to the members, a majority of the members named in the articles of organization may amend the articles of organization or dissolve the limited liability company. In such event, the persons adopting such amendments to the articles of organization or authorizing such dissolution shall sign and file with the Secretary of State the articles of amendment provided for in Articles 3.06 and 3.07 of this Act and the articles of dissolution

H. Except as provided in the articles of organization or the regulations, if any capital has been paid into the limited liability company, the affirmative vote, approval, or consent of all members is required to amend the articles of organization.

Art. 2.23, Secs. A, D amended by and Art. 2.23, Secs. G, H added by Acts 1997, 75th Leg., ch. 375, § 60, eff. Sept. 1, 1997.

## PART THREE

### Formation

Art. 3.01. A. Any natural person of the age of eighteen years or more, or any other person (without regard to place of residence, domicile, or organization) may act as an organizer of a limited liability company by signing the articles of organization for such limited liability company and by delivering the original and a copy of the articles of organization to the Secretary of State.

### Articles of Organization

Art. 3.02. A. The initial Articles of Organization shall set forth:

(1) The name of the limited liability company;

(2) The period of duration, which may be perpetual;

(3) The purpose for which the limited liability company is organized which may be stated to be, or to include, the transaction of any or all lawful business for which limited liability companies may be organized under this Act;

(4) The address of its initial registered office and the name of its initial registered agent at that address;

(5) If the limited liability company is to have a manager or managers, a statement to that effect and the names and the addresses of the initial manager or managers, or if the limited liability company will not have managers, a statement to that effect and the names and the addresses of the initial members;

(6) The name and the address of each organizer, unless the limited liability company is being organized

Case 9:08-cv-01470-PLM Document 8 Filed 06/26/2008 Page 22 of 38

Art. 4.02. A. The regulations may establish classes or groups of one or more members having certain expressed relative rights, powers, and duties, including voting rights, and may provide for the future creation, in the manner provided in the regulations, of additional classes or groups of members having certain relative rights, powers, or duties, including voting rights, expressed either in the regulations or at the time of creation. The rights, powers, or duties of a class or group may be senior to those of one or more existing classes or groups of members.

B to D. Repealed by Acts 1993, 73rd Leg., ch. 215, § 1.32(3), eff. Sept. 1, 1993.

## Liability to Third Parties

Art. 4.03. A. Except as and to the extent the regulations specifically provide otherwise, a member or manager is not liable for the debts, obligations or liabilities of a limited liability company including under a judgment decree, or order of a court.

B. Transaction of business outside state. It is the intention of the legislature by the enactment of this Act that the legal existence of limited liability companies formed under this Act be recognized beyond the limits of this state and that, subject to any reasonable registration requirements, any such limited liability company transacting business outside this state be granted the protection of full faith and credit under Section 1 of Article IV of the Constitution of the United States.

C. Parties to actions. A member of a limited liability company is not a proper party to proceedings by or against a limited liability company, except where the object is to enforce a member's right against or liability to the limited liability company.

## Nature of Membership Interest

Art. 4.04. A. A membership interest is personal property. A member has no interest in specific limited liability company property.

## Assignment of Membership Interest

Art. 4.05. A. Unless otherwise provided by the regulations:

(1) a membership interest is assignable in whole or in part;

(2) an assignment of a membership interest does not of itself dissolve the limited liability company or entitle the assignee to participate in the management and affairs of the limited liability company or to become or

7

exercise any rights of a member;

(3) an assignment entitles the assignee to be allocated income, gain, loss, deduction, credit, or similar items, and to receive distributions, to which the assignor was entitled, to the extent those items are assigned, and, for any proper purpose, to require reasonable information or account of transactions of the limited liability company and to make reasonable inspection of the books and records of the limited liability company; and

(4) until the assignee becomes a member, the assignor member continues to be a member and to have the power to exercise any rights or powers of a member, except to the extent those rights or powers are assigned.

B. The regulations may provide that a member's membership interest may be evidenced by a certificate of membership interest issued by the limited liability company, may provide for the assignment or transfer of membership interests represented by a certificate, and may make other provisions with respect to the certificate.

C. Until an assignee of the interest of a member in a limited liability company is admitted as a member, the assignee does not have liability as a member solely as a result of the assignment.

## Rights of Judgment Creditor

Art. 4.06. A. On application to a court of competent jurisdiction by a judgment creditor of a member or any other owner of a membership interest, the court may charge the membership interest of the member or other owner with payment of the unsatisfied amount of the judgment. Except as otherwise provided in the regulations to the extent that the membership interest is charged in this manner, the judgment creditor has only the rights of an assignee of the interest. This Section does not deprive any member of the benefit of any exemption laws applicable to that member's membership interest.

## Right of Assignee to Become Member

Art. 4.07. A. An assignee of a membership interest may become a member if and to the extent that:

(1) the regulations provide; or

(2) all members consent.

B. An assignee who becomes a member has, to the extent assigned, the rights and powers and is subject to the restrictions and liabilities of a member under the regulations and this Act. Unless otherwise provided by regulations, an assignee who becomes a member also is liable for the obligations of the assignor to make contributions but is not obligated for liabilities unknown to the assignee at the time the assignee became a

C. whether or not an assignee of a membership interest becomes a member, the assignor is not released from the assignor's liability to the limited liability company.

Case 1:08-cv-01470-PLF    Document 18    Filed 06/26/2008    Page 24 of 38

PART FIVE

## Form of Contribution

Art. 5.01. A. The contribution of a member may consist of any tangible or intangible benefit to the limited liability company or other property of any kind or nature, including cash, a promissory note, services performed, a contract for services to be performed, or other interests in or securities or other obligations of any other limited liability company, domestic or foreign, or other entity.

Art. 5.01 amended by Acts 1997, 75th Leg., ch. 375, § 65, eff. Sept. 1, 1997.

## Liability for Contribution Obligations

Art. 5.02. A. A promise by a member to make a contribution to, or otherwise pay cash or transfer property to, a limited liability company is not enforceable unless set out in writing and signed by the member.

B. Except as otherwise provided by the articles of organization or regulations, a member or the member's legal representative or successor is obligated to the limited liability company to perform an enforceable promise to make a contribution to or otherwise pay cash or transfer property to a limited liability company, notwithstanding the member's death, disability, or other change in circumstances. If a member or a member's legal representative or successor does not make a contribution or other payment of cash or transfer of property required by the enforceable promise, whether as a contribution or with respect to a contribution previously made, that member or the member's legal representative or successor is obligated, at the option of the limited liability company, to pay to the limited liability company an amount of cash equal to that portion of the agreed value, as stated in the regulations or in the limited liability company records required to be kept under Article 2.22 of this Act, of the contribution represented by the amount of cash that has not been paid or the value of the property that has not been transferred.

C. The regulations may provide that the interest of a member who fails to make a payment of cash or transfer of property to the limited liability company, whether as a contribution or with respect to a contribution previously made, required by an enforceable promise is subject to specified consequences. A consequence may take the form of a reduction of the defaulting member's percentage or other interest in the limited liability company, subordination of the member's interest to that of nondefaulting members, a forced sale of the member's interest, forfeiture of the member's interest, the lending of money to the defaulting member by other members of the amount necessary to meet the defaulting member's commitment, a determination of the value of the defaulting member's interest by appraisal or by formula and redemption or sale of the interest at that

D. Unless otherwise provided by the regulations, the obligation of a member or a member's legal representative or successor to make a contribution or otherwise pay cash or transfer property or to return cash or property paid or distributed to the member in violation of this Act or the regulations may be compromised or released only by consent of all of the members. Notwithstanding the compromise or release, a creditor of a limited liability company who extends credit or otherwise acts in reasonable reliance on that obligation, after the member signs a writing that reflects the obligation and before the writing is amended or canceled to reflect the compromise or release, may enforce the original obligation. A conditional obligation may not be enforced unless the conditions of the obligation have been satisfied or waived as to or by the applicable member. Conditional obligations include contributions payable on a discretionary call of a limited liability company, prior to the time the call occurs.

Art. 5.02, Sec. D amended by Acts 1997, 75th Leg., ch. 375, § 66, eff. Sept. 1, 1997.

## Allocation of Profits and Losses

Art. 5.02-1. A. The profits and losses of a limited liability company shall be allocated among the members and among classes of members in the manner provided in the regulations. If the regulations do not otherwise provide, the profits and losses shall be allocated in accordance with the then current percentage or other interest in the limited liability company of the members stated in limited liability company records of the kind described in Section A of Article 2.22 of this Act.

## Sharing of Distributions

Art. 5.03. A. Distributions of cash or other assets of a limited liability company shall be made to the members in the manner provided by the regulations. If the regulations do not otherwise provide, distributions shall be made on the basis of the agreed value, as stated in the records required to be kept under Article 2.22 of this Act, of the contributions made by each member.

## Interim Distributions

Art. 5.04. A. Except as otherwise provided by this Article, a member is entitled to receive distributions from a limited liability company before the member's withdrawal from the limited liability company and before the winding up of the limited liability company to the extent and at the times or on the occurrence of the events specified in the regulations.

## Withdrawal or Expulsion of Member

Art. 5.05. A. member may withdraw or be expelled from a limited liability company at the time or on the

EXHIBIT C

FILED
LOS ANGELES SUPERIOR COURT

JAN 2 6 2005

JOHN A. CLARKE, CLERK

BY J. LORENZ, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| LISA KATONA GALAZ, an individual,<br><br>        Plaintiff,<br><br>    v.<br><br>MARIAN OSHITA, an individual; WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC a California Limited Liability Company, formerly named ARTIST COLLECTIONS GROUP, LLC, and DOES 1 through 10, inclusive,<br><br>        Defendants. | CASE NO. BC 297015<br><br>PLAINTIFF'S JUDGMENT ON JURY VERDICT |

This action came on regularly for trial on December 6, 2004, in Department 14 of the Superior Court, the Hon. Alan Buckner Judge Presiding; the plaintiff appearing by attorney Brian D. Boydston, Esq. defendant MARIAN OSHITA appearing by attorney Michael Harris, Esq., and defendants WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, WORLDWIDE SUBSIDY GROUP, LLC

1

a California Limited Liability Company, formerly named ARTIST COLLECTIONS GROUP, LLC appearing by attorney Jeffrey Bogert, Esq. A jury of twelve persons and two alternates was regularly impaneled and sworn. Witnesses were sworn and testified. After hearing the evidence and arguments of counsel, the jury was duly instructed by the Court and the cause was submitted to the jury with directions to return a verdict on special issues. The jury deliberated and thereafter returned into court with its verdict as follows:


We answer the questions submitted to us as follows:


(1) Did Marian Oshita represent to Raul Galaz that $50,000 was then owed to her for unreimbursed expenses?


_____ Yes    _____ No


Answer: Yes


If your answer to question 1 is yes, then answer question 2. If you answered no, go to Question 8.


(2) Was Marian Oshita's representation false?


_____ Yes    _____ No


Answer: Yes

1    If your answer to question 2 is yes, then answer question 3. If
2    you answered no, go to Question 8.

4    (3)  Did Marian Oshita know that this representation was false
5    when she made it, or that she made the representation recklessly and
6    without regard for its truth?

8    _____ Yes    ___ ___ No

10    Answer: Yes

12    If your answer to question 3 is yes, then answer question 4. If
13    you answered no, go to Question 8.

15    (4)  Did Marian Oshita intend that Raul Galaz rely on the
16    representation?

18    _____ Yes    _____ No

20    Answer: Yes

22    If your answer to question 4 is yes, then answer question 5. If
23    you answered no, go to Question 8.

25    (5)  Did Raul Galaz reasonably rely on Marian Oshita's
26    representation?

28    _____ Yes    _____ No

3

1 | each member of the companies;

2 |          (b) Copies of the companies' articles of organization and
3 | all amendments thereto;

4 |          (c) Copies of all the companies' tax returns, if any, for
5 | the last six years;

6 |          (d) Copies of the companies' financial statements, if any,
7 | for the last six years; and

8 |          (e) The books and records of the companies as they relate
9 | to the internal affairs of the companies for the current and last four
10 | years.

11 |

12 |          _____ Yes     _____ No

13 |

14 |     Answer: Yes

15 |

16 |     If your answer to question 8 is yes, then answer question 9. If
17 | you answered no and your answer to any of Questions 1 through 7 was
18 | no, go to Question 10.  If you answered no and your answer to Question
19 | 7 was yes, have the presiding juror sign and date this form.

20 |

21 |     (9)  What damages, if any, do you award Lisa Galaz for Marian
22 | Oshita's breach of fiduciary duties: $_____.

23 |

24 |     Answer: $18,750

25 |

26 |     If your answer to any of Questions 1 through 7 was no go to
27 | Question 10.  If your answer to Question 7 was yes, have the presiding
28 | juror sign and date this form.

                                      5

(10) Do you find that both Marian Oshita and Raul Galaz consented to the transfer of Raul Galaz' membership interest, as opposed to merely an economic interest, in Worldwide Subsidy Group-Texas to Lisa Galaz?


_____ Yes    _____ No


Answer: Yes


Go to the next question.


(11) Do you find that both Lisa Galaz and Raul Galaz consented to the transfer of Raul Galaz' membership interest, as opposed to merely an economic interest, in Worldwide Subsidy Group-Texas to Marian Oshita?


_____ Yes    _____ No


Answer: No


Got to Question 12.


(12) Do you find that Raul Galaz consented to the transfer of Raul Galaz' membership interest, as opposed to merely an economic interest, in Worldwide Subsidy Group-California to Lisa Galaz?


_____ Yes    _____ No


6

1      Answer: Yes

2

3      If your answer to Question 2 is yes, go to Question 13.  If your

4   answer is no, have the presiding juror sign and date this form.

5

6      (13) Do you find that Lisa Galaz consented to the transfer of

7   Raul Galaz' membership interest, as opposed to merely an economic

8   interest, in Worldwide Subsidy Group-California to Marian Oshita?

9

10              _____ Yes    _____ No

11

12      Answer: No

13

14      The presiding juror must now sign and date this form.

15   Dated: 12/17/04         /s/Michael L. Taylor, Presiding Juror

16

17      The jury was polled and answered in agreement with the verdict

18   as read.

19      It appearing by reason of said verdict that the plaintiff LISA

20   KATONA GALAZ is entitled to a judgment against the defendant MARIAN

21   OSHITA,

22      NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED BY THIS COURT

23   as follows:

24

25      (1)  that the sale from plaintiff, LISA KATONA GALAZ's assignor,

26   Raul Galaz, to defendant MARIAN OSHITA, of a 37.5% interest in

27   WORLDWIDE SUBSIDY GROUP, LLC a Texas Limited Liability Company, dba

28   INDEPENDENT PRODUCERS GROUP, and a 37.5% interest in WORLDWIDE SUBSIDY

7

1  GROUP, LLC a California Limited Liability Company, formerly named

2  ARTIST COLLECTIONS GROUP, LLC, is hereby rescinded;

3      (2)  that by virtue of such rescission, from the date of entry

4  of this judgment, plaintiff, LISA KATONA GALAZ, is the owner of a 75%

5  economic and membership interest in WORLDWIDE SUBSIDY GROUP, LLC a

6  Texas Limited Liability Company, dba INDEPENDENT PRODUCERS GROUP, and

7  a 75% economic and membership interest in WORLDWIDE SUBSIDY GROUP, LLC

8  a  California  Limited  Liability  Company,  formerly  named  ARTIST

9  COLLECTIONS GROUP, LLC;

10      (3)  that the books of WORLDWIDE SUBSIDY GROUP, LLC a Texas

11  Limited  Liability  Company,  dba  INDEPENDENT  PRODUCERS  GROUP,  and

12  WORLDWIDE SUBSIDY GROUP, LLC a California Limited Liability Company,

13  formerly named ARTIST COLLECTIONS GROUP, LLC be adjusted to reflect

14  that on May 14, 2002, Mr. Galaz received a draw of $50,000; and

15      (4)  that plaintiff, LISA KATONA GALAZ, have and recover from

16  said defendant, MARIAN OSHITA, the sum of $18,750, with interest

17  thereon at the rate of ten percent (10%) per annum from the date of

18  entry of this judgment until paid.

19  

20  DATED: Jan 26, 2005        _____

21                                   Judge of the Superior Court

22  

23  

24  

25  

26  

27  

28

**EXHIBIT  D**



MORRISN
HECKER LLP

(202) 728-3037
.........son.com
www.stinson.com

1150 18th Street N.W., Suite 800
Washington, D.C. 20036-3816

Tel (202) 785-9100
Fax (202) 572-9970

April 9, 2008

RECEIVED
APR 1 1 2008
03

<u>**VIA FEDERAL EXPRESS AND EMAIL**</u>

Brian D. Boydston
Pick & Boydston, LLP
1000 Wilshire Boulevard, Suite 600
Los Angeles, CA 90017

> Re:    Independent Producers Group's Petition to Participate in
>        Copyright Royalty Board Docket No. 2008-1 CRB CD 98-99
>        ("1998-99 Phase II Cable Distribution Proceeding").

Dear Mr. Boydston:

My firm represents the Motion Picture Association of America, Inc. ("MPAA"), which, like Independent Producers Group ("IPG"), petitioned to participate in the 1998-99 Phase II Cable Distribution Proceeding.[1] We wish to remind you that an existing agreement bars IPG from participating in that proceeding.

The Copyright Office ("Office") docketed the initial consolidated proceeding to resolve the 1998 and 1999 cable royalty disputes. While that initial proceeding was pending before the Office, two other cases, regarding the 1997 Phase II cable royalties, D.C. Circuit Court of Appeals Case Nos. 02-1033 and 02-1040, involving MPAA, IPG and the Librarian of Congress, were also pending. Pursuant to a court-ordered mediation in the appellate cases, IPG entered into a comprehensive two-part, three party settlement agreement which, by its terms, resolved all outstanding IPG claims to the 1997, 1998, and 1999 cable and satellite royalty funds ("Agreement"). MPAA previously provided the documents relevant to the Agreement to Erik Syverson of your firm on December 3, 2004 in response to a subpoena served by your firm. We are providing the documents again for your reference as **Exhibits A and B** to this letter.

The Agreement was executed in two parts. Settlement Agreement -- Part 1, attached hereto as **Exhibit A**, is a confidential settlement between MPAA and IPG, which, for due consideration paid to IPG, settled all outstanding Phase II controversies between the parties regarding the distribution of cable and satellite royalties for 1997, 1998 and 1999. Settlement Agreement -- Part 2, **Exhibit B**, is a

KANSAS CITY
OVERLAND PARK
WICHITA
WASHINGTON, D.C.
PHOENIX
ST. LOUIS
OMAHA
JEFFERSON CITY

---

[1] On March 24, 2008, the Copyright Royalty Board ("CRB") ordered the commencement of the voluntary negotiation period on April 1, 2008, pursuant to 17 U.S.C. § 803(b)(3).

DB04/762224.0060/372056.2

three-party settlement between MPAA, IPG, and the Librarian of Congress resolving the same controversies resolved in Settlement Agreement – Part 1, as well as D.C. Circuit Court of Appeals Case Nos. 02-1033 and 02-1040. Specifically, Settlement Agreement – Part 2 ensured that that IPG would not participate in distribution proceedings regarding the 1997, 1998, and 1999 cable and satellite royalty funds by requiring IPG to file withdrawals of its notices of intent to participate in royalty distribution proceedings for the years in question. IPG subsequently withdrew from the proceedings as agreed, but only as to the syndicated programming and movies categories. *See* **Exhibit C**.

At all times during the course of the negotiations which led to the Agreement, IPG was represented Jeffrey Bogert, IPG's counsel of record, who had authority to bind IPG. *See* **Exhibit A**, **Attachment A** (Bogert letter dated March 31, 2004 attesting to his authority to represent IPG). Thus, the Agreement is binding on IPG, MPAA, and the Librarian of Congress.

In light of the Agreement, IPG cannot participate in the 1998-99 Phase II Cable Distribution Proceeding. Accordingly, we ask that IPG honor the Agreement by withdrawing its Petition to Participate in the 1998-99 Phase II Cable Distribution Proceeding.

MPAA seeks an amicable resolution to this issue, and would prefer to address the matter between the parties before submitting it to the CRB. Please respond to the undersigned in writing **no later than Friday, April 18, 2008** regarding whether IPG intends to honor with the Agreement.

Sincerely,

**STINSON MORRISON HECKER** LLP

Gregory O. Olaniran

GOO:lhp

Attachments

cc:    Jane Saunders, MPAA
       Marsha Kessler, MPAA

1

## PROOF OF SERVICE

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

    I am employed in the County of Los Angeles, State of California, I am over the age of 18 years and not a party to the within entitled action; my business address is 1000 Wilshire Boulevard,

4

Suite 600, Los Angeles, CA 90017

5

    On June 26, 2008, I served the foregoing document(s) described as: **AMENDED COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION**

6

    **[X] By placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope**

7

**addressed as follows:**

8

Karin G. Pagnanelli, Esq.         Gregory O. Olaniran, Esq.
Marc E. Mayer, Esq.              Lucy Holmes Plovnick, Esq.

9

**MITCHELL SILBERBERG & KNUPP LLP**  **STINSON MORRISON HECKER LLP**
**11377 West Olympic Boulevard**      **1150 18**[TH] **Street NW, Suite 800**

10

**Los Angeles, CA 90064-1683**        **Washington, D.C. 20036-3816**
**Fax: (310) 312-3100**             **Fax: (202) 785-9163**

11

12

**[X]**   **(BY MAIL)** I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am readily familiar with

13

the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of

14

business. I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of

15

deposit for mailing affidavit.

16

**[ ]**   **(BY FEDERAL EXPRESS)** I delivered to an authorized driver by Federal Express to receive documents, in an envelope or package designated by Federal Express with

17

delivery fees paid or provided for, addressed to the person on who it is served, at the office address as last given by that person on any document filed in the cause and served on that party making service; or at that party's place of residence.

18

19

**[ ]**   **(BY PERSONAL SERVICE)**
I delivered such envelope(s) by hand to the office(s) of the addressee(s).

20

**[ ]**   **(BY FACSIMILE)** I faxed such document from Los Angeles, California to the facsimile number(s) shown on the attached service list. The sending facsimile

21

machine number is (213) 624-9073. The transmission was reported as complete and without error and the transmission report was properly issued by the transmitting

22

facsimile machine.

23

**[X]**   **(STATE)** I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

24

**[ ]**   **(FEDERAL)** I declare that I am employed in the office of a member of the bar of

25

this court at whose direction the service was made.

26

Executed on June 26, 2008, at Los Angeles, California.

27

_____
JA TOYA TWYMAN

28

      PROOF OF SERVICE

## PROOF OF SERVICE

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

I am employed in the County of Los Angeles, State of California, I am over the age of 18 years and not a party to the within entitled action; my business address is 1000 Wilshire Boulevard, Suite 600, Los Angeles, CA 90017

On June 26, 2008, I served the foregoing document(s) described as: **AMENDED COMPLAINT FOR DECLARATORY RELIEF AND RESCISSION**

**[X] By placing [ ] the original [X] a true copy thereof enclosed in a sealed envelope addressed as follows:**

Karin G. Pagnanelli, Esq.                    Gregory O. Olaniran, Esq.
Marc E. Mayer, Esq.                          Lucy Holmes Plovnick, Esq.
**MITCHELL SILBERBERG & KNUPP LLP**          **STINSON MORRISON HECKER LLP**
11377 West Olympic Boulevard                 1150 18TH Street NW, Suite 800
Los Angeles, CA  90064-1683                  Washington, D.C. 20036-3816
Fax: (310) 312-3100                          Fax: (202) 785-9163

**[X]**    **(BY MAIL)** I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am readily familiar with the firm's practice of collection and processing correspondence for mailing. It is deposited with the U.S. Postal Service on that same day in the ordinary course of business.  I am aware that on motion of party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing affidavit.

**[ ]**    **(BY FEDERAL EXPRESS)** I delivered to an authorized driver by Federal Express to receive documents, in an envelope or package designated by Federal Express with delivery fees paid or provided for, addressed to the person on who it is served, at the office address as last given by that person on any document filed in the cause and served on that party making service; or at that party's place of residence.

**[ ]**    **(BY PERSONAL SERVICE)**
I delivered such envelope(s) by hand to the office(s) of the addressee(s).

**[ ]**    **(BY FACSIMILE)** I faxed such document from Los Angeles, California to the facsimile number(s) shown on the attached service list. The sending facsimile machine number is (213) 624-9073. The transmission was reported as complete and without error and the transmission report was properly issued by the transmitting facsimile machine.

**[X]**    **(STATE)** I declare under penalty of perjury under the laws of the State of California, that the foregoing is true and correct.

**[ ]**    **(FEDERAL)** I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on June 26, 2008, at Los Angeles, California.

_____
LA TOYA TWYMAN

-1-                                    PROOF OF SERVICE